No. 2023-1359

# United States Court of Appeals
# for the Federal Circuit

———————————

KROY IP HOLDINGS, LLC,

*Plaintiff-Appellant,*

v.

GROUPON, INC.,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court for the District of Delaware, No. 1:17-cv-01405, Judge Maryellen Noreika

---

## PRINCIPAL BRIEF
## FOR PLAINTIFF-APPELLANT KROY IP HOLDINGS, LLC

---

Timothy Devlin
tdevlin@devlinlawfirm.com
(302) 449-9010
Paul M. Richter, Jr.
prichter@devlinlawfirm.com
(917) 254-5133
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806

*Attorneys for Plaintiff-Appellant*
*Kroy IP Holdings, LLC*

June 12, 2023

Claims 91-93, 95-97, 100, 103-104, and 107-111 of United States Patent No. 6,061,660 (the "'660 patent") read:

91. A method for generating an incentive program, comprising:
  providing a computer,
  providing an incentive program builder application of such computer,
  providing a database of objects associated with parameters of an incentive program,
  providing an interface of the incentive program builder application for user entry of parameters for an incentive program,
  associating an object with each parameter entered by the user,
  generating an incentive program comprising the objects associated with all of the parameters entered by the user,
  wherein the computer is a host computer provided by a host through which a sponsor offers the incentive program to a consumer,
  wherein the host, the sponsor; and the consumer are different entities, and
  wherein the host and the sponsor are different individuals or corporate entities,
  wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host,
  receiving consumer interaction through a website of the host to participate in the incentive program
  wherein the receiving comprises:
  receiving a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors.

92. The method of claim 91, wherein the receiving a consumer request comprises:
  receiving a request to search for the promotions using a name of the sponsor from among the plurality of sponsors.

93. The method of claim 91, wherein the receiving a consumer request comprises:
  receiving a request to search for the promotions using a type of promotion from among the plurality of promotions.

95. A method of incentive program generation, comprising:
  providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network,

providing an incentive program builder application, running on the host computer, builder application,

providing a database of objects associated with parameters of said incentive program builder application,

providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program,

wherein the sponsor builds an incentive program by interacting with the incentive program builder application,

wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer,

wherein the host, the sponsor; and the consumer are different entities, and

wherein the host and the sponsor are different individuals or corporate entities,

wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host, and

receiving consumer interaction through a website of the host to participate in the incentive program,

wherein the receiving comprises:

receiving a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors.

96. The method of claim 95, wherein the receiving a consumer request comprises:

receiving a request to search for the promotions using a name of the sponsor from among the plurality of sponsors.

97. The method of claim 95, wherein the receiving a consumer request comprises:

receiving a request to search for the promotions using a type of promotion from among the plurality of promotions.

100. A method of incentive program generation and redemption, comprising:

providing a host computer, said host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network,

providing an incentive program builder application, running on the host computer,

providing a database of objects associated with parameters of said incentive program builder application,

providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program offered to a customer; wherein the sponsor builds an incentive program by interacting with the interface of the incentive program builder application;

issuing an award to the consumer in accordance with the incentive program, wherein the incentive program is a promotion of the sponsor to the consumer facilitated by the host;

receiving, from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer;

validating the award using the database,

wherein the host, the sponsor; and the consumer are different individuals or corporate entities,

wherein the host computer is provided by a host through which the sponsor offers the incentive program to a consumer,

wherein the host computer hosts a website of the host through which the sponsor builds the incentive program; and

providing an interface of a website of the host, wherein the consumer interacts with the interface to participate in the incentive program,

wherein the website of the host provides to the consumer incentive programs of a plurality of sponsors.

103. A method of incentive program generation, comprising:

providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;

providing an incentive program builder application, running on the host computer;

providing a database of objects associated with parameters of said incentive program builder application; and

providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program,

wherein the sponsor builds an incentive program by interacting with the incentive program builder application,

wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer,

wherein the host, the sponsor; and the consumer are different entities,

wherein the host and the sponsor are different individuals or corporate entities,

wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host; and

issuing an electronic card to the consumer, the electronic card storing information of the consumer for accessing the promotion of the sponsor offered to the consumer.

104. The method of claim 103, further comprising validating participation of the consumer in the promotion using the electronic card.

107. A method of incentive program generation and redemption, comprising:

providing a host computer, said host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;

providing an incentive program builder application, running on the host computer;

providing a database of objects associated with parameters of said incentive program builder application;

providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program offered to a customer, wherein the sponsor builds an incentive program by interacting with the interface of the incentive program builder application;

issuing an award to the consumer in accordance with the incentive program, wherein the incentive program is a promotion of the sponsor to the consumer facilitated by the host;

receiving, from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer;

validating the award using the database,

wherein the host, the sponsor, and the consumer are different individuals or corporate entities; and

issuing an electronic card to the consumer, the electronic card storing information of the consumer for accessing the promotion of the sponsor offered to the consumer.

108. The method of claim 107 further comprising validating participation of the consumer in the promotion using the electronic card.

109. The method of claim 107, wherein the validating comprises validating the award using the database and the electronic card.

110. The method of claim 107, wherein the electronic card indicates participation of the consumer in the promotion.

111. A method of incentive program generation, comprising:

    providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;

    providing an incentive program builder application, running on the host computer;

    providing a database of objects associated with parameters of said incentive program builder application;

    providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program builder application;

    receiving first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors;

    receiving second input from a consumer selecting an incentive program from among the plurality of incentive programs;

    issuing an award to the consumer corresponding to the Selected incentive program;

    receiving a request to validate the award; and

    validating the award.

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

| | |
|---|---|
| **Case Number** | 2023-1359 |
| **Short Case Caption** | Kroy IP Holdings, LLC v. Groupon, Inc. |
| **Filing Party/Entity** | Appellant: Kroy IP Holdings, LLC |

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 06/12/2023

Signature: /s/ Timothy Devlin

Name: Timothy Devlin

i

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Kroy IP Holdings, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Devlin Law Firm LLC | Timothy Devlin | Paul M. Richter, Jr. |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)   ☐   No   ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ....................................................................v

STATEMENT OF RELATED CASES ....................................................1

JURISDICTIONAL STATEMENT ..........................................................2

STATEMENT OF THE ISSUES...............................................................3

STATEMENT OF THE CASE...................................................................4

   A.  Procedural Background of the Underlying District Court Case......................4

   B.  Kroy's '660 Patent at Issue in this Appeal ......................................8

   C.  The District Court's Decision on Collateral Estoppel, which Resulted in It
Dismissing the Second Amended Complaint Below.............................................13

SUMMARY OF THE ARGUMENT .....................................................19

STANDARD OF REVIEW ...................................................................21

ARGUMENT .........................................................................................22

   A.  Collateral Estoppel Should Not Apply in the District Court to Claims that
Were Not Subject to the IPR Proceedings.................................................22

   B.  Even if Collateral Estoppel Could Apply, It Should Not Have Applied To
Newly Asserted Claims 91-93, 103, 104 and 107-110 Because They Do Not
Match Any Claim Invalidated in the IPRs...............................................31

   C.  Collateral Estoppel Was Not Appropriate To Apply At The Pleadings Stage
Here In Response To A Motion to Dismiss Under Rule 12(b)(6)........................40

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ..............................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................22

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
  135 S. Ct. 1293 (2015) .......................................... 14, 24, 27

*Blonder-Tongue Labs., Inc.v. Univ. of Ill. Found.*,
  402 U.S. 313 (1971) ............................................................24

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ..........................................22

*Fellowes Inc. v. ACCO Brands Corp.*,
  2019 WL 1762910 (N.D. Ill. Apr. 22, 2019) ........................27

*Grier v. Klem*,
  591 F.3d 672 (3d Cir. 2010) ................................................22

*Grogan v. Garner*,
  498 U.S. 279 (1991) ............................................................28

*Groupon, Inc. v. Kroy IP Holdings, LLC*,
  IPR2019-00044, 2020 WL 1900398 (P.T.A.B. Apr. 16, 2020) ............................7

*Groupon, Inc. v. Kroy IP Holdings, LLC*,
  IPR2019-00061, 2020 WL 1900402 (P.T.A.B. Apr. 16, 2020) ............................6

*In re Braen*,
  900 F.2d 621 (3d Cir. 1990) ......................................... 23, 28

*In re Graham*,
  973 F.2d 1089 (3d Cir. 1992) ..............................................23

*Intellectual Ventures I LLC v. Lenovo Grp. Ltd.*,
  370 F. Supp. 3d 251 (D. Mass. 2019) .................... 14, 26, 27

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
  458 F.3d 244 (3d Cir. 2006) ..................................... 23, 36, 38

*Kroy IP Holdings, LLC v. Groupon, Inc.*,
  849 F. App'x 930 (Fed. Cir. 2021) ........................................7

**Page(s)**

*M2M Solutions LLC, et al. v. Sierra Wireless Am., Inc. et al.*,
   Civil Action No. 14-1102-RGA, D.I. 213 (D. Del. Mar. 31, 2021) .............. 14, 26

*MaxLinear, Inc. v. CF CRESPE LLC*,
   880 F.3d 1373 (Fed. Cir. 2018) .................................................................... 14, 24

*McTernan v. City of York*,
   577 F.3d 521 (3d Cir. 2009) ................................................................................22

*Microsoft Corp. v. i4i Ltd. P'ship*,
   564 U.S. 91 (2011) ...............................................................................................29

*O'Shea v. Amoco Oil Co.*,
   886 F.2d 584 (3d Cir. 1989) ................................................................................29

*Ohio Willow Wood Co. v. Alps South, LLC*,
   735 F.3d 1333 (Fed. Cir. 2013) .................................................................... 14, 25

*Papst Licensing GmbH & Co., KG, v. Samsung Electronics Co., Ltd.*,
   403 F. Supp. 3d 571 (E.D. Tex. 2019) .......................................................... 26, 27

*Phil-Insul Corp. v. Airlite Plastics Co.*,
   854 F.3d 1344 (Fed. Cir. 2017) .................................................................... 38, 39

*Purdue Pharma L.P. v. Mylan Pharms. Inc.*,
   2017 WL 2569604 (D. Del. June 13, 2017) ........................................................41

*Sanofi-Aventis U.S., LLC v. Mylan GmbH*,
   2019 U.S. Dist. LEXIS 170790 (D.N.J. Oct. 2, 2019) ........................................27

*Shell Petroleum, Inc. v. United States*,
   319 F.3d 1334 (Fed. Cir. 2003) ..........................................................................22

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*,
   778 F.3d 1311 (Fed. Cir. 2015) ............................................................... 14, 23, 25

*Stragent, LLC v. BMW of N. Am., LLC*,
   2021 WL 1147468 (D. Del. March 25, 2021) .....................................................40

*United Access Techs., LLC v. CenturyTel Broadband Servs. LLC*,
   778 F.3d 1327 (Fed. Cir. 2015) .................................................................... 39, 40

*XY, LLC v. Trans Ova Genetics*,
   890 F.3d 1282 (Fed. Cir. 2018) .................................................................... 13, 24

**Page(s)**

**Statutes**

35 U.S.C § 282 ................................................................29

35 U.S.C. § 316 ...............................................................29

37 C.F.R. § 42.1 ..............................................................29

**Other Authorities**

18 Charles Alan Wright & Arthur R. Miller,
    Federal Practice & Procedure § 4422 (3d ed. 1998) ...........................27

Restatement (Second) of Judgments § 28 .............................................28

**Rules**

Fed. R. Civ. P. 12 ............................................................40

## STATEMENT OF RELATED CASES

No other appeal in, or from, the same civil action below was previously before this or any other appellate Court.  However, in *Kroy IP Holdings, LLC v. Groupon, Inc.*, 849 F. App'x 930 (Fed. Cir., June 14, 2021) (Moore, C.J., Lourie, Dyk, JJ.) (Fed. Cir. Case Nos. 2020-1916, -1917), this Court summarily affirmed in a *per curiam* opinion two *inter partes* review ("IPR") decisions invalidating certain claims in a patent at issue in this appeal (United States Patent No. 6,061,660, "the '660 patent") and involving both Appellant Kroy IP Holdings, LLC ("Kroy") and Appellee Groupon, Inc. ("Groupon").

Counsel is unaware of any case pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in the pending case.

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Delaware had jurisdiction over this patent case under 28 U.S.C. §§ 1331 and 1338(a).  On January 4, 2023, Kroy timely appealed the district court's December 22, 2022 dismissal with prejudice of Kroy's complaint based on Kroy purportedly being collaterally estopped from asserting against Groupon certain claims in the '660 patent that were not invalidated by the Patent Trial and Appeal Board ("PTAB") in the prior related IPRs.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

**STATEMENT OF THE ISSUES**

1.     Whether the district court erred in concluding that the PTAB's invalidation of claims in the '660 patent in the two prior IPRs under the preponderance of the evidence standard could collaterally estop Kroy from asserting certain remaining claims in that patent, particularly when the evidentiary standard for invalidating those remaining claims in the district court would be the higher standard of clear and convincing evidence?

2.     Even if collateral estoppel might apply at the district court to claims in the '660 patent that were not part of the two prior IPRs, whether the district court erred in concluding that Kroy should be collaterally estopped from asserting any of claims 91-93, 103, 104 and 107-110, each of which was not part of either IPR and is not equivalent to any claim that was part of either IPR and therefore required the district court to start its collateral estoppel analysis for each of those claims by fabricating a hypothetical claim that the PTAB supposedly would have also (but never actually did) invalidate?

3.     Even if collateral estoppel might apply at the district court to claims in the '660 patent that were not part of the two prior IPRs, whether the district court erred in concluding that it was proper to require Kroy to address such estoppel allegations at the pleading stage of this case in response to a motion under Fed. R.Civ. P. 12(b)(6)?

## STATEMENT OF THE CASE

The '660 patent describes and claims improved systems and methods for generating, implementing, and administering computerized incentive programs. The district court erroneously found that Kroy was collaterally estopped from asserting certain claims in Kroy's patent at issue that were not subject to either of the two IPRs brought by Groupon, based on the invalidation of other claims from that patent in those two IPRs. Therefore, the district court incorrectly dismissed Kroy's Second Amended Complaint, with prejudice, based on that erroneous finding of collateral estoppel.

### A. Procedural Background of the Underlying District Court Case

Kroy filed suit against Groupon on October 6, 2017, alleging that Groupon infringed United States Patent No. 6,061,660 ("the '660 patent"), which claims a method and system for providing incentive programs over a computer network. More specifically, the '660 patent discloses an incentive builder program with an award fulfillment system that permits multiple sponsors to customize and market incentive programs through a central market place using an interface. In its original Complaint, Kroy asserted 13 exemplary claims of the '660 patent against Groupon: claims 1, 10, 16-21, 25, and 27-30. *E.g.*, Appx1014 at ¶¶ 43-44.

The original '660 patent issued on May 9, 2000, with 15 claims. The patent thereafter went through an *ex parte* reexamination, and a reexamination certificate

was issued on February 6, 2015. In the reexamination, claims 1, 2, 4, 7 and 14 were determined to be patentable as amended, claims 3, 5, 6, 8-13, and 15 were not reexamined, and new claims 16-115 were added. Appx104-109.

In October 2018, Groupon filed two *inter partes* review petitions (the "IPRs"), challenging 21 total claims in the '660 patent: claims 1, 7, 10, 12, 14, 16-21, 25, 27-30, 67-69, 87, and 101 of the '660 patent (the "Invalidated Claims") with the United States Patent and Trademark Office's ("PTO"), specifically the Patent Trial and Appeal Board ("PTAB"). Appx2571; Appx2610. This included all 13 of the exemplary claims identified by Kroy in its original Complaint, plus eight additional claims of the patent. Groupon chose not to challenge the remaining '660 patent claims.

In IPR2019-00044, Groupon relied on U.S. Patent No. 5,816, as its primary reference. According to Groupon, Kelly disclosed a "system deploying promotional games over a wide area network, like the internet[,]" in which "players us[e] game units to interact with a 'host' server that provides promotional games, including games that may be supplied by a plurality of sponsors." Appx2613. In that same IPR, Groupon also relied on Microsoft® FrontPage Unleashed (1st ed. 1996) ("Stanek,"), U.S. Patent No. 5,890,175 ("Wong,", and U.S. Patent No. 5,905,895 ("Halter," as secondary references Appx2612-2613. In IPR2019-00061, Groupon relied on U.S. Patent No. 5,710,887 ("Chelliah,") as its primary reference; according

to Groupon, Chelliah disclosed an "electronic commerce system with an 'Incentives Subsystem' to create and host incentives programs on behalf of sponsors (i.e., stores)." Appx2571-2572. Groupon also relied on Halter and U.S. Patent No. 6,035,280 ("Christensen,") as secondary references. Appx2955-2956.

On February 6, 2019, a few months after Groupon filed its IPR petitions, Kroy filed an Amended Complaint in this case. In the Amended Complaint, Kroy now asserted not only the same 13 claims as it did in its original Complaint, but it also added an additional 22 claims: claims 12, 75-76, 87-89, 91-93, 95-97, 100-04, and 107-11. Appx1910-2039 at ¶¶ 49, 63-64. These additional claims were first asserted after Groupon's IPR filing deadline had passed, and nearly all of these 22 additional claims in the Amended Complaint were not included in Groupon's IPR petitions.

In April 2019, the PTAB instituted trial proceedings as to both IPR petitions and on all 21 challenged claims of the '660 patent. In May 2019, the parties jointly stipulated that the underlying district court case should be stayed, pending the issuance of Final Written Decisions by the PTAB in both IPR proceedings. On April 16, 2020, the PTAB issued Final Written Decisions in both IPRs, determining that all of the challenged claims were invalid. *See Groupon, Inc. v. Kroy IP Holdings, LLC*, IPR2019-00061, 2020 WL 1900402 (P.T.A.B. Apr. 16, 2020) (hereinafter "*Groupon I*" or "IPR2019-00061"); *Groupon, Inc. v. Kroy IP Holdings, LLC*,

IPR2019-00044, 2020 WL 1900398 (P.T.A.B. Apr. 16, 2020) (hereinafter "*Groupon II*" or "IPR2019-00044")).

In IPR2019-00061, the PTAB invalidated all of the challenged claims with the exception of claims 10 and 12, on the grounds that either Chelliah anticipated these claims or that Chelliah in combination with Christensen rendered the claims obvious. *See Groupon I*, 2020 WL 1900402, at *1, *25. In IPR2019-00044, the PTAB invalidated all of the challenged claims as obvious in light of Kelly and one or more of the relevant secondary references (*i.e.*, Stanek, Halter and/or Wong). *See Groupon II*, 2020 WL 1900398, at *1, *27.

Kroy appealed from both IPR decisions, and on June 14, 2021, this Court affirmed the PTAB's decisions, pursuant to Federal Circuit Rule 36 ("Rule 36"). *Kroy IP Holdings, LLC v. Groupon, Inc.*, 849 F. App'x 930 (Fed. Cir. 2021).

Following that affirmance, the underlying district court remained stayed while Kroy was determining whether to proceed on the asserted claims that had not been at issue in the IPRs. Both sides in the district court case agreed that discovery should remain stayed, pending a decision on whether Kroy was collaterally estopped from litigating the asserted claims that had not been at issue in the IPRs.

On March 10, 2022, Kroy filed a Second Amended Complaint which limited the underlying district court action to only 14 asserted claims, namely claims 91-93, 95-97, 100, 103-104, and 107-111 (the "Newly Asserted Claims"), none of which

was at issue in either of the IPRs. Appx2472-2479 at ¶¶ 48-80.  In response, Groupon filed a motion to dismiss the Second Amended Complaint under Rule 12(b)(6), arguing that Kroy should be collaterally estopped from asserting the Newly Asserted Claims in light of the two IPR decisions.  Following briefing, an oral argument was heard and the District of Delaware issued a decision on December 2, 2022 ("the December 2 decision") dismissing the Second Amended Complaint, with prejudice, because it found that Kroy was collaterally estopped from asserting the Newly Asserted Claims against Groupon.

## B. Kroy's '660 Patent at Issue in this Appeal

The '660 patent relates to improved systems and methods for generating, implementing, and administering computerized incentive programs. The patent claims priority to provisional applications filed on October 20, 1997 and December 10, 1997.  Appx54.  Prior to the inventions in the '660 Patent, computer systems providing incentive programs over the Internet were generally limited to offering programs "by a single sponsor and generally limited to offering consumers the ability to participate in incentive programs."  Appx80 at 4:17-24.  The known systems did not allow promotion sponsors the ability to conveniently generate incentive programs and track and automate fulfilment of awards.  *Id.*

Incentive programs prior to the invention were offered directly from the promotion sponsor through the sponsor's own server and website with specific

computer software and hardware, thus requiring the promotion sponsor to have its own database, storage capabilities, and also required the use of an independent contractor to code the computer software needed to run the incentive program. *Id*. at 4:17-22. At the time of the invention of the '660 Patent, computer incentive programs also typically relied on conventional manual methods for award fulfillment and had limited safeguards in place to prevent counterfeiting or attempts at redeeming a promotion without making the requisite purchases. Appx79 at 2:49-55; Appx81 at 5:22-26.

Thus, the '660 Patent recognized these technical drawbacks and disclosed a multifaceted computerized incentive program system that overcomes them through an architecture that utilizes "host," "sponsor," and "consumer" components. The '660 Patent discloses a multifaceted computer incentive program system that includes a "host computer" and an incentive program builder application, which permits multiple sponsors to generate customizable, interactive incentive programs from a central location, and provides verification and automated fulfillment of the awards. Appx80-81 at 5:47–7:6. The invention's use of the "host computer," instead of an individual sponsor's server or website as used in the prior art, allows multiple sponsors to quickly and efficiently create new incentive programs by interacting with the incentive program builder application running on the host computer and allows for multiple consumers to search and access the promotions through an

interface of the host system. The system also controls fraud by allowing the sponsor to invoke the host to validate the award before it is redeemed. Appx79 at 1:48-50.

Unlike in the prior art approaches, the promotion sponsor no longer had to invest significant time and resources to create a desired promotion. Sponsors no longer had to purchase special software and hardware and hire independent contractors each time a new promotion was needed. Appx81 at 5:1-10, 5:17-21. Sponsors were free to create promotions quickly and efficiently, with the additional benefit that the central host computer also allowed consumers to quickly search for and access these promotions.

Figure 2 of the '660 Patent (reproduced below) illustrates the host computer in communication over a network with respective computers of the consumer and promotion sponsors, and with a member retailer's computer system. Appx57 at Fig. 2.



Fig. 2

More specifically, Figure 2 of the '660 patent illustrates consumer computer 12, sponsor computer 14, and retailer computer 16 connected over the Internet to a host computer 18. Appx83 at 10:43–47. Sponsors build incentive programs through interaction with the host computer's incentive program builder application. Appx85 at 14:43-49.

As further shown in Figure 15 of the patent (reproduced below), host computer 18 stores consumer database 200, sponsor database 202, and award database 204, as well as files containing code for implementing a consumer site, a sponsor site, and an award site. Appx84 at 12:12-18; Appx67 at Fig. 15. In operation, a sponsor may access a sponsor site through a Web browser and register

as a sponsor in the host system. Appx85 at 14:7-13. The sponsor may choose to purchase an incentive program from the host or "build an incentive program through interaction with the host system's computer automated incentive program building capability." Appx85 at 14:26-43. "The sponsor database is updated to reflect the presence of the new incentive program, and the sponsor site . . . is updated to include a link to the new incentive program." Appx85 at 14:53-56. The sponsor may select prizes for the incentive program from an award database that includes retailer merchandise. Appx85 at 14:66–15:8.



Fig. 15

A consumer interacts with host computer 18 by accessing the consumer site with a Web browser. *Id.* at 15:60–66. The consumer may search for and select an

incentive program. Appx86 at 16:30-41. When a consumer successfully completes an incentive program, as defined by the parameters of the incentive program, host computer 18 determines what prize has been won by the consumer. Appx89 at 21:37-51. The award database is updated to reflect the association between the consumer and the prize. Appx89 at 21:59-62.  Host computer 18 may identify a retail location for fulfillment of the prize and may upload the prize information to a card processor for clearing the prize via a card network. Appx89 at 21:65–22:9. A consumer may present an electronic card to a retailer for fulfillment of the prize, whereby the retailer or merchant may validate the prize through a query to the award database. Appx89 at 22:9–26.

## C. The District Court's Decision on Collateral Estoppel, which Resulted in It Dismissing the Second Amended Complaint Below

The district court's decision begins by examining what it identifies as two lines of authority regarding collateral estoppel or "issue preclusion."  *See* Appx8-9. Specifically, the district court noted that "[t]he Federal Circuit has held that when the PTAB issues a final judgment on the invalidity of a patent claim, this will have an issue-preclusive effect on any pending or co-pending district court actions involving that same patent claim (even though the district court and PTAB, inter alia, require a patent challenger to meet different burdens of proof in order to establish invalidity)." Appx8 (citing *XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294 (Fed. Cir. 2018); *cf. MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373,

1376-77 (Fed. Cir. 2018) (applying collateral estoppel based on a PTAB decision, and stating that "[i]t is well established that collateral estoppel, also known as issue preclusion, applies" when the same issue is before a court and an administrative agency) (citing *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015))). The district court also noted that this Court has stated that its precedent does not limit collateral estoppel to patent claims that are identical, so "if the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity, collateral estoppel applies." Appx9 (citing *Soverain*, 778 F.3d at 1319 and *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013)).

In light of the above two lines of authority that it identified, the district court concluded that:

> when one considers these two lines of authority together, it follows that: (1) if the PTAB issues a final judgment invalidating a patent claim; and (2) if another claim in the same patent is at issue in a district court litigation; and (3) if any differences between the two claims do not materially alter the question of invalidity regarding the district court claim; then (4) the patentee will be collaterally estopped from litigating the district court claim (assuming the other requirements of the collateral estoppel doctrine are met). *See M2M Solutions LLC, et al. v. Sierra Wireless Am., Inc. et al.*, Civil Action No. 14-1102-RGA, D.I. 213 at 5-7 (D. Del. Mar. 31, 2021) (granting summary judgment on collateral estoppel grounds regarding patent claims that were not materially different from claims in the same patent that had been previously invalidated by the PTAB); *Intellectual Ventures I LLC v. Lenovo Grp. Ltd.*, 370 F. Supp. 3d 251, 257 (D. Mass. 2019) ("PTAB decisions have a collateral-estoppel effect in district court on

14

> unadjudicated claims that do not 'materially alter the question of invalidity.'")

Appx9.  The district court then applied the above test that it constructed to the fourteen Newly Asserted Claims, by comparing them to selected Invalidated Claims that were invalidated in the two IPRS.  *See* Appx11-34.  In each instance, the district court found that the Newly Asserted Claims were not materially different from the selected Invalidated Claims to which they were compared.  Therefore, the district court concluded that Kroy was collaterally estopped from asserted any of the Newly Asserted Claims against Groupon and dismissed the Second Amended Complaint, with prejudice.

Specifically, the district court made the following conclusions in its decision when comparing selected Newly Asserted Claims from the Second Amended Complaint to selected Invalidated Claims from the the two IPRs:

1. Newly Asserted Claim 111 is "nearly identical" to Invalidated Claim 14, which the PTAB found (i) anticipated by Chellliah, (ii) obvious over Chelliah and Christensen, (iii) obvious over Kelly and Stanek and (iv) obvious over Kelly and Wong (Appx11-17);

2. Newly Asserted Claim 95 is "nearly identical" to Invalidated Claim 87, which the PTAB found (i) anticipated by Chellliah, (ii) obvious over Chelliah and Christensen, (iii) obvious over Kelly and Stanek and (iv) obvious over Kelly and Wong (Appx11-17);

3. With regard to Newly Asserted Claim 100, "[m]uch (though not all) of the content of claim 100's method is found in the similarly-worded system claim of Invalidated Claim 16, which the PTAB found (i) anticipated by Chellliah, (ii) obvious over Chelliah and Christensen and (iii) obvious over Kelly and Stanek (Appx17-18);

4. Another portion of Newly Asserted Claim 100 was not found in Invalidated Claim 16, relating to websites through which sponsors and consumers interact with the host, but those website elements are referenced, in similarly worded form, in Invalidated Claims 17 and 29 (both which depend from Invalidated Claim 16), which the PTAB concluded (as to Claim 17) was obvious over Chellliah in view of Christenson and (as to Claim 29) concluded was (i) anticipated by Chelliah, (ii) obvious over Chelliah and Christenson and (iii) obvious over Kelly and Stanek (Appx18-22);

5. As to Newly Asserted Claims 103 and 107, which were addressed collectively and solely with respect to the language of Newly Asserted Claim 107, the only element missing from Invalidated Claim 1 (which the PTAB found obvious over Kelly and Stanek) and found in Newly Asserted Claim 107 is Claim 107's final "electronic card" limitation ("issuing an electronic card to the consumer, the electronic card storing information of the consumer for accessing the promotion of the sponsor offered to the consumer"), but

16

Invalidated Claim 12 did have an electronic card limitation and the PTAB concluded that Kelly and Stanek disclosed that limitation (Appx22-25);

6. As for Newly Asserted Claims 104 and 108-110, each of which depends from either Newly Asserted Claim 103 (for Claim 104) or107 (for Claims 108-110), they contain further limitations relating to the electronic card element in requiring "validating participation of the consumer in the promotion using the electronic card" or "validating the award using the database and the electronic card" or "wherein the electronic card indicates participation of the consumer in the promotion," Kelly disclosed the use of the electronic card for each of the foregoing purposes (Appx26-28);

7. Regarding Newly Asserted Claim 91, as compared to Invalidated Claims 7 and 87, which the PTAB found (i) anticipated by Chellliah, (ii) obvious over Chelliah and Christensen, (iii) obvious over Kelly and Stanek and (iv) obvious over Kelly and Wong, there is not an equivalent of every Claim 91 element in each of Claims 7 and 87, but the equivalent of every such Claim 91 element was found in either Claim 7 or 87 (Appx28-30);

8. Regarding Newly Asserted Claims 96-97, Newly Asserted Claim 95 (from which Claims 96-97 depend) requires, *inter alia*, that the claimed method comprises "receiving a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of

sponsors," (Appx82 at 7:32-34), Claim 96 simply adds that the consumer request must involve searching for the promotions "using a *name of the sponsor*[,]" and claim 97 adds only that the request has to involve searching by "*type of promotion*[.]" (Appx82 at 7:37-39, 7:43-45 (emphasis added)), which are found in the same prior art that invalidated Claim 87 at the PTAB (as set forth above)) (Appx31-33); and

9. Finally, with regard to Newly Asserted Claims 92 and 93 (which depend from New Asserted Claim 91), they add to that Claim 91 the same additional information cited above regarding Newly Asserted Claims 96 and 97, namely Claim 92 adds a limitation that the method receives a request to search for incentive programs by sponsor name, while Claim 93 adds that the request requires searching by program type (Appx81 at 6:58-67), so given the application of collateral estoppel to Newly Asserted Claims 96 and 97 in light of the disclosures in certain of the invalidating art listed above, Kroy is also estopped from asserting Newly Asserted Claims 92 and 93.

In each instance, following the above comparison of Newly Asserted Claims to the Invalidated Claims from the IPRs, the district court found that collateral estoppel applied because there were no material differences as between the former and the latter.

Finally, although it did not directly address the appropriateness of deciding collateral estoppel at the pleadings stage, pursuant to a Rule 12(b)(6) motion to dismiss, the district court did note at the end of its opinion that "[t]his is one of those (perhaps somewhat rare) circumstances where, even at the motion to dismiss stage, a defendant has demonstrated that a plaintiff is collaterally estopped from asserting certain patent claims in light of the PTAB's decision that other (slightly-differently-worded) claims of the same patent were invalid." Appx34.

## SUMMARY OF THE ARGUMENT

(1)    There does not appear to be any precedent addressing the exact circumstances of this case. There is precedent of this Court holding that collateral estoppel applies to claims in litigation where the *same* claim is invalidated in a final decision by the PTAB in an IPR. There is also precedent of this Court teaching that collateral estoppel can reach claims in a district court case that are not materially different from claims invalidated *by another district court*. These are the two lines of authority cited by the district court. However, Kroy is not aware of any precedent addressing the situation here, where claims invalidated by the PTAB in IPRs under the lesser preponderance of the evidence standard are used to collaterally estop claims from the same patent in litigation subject to the higher "clear and convincing evidence" standard for invalidity, when those litigation claims were not subject to the IPRs and are not the same as the invalidated claims in the IPRs.

19

That is why the district court constructed its own (erroneous) test for collateral estoppel. That test should be rejected. This Court should hold that collateral estoppel does not apply here, where the standards of proof are different and the claims in the litigation and the IPRs were not the same. The invalidation of a first set of claims a patent by the PTAB in an IPR under the lesser preponderance of evidence standard should not be a basis for collaterally estopping a second set of claims in the same patent asserted in a district court litigation, where that second set of claims are subject to the higher clear and convincing evidence standard of proof for invalidity and are not the same as any of the claims invalidated in the IPR.

The district court's decision should be reversed on that basis alone as to its application of collateral estoppel to all of the Newly Asserted Claims and its dismissal, with prejudice, of the Second Amended Complaint.

(2) Even if the district court's test were correct and collateral estoppel could apply here, it still should not apply to Newly Asserted Claims 91-93, 103-104 and 107-110. The district court was unable to find a single claim among the Invalidated Claims to compare to any of these Newly Asserted Claims. Instead, it constructed hypothetical claims for that comparison, concluded that the PTAB would have invalidated those hypothetical claims, and then found that the invalidation of the hypothetical claims was a basis for collaterally estopping the above Newly Asserted Claims. That goes too far. By any maxim of logic, the district court's need to

20

fabricate a hypothetical claim and conclusion of the PTAB for it proves that the issue of validity for these Newly Asserted Claims was never previously adjudicated and Kroy cannot possibly have had the opportunity to actually have litigated it (a foundational principle of collateral estoppel).  None of this Court's precedent condones such shorthand attacks on a patentee's property and due process rights.

On this additional basis, the district court's December 2 decision should be reversed at least as to collateral estoppel of Newly Asserted Claims 91-93, 103-104 and 107-110, and its dismissal of the Second Amended Complaint as to those claims should be reversed as well.

(3) Even if collateral estoppel might apply at the district court to claims in the '660 patent that were not part of the two IPRs, the district court erred in concluding that it was proper to require Kroy to address such estoppel allegations at the pleading stage of the case in response to a motion under Fed. R. Civ. P. 12(b)(6).  At the very least, such allegations should have been decided on summary judgment, where expert and other evidence could have been taken on the claims and teachings of the prior art, which could have been relevant to the collateral estoppel analysis and comparison of the district court and IPR claims.

## STANDARD OF REVIEW

This Court "review[s] a district court's dismissal for failure to state a claim under the law of the regional circuit." *Content Extraction & Transmission LLC v.*

21

*Wells Fargo Bank, Nat'l Ass'n,* 776 F.3d 1343, 1346 (Fed. Cir. 2014).  The Third Circuit exercises plenary (*de novo*) review over a district court's grant of a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  *See Grier v. Klem,* 591 F.3d 672, 676 (3d Cir. 2010).  "In deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them."  *McTernan v. City of York,* 577 F.3d 521, 526 (3d Cir. 2009) (internal quotation marks and citation omitted).  And to withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks and citation omitted).

This Court reviews *de novo* a trial court's application of collateral estoppel (also known as issue preclusion).  *See Shell Petroleum, Inc. v. United States,* 319 F.3d 1334, 1338 (Fed. Cir. 2003).

## ARGUMENT

### A. Collateral Estoppel Should Not Apply in the District Court to Claims that Were Not Subject to the IPR Proceedings

As set forth above, this Court "review[s] a district court's dismissal for failure to state a claim under the law of the regional circuit."  *Content Extraction,* 776 F.3d at 1346.  Moreover, when evaluating questions of collateral estoppel in a patent case,

a district court must apply regional circuit law to the general procedural question of whether collateral estoppel applies, while applying this Court's law to questions "involving substantive issues of patent law, issues of [collateral estoppel] that implicate substantive patent law issues, or issues of [collateral estoppel] that implicate the scope of [this Court's] own previous decisions." *See Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015).

Under Third Circuit law, collateral estoppel applies only when: "(1) the issue sought to be precluded [is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment." *In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992) (citations omitted).[1] However, these elements are themselves subject to many longstanding exceptions, including that the issues are not identical when the movant carries a significantly higher burden in the subsequent action than it did in the first (*see, e.g.*, *In re Braen*, 900 F.2d 621, 624 (3d Cir. 1990), *abrogated on other grounds by*, *In re Graham*, 973 F.2d at 1099–1101) and the

---

[1] More recently, the Third Circuit has identified these four requirements that must be met in order for the doctrine of collateral estoppel to apply as being: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (internal quotation marks and citation omitted).

issues are not "actually litigated" in a prior action when a party is denied a full and fair opportunity to do so (*see, e.g.*, *Blonder-Tongue Labs., Inc.* v. *Univ. of Ill. Found.*, 402 U.S. 313, 333 (1971)).

Here, the district court identified two lines of caselaw that it deemed pertinent to deciding the motion to dismiss on the question of collateral estoppel. First, the district court examined cases from this Court where the PTAB issued a final decision invalidating a patent claim and the same claim was being litigated in a district court:

> The Federal Circuit has held that when the PTAB issues a final judgment on the invalidity of a patent claim, this will have an issue-preclusive effect on any pending or co-pending district court actions involving that same patent claim (even though the district court and PTAB, *inter alia*, require a patent challenger to meet different burdens of proof in order to establish invalidity). *See XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294 (Fed. Cir. 2018); *cf. MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1376-77 (Fed. Cir. 2018) (applying collateral estoppel based on a PTAB decision, and stating that "[i]t is well established that collateral estoppel, also known as issue preclusion, applies" when the same issue is before a court and an administrative agency) (citing *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015)).

Appx8.

Next, the district court reviewed a second line of cases from this Court where collateral estoppel was applied to a first set of claims in one litigation based on invalidation in another litigation of a second set of claims that were not identical to the first set. Specifically, the district court observed:

24

> The Federal Circuit has further held that "[c]omplete identity of claims is not required to satisfy the identity-of-issues requirement for claim preclusion." *Soverain*, 778 F.3d at 1319; *see also Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013) ("Our precedent does not limit collateral estoppel to patent claims that are identical."). Rather, the inquiry in that instance hinges on the "identity of the *issues* that were litigated." *Ohio Willow Wood Co.*, 735 F.3d at 1342 (emphasis in original). In other words, if "the differences between the unadjudicated patent claims and adjudicated patent claims do not *materially alter the question of invalidity*, collateral estoppel applies." *Id.* (emphasis added).

Appx8.

The district court then blended those two lines of authority to form its own test of collateral estoppel in a situation, like here, where the PTAB invalidates on IPR one set of claims and a separate set of non-identical claims in the same patent were not involved in that IPR and are asserted in litigation. According to the district court, the test in such a situation should be: "(1) if the PTAB issues a final judgment invalidating a patent claim; and (2) if another claim in the same patent is at issue in a district court litigation; and (3) if any differences between the two claims do not materially alter the question of invalidity regarding the district court claim; then (4) the patentee will be collaterally estopped from litigating the district court claim (assuming the other requirements of the collateral estoppel doctrine are met)." Appx9 (citing *M2M Solutions LLC, et al. v. Sierra Wireless Am., Inc. et al.*, Civil

25

Action No. 14-1102-RGA, D.I. 213 at 5-7 (D. Del. Mar. 31, 2021) and *Intellectual*

*Ventures I LLC v. Lenovo Grp. Ltd.*, 370 F. Supp. 3d 251, 257 (D. Mass. 2019)).

Notably, however, the district court was not able to identify any controlling

precedent from this Court addressing the present situation, instead relying solely on

the two district court cases cited above as support for its test of collateral estoppel in

these circumstances.  Research did not reveal any such precedent either.  Thus, this

case appears to present a case of first impression that is important for this Court to

decide.

Specifically, collateral estoppel should not be applied in instances like those

present here, where a lower standard of proof (preponderance of the evidence) is

applied by the PTAB to invalidate one set of claims in a patent that are not identical

to a second set of claims in the same patent being litigated under a much higher

standard of proof (clear and convincing evidence) relative to validity.  While this

Court has never directly addressed this question, at least some district courts have

contemplated it.

For example, in *Papst Licensing GmbH & Co., KG, v. Samsung Electronics*

*Co., Ltd.,* 403 F. Supp. 3d 571 (E.D. Tex. 2019), a district court considering the

differing standards of proof at the PTAB and in district court litigation relative to

collateral estoppel noted:

> The Court is not persuaded that issue preclusion should
> apply in this case. The parties do not present, and the Court

has not found, any binding precedent addressing whether a finding of invalidity under the preponderance of the evidence standard in an IPR collaterally estops invalidity arguments for separate, unadjudicated claims under the clear and convincing standard in a district court. The Supreme Court in *B & B Hardware* noted that the Restatement standards allow for some "well-known" exceptions to issue preclusion. *See* 135 S. Ct. at 1303, 1309–10 ; *see Papst*, 924 F.3d at 1251 (explaining same). One such exception is when the party seeking preclusion "has a significantly heavier burden than he had in the first action." Restatement (Second) of Judgments § 28(4) (1982) ; *see also* 18 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 4422 (3d ed. 1998) ("[A] party who has carried the burden of establishing an issue by a preponderance of the evidence is not entitled to assert preclusion in a later action that requires proof of the same issue by a higher standard."). *But see Fellowes Inc. v. ACCO Brands Corp.*, 2019 WL 1762910, at *6 (N.D. Ill. Apr. 22, 2019) (finding opposite but for same claims); *Intellectual Ventures I v. Lenovo Grp.*, 370 F. Supp. 3d 251, 256 (D. Mass. 2019) (applying findings of invalidity for independent claims to their dependent claims in the same patent).

*Papst Licensing,* 403 F. Supp. 3d at 571, 602 (finding further that "even accepting Samsung's argument that collateral estoppel could apply, Samsung has failed to show that it does apply and would require judgment as a matter of law of invalidity.")

Likewise, the District of New Jersey contemplated the same question in *Sanofi-Aventis U.S., LLC v. Mylan GmbH,* 2019 U.S. Dist. LEXIS 170790 (D.N.J. Oct. 2, 2019) (rejecting Mylan's assertion that collateral estoppel should apply to claims in litigation based on PTAB claim invalidations in an IPR because "[i]n the instant case, the second action in this Court involves application of a different legal

standard than the PTAB applied [in an IPR]" relative to validity, and noting that the Supreme Court's *B&B Hardware* decision "states clearly: '[I]ssues are not identical if the second action involves application of a different legal standard, even though the factual setting of both suits may be the same." (internal citations omitted)).

It is fundamental that collateral estoppel does not apply when the party seeking to invoke it has a significantly heavier burden of proof in the second action than it carried in the first. *See In re Braen*, 900 F.2d at 624 ("[D]isparate burdens of proof foreclose application of the issue preclusion doctrine."); *see also* Restatement (Second) of Judgments § 28(4) ("[R]elitigation of the issue in a subsequent action between the parties is not precluded" when "the adversary has a significantly heavier burden than he had in the first action."). There is a good reason for this principle. Invoking collateral estoppel when the burdens are significantly different "would be to hold, in effect, that the losing party in the first action would also have lost had a significantly different burden [been] imposed." Restatement (Second) of Judgments § 28(4).

The Supreme Court expressly applied the foregoing standards in *Grogan v. Garner*, holding that the difference between a preponderance of the evidence" standard and a "clear and convincing" standard would be significant and sufficient to prevent the application of collateral estoppel. 498 U.S. 279, 284-85 (1991) (citing Restatement (Second) of Judgments § 28(4)). In *Grogan*, the Court held that if the

burden of proof in a later non-dischargability action were the same (preponderance), then collateral estoppel might apply, but if the higher "clear and convincing standard applies to non-dischargeability, the prior judgment could not be given collateral estoppel effect. *Seed.* at 284-85. In other words, because something has been proved by a preponderance of the evidence does not establish that it has been proved by clear and convincing evidence. "[I]n such cases, it would be both unfair and illogical for issue preclusion to attach." *O'Shea v. Amoco Oil Co.*, 886 F.2d 584, 594 (3d Cir. 1989).

At the PTAB, Groupon's burden was to prove invalidity of the Invalidated Claims by a "preponderance of the evidence." 35 U.S.C. § 316(e); *see also* 37 C.F.R. § 42.1(d). In the district court, however, Groupon's burden of proof is significantly higher. To prevail on patent invalidity, Groupon must demonstrate obviousness by "clear and convincing" evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) (Section 282 of the Patent Act requires an invalidity defense to be proved by "clear and convincing evidence"). Additionally, unlike before the PTAB, Mylan must also overcome the patent's presumption of validity in district court. *See* 35 U.S.C § 282(a) ("A patent shall be presumed valid.").

Thus, given the vastly different burdens as between the PTAB in an IPR and a district court in terms of patent invalidity, collateral estoppel should not apply in cases like this one, where the Newly Asserted Claims are presumed valid, could be

invalidated at the district court only by clear and convincing evidence, were not at issue in either of the two IPRs, and are not identical to any of the Invalidated Claims that were invalidated in the two IPRs under a much lesser evidentiary standard of preponderance of the evidence.

To be clear, Kroy is not challenging this Court's precedent cited by the district court in any of the "two lines" it analyzed in the December 2 decision. Instead, there does not appear to be any controlling precedent that directly addresses the situation presented here. Indeed, Kroy is challenging the "test" of collateral estoppel strung together by the district court from those two lines of authority to purportedly address the circumstances present here and described above. And, for all the reasons expressed above, Kroy respectfully requests that this Court reject the district court's test and find, in a case of first impression, that collateral estoppel should not apply in the circumstances presented here (where none of the Newly Asserted Claims in litigation, where the standard of proof for invalidity is "clear and convincing evidence, was at issue in IPRs where claims from the same patent were invalidated by the PTAB under the lesser "preponderance of the evidence" standard, and none of those Invalidated Claims is the same as any of the Newly Asserted Claims).

**B. Even if Collateral Estoppel Could Apply, It Should Not Have Applied To Newly Asserted Claims 91-93, 103, 104 and 107-110 Because They Do Not Match Any Claim Invalidated in the IPRs**

As set forth above, given the differences in burdens of proof at the PTAB and in a district court as to patent invalidity and the fact that none of the Newly Asserted Claims (claims 91-93, 95-97, 103-104 and 107-111) were part of the two Groupon IPRs, all of those Newly Asserted Claims should not be subject to collateral estoppel review. However, even if the district court did not err in analyzing whether collateral estoppel should apply here, Newly Asserted Claims 91-93, 103, 104 and 107-110 should not be collaterally estopped under the test applied by the district court and the recognized law of such estoppel.

The district court first addressed Newly Asserted Claims 111 and 95, which it found to be "nearly identical" to Invalidated Claims 14 and 87, respectively, each of which was invalidated by the PTAB in the Groupon IPRs. Therefore, the district court found that that these Newly Asserted Claims were not materially different from the claims in the same patent that had been previously invalidated by the PTAB, such that collateral estoppel should apply to claims 111 and 95. *See* Appx8-9; Appx15-17. The district court found that the Newly Asserted Claims 96 and 97, which depend from Newly Asserted Claim 95, added limitations to Claim 95 that were already found in the same prior art applied against Invalidated Claim 87 in the

IPR, so Newly Asserted Claims 96 and 97 were collaterally estopped as well. Appx31-33.

The district court applied the same sort of analysis in finding Newly Asserted Claim 100 collaterally estopped based on comparing it to Invalidated Claim 16, along with Invalidated Claims 17 and 29 that depend from that claim, each of which were invalidated in the two Groupon IPRs. Following that analysis, the district court likewise found no "material differences" between those claims invalidated in the IPRs and Newly Asserted Claim 100 not subject to the IPRs and, therefore, applied collateral estoppel to Newly Asserted Claim 100. Appx18-22.

Significantly, the district court's analysis necessarily changed with regard to the remaining Newly Asserted Claims (claims 91-93, 103-104 and 107-110), where neither Groupon nor the district court could find a single claim in the Invalidated Claims from the IPRs that directly corresponded to any of these remaining Newly Asserted Claims. Those remaining Newly Asserted Claims were analyzed in groups, starting with independent Newly Asserted Claims 103 and 107, then Newly Asserted Claim 104 (which depends from claim 103) and Newly Asserted Claims 108-110 (which depends from clam 107), followed by Newly Asserted Claim 91 and its dependent claims, Newly Asserted Claims 92-93.

The district court analyzed independent Newly Asserted Claims 103 (a "method of incentive program generation") and 107 (a "method of incentive

program generation and redemption") together, finding that they were very similar and that Newly Asserted Claim 107 was representative of both (even if it had a few more "narrowing" limitations than Newly Asserted Claim 103). Appx22-25. The district court compared Newly Asserted Claim 107 to Invalidated Claim 1, and acknowledged that final "electronic card" limitation in Newly Asserted Claim 107 ("issuing an electronic card to the consumer, the electronic card storing information of the consumer for accessing the promotion of the sponsor offered to the consumer") was missing from Invalidated Claim 1. To fill that hole in Invalidated Claim 1, the district court pointed to language in Invalidated Claim 12 reciting "providing an electronic card for fulfilment of an award, having memory for storing information associated with the consumer, wherein the information may be a personal identification number or information associated with the consumer's participation in an incentive program." Appx24.

However, the "electronic card" element of Invalidated Claim 12 is different from that of Newly Asserted Claim 107 because it lacks the language stating that the card stores information of the consumer "for accessing the promotion of the sponsor offered to the consumer." The district court found that this was not a "material difference" from the Invalidated Claims, such that collateral estoppel should still apply to Newly Asserted Claims 103 and 107 based on the disclosures of Invalidated Claims 1 and 12. *See* Appx26-28.

The district court's above finding of a lack of material difference in the "electronic card" limitation is contradicted by the '660 patent's specification, which reads:

> A *key component of the retail based redemption process is the electronic card* 11 for redemption of specific prepaid products and services. The electronic card 11 may use magnetic strip technology for encoding and reading of information, or similar functionality may be achieved with a bar code, chip, smart card or other electronic card-based technology. The primary function of the card is to provide an electronic identification procedure at the check-out counter or point of sale (POS) *whereby the identification information can be compared with an award winner's award information in order to authorize payment by the incentive company (via an issuer) for a particular product or service*. The winning consumer's award information may include the name, identification number of the consumer and the identification of the award, e.g., the stock keeping unit, or SKU.

Appx99 at 41:66–42:13 (emphasis added).

Thus, the '660 patent describes its electronic card as a "key component" of the invention and operates by storing consumer information "for accessing the promotion of the sponsor offered to the consumer." The above differences between the electronic card of Newly Asserted Claim 107 and that of Invalidated Claim 12 are, therefore, "material." Newly Asserted Claim 107 should not be collaterally estopped in light of Invalidated Claims 1 and 12, even under the two lines of authority cited by the district court in its December 2 decision and the flawed test of collateral estoppel that the district crafted from those two lines of authority. The

same logic applies to independent Newly Asserted Claim 103 (analyzed by the district court through "representative" Newly Asserted Claim 107) and Newly Asserted Claims 104 and 108-110 through their dependency on Newly Asserted Claims 103 or 107. On that basis alone the district court's decision should be reversed in dismissing the Second Amended Complaint and that Newly Asserted Claims 103-104 and 107-110 are collaterally estopped by any of the Invalidated Claims in either of the Groupon IPRs.

Moreover, the district court's analysis under its collateral estoppel test of Newly Asserted Claims 103-104 and 107-110 is fundamentally flawed for another important reason. It does not compare any of those Newly Asserted Claims to any actual claim that was Invalidated in either of the two Groupon IPRs. Rather, by combining Invalidated Claims 1 and 12, the district court: (1) constructs a hypothetical claim that was never at issue in either IPR; (2) concludes that such a hypothetical claim would have been invalidated had it been at issue in the IPRs; and (3) then concludes that the hypothetically invalidated hypothetical claim is not "material different" from any of Newly Asserted Claims 103-104 and 107-110, such that each of those Newly Asserted Claims is subject to collateral estoppel under the district court's test. *See* Appx22-28.

Specifically, the district court acknowledges that the "electronic card" limitation is missing from Invalidated Claim 1 and that the electronic card limitation

of Invalidated Claim 12 that it melds with Invalidated Claim 1 does not recite that the card stores information of the consumer "for accessing the promotion of the sponsor offered to the consumer." *See* Appx25-27. Also, the language in Newly Recited Claim 107 of "receiving from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer," is worded differently from the corresponding language in Invalidated Claim 1. Finally, Invalidated Claim 12 also omits this material limitation of Newly Asserted Claim 107 reciting "receiving from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer."

So, even if Invalidated Claim 12 recites the same electronic card as that of Newly Asserted Claim 107 (which Kroy disputes), and the PTAB decided that the Kelly disclosed such an electronic card, the PTAB never addressed validity of the particular combination of elements recited in Newly Asserted Claim 107. The district court's construct of a hybridized, hypothetical claim from Invalidated Claims 1 and 12 was never before the PTAB.

This flaw in the district court's analysis is significant and case determinative because it demonstrates "the identical issue" was not previously adjudicated and the "the issue" was not "actually litigated." *See Jean Alexander Cosmetics,* 458 F.3d at 249. Indeed, given the above flaws in the district court's hypothetical, hybridized claim that was never at issue in the IPRs, the validity issue relative to Newly

Asserted Claims 103-104 and 107-110 was not previously adjudicated and Kroy cannot possibly have had the opportunity to actually litigate it. Therefore, collateral estoppel should not apply to any of those claims (*see id*.), and this is another reason the district court's decision collaterally estopping Newly Asserted Claims 103-104 and 107-110 and dismissing the Second Amended Complaint as to them should be reversed.

The same flaws infect the district court's analysis of Newly Asserted Claim 91 ("a method of generating an incentive program") and its dependent claims, Newly Asserted Claims 92-93. Here, again, the district court could not point to a single Invalidated Claim from the IPRs as an analog to compare to New Asserted Claim 91. Instead, the district court once again constructed a hypothetical claim from parts of each of Invalidated Claims 7 and 87 (Appx29-30), matched up that hypothetical claim to the elements of Newly Asserted Claim 91 (Appx28-31), and then concluded that the prior art from the IPRs that invalidated each of Invalidated Claims 7 and 87 would have invalidated the combination of elements from those claims used in its hypothetical claim (Appx31). On that basis, the district court found that Newly Asserted Claim 91 and its dependencies (Newly Asserted Claims 92-93) are collaterally estopped.

Thus, it is beyond dispute that the PTAB never addressed validity of the particular combination of elements recited in Newly Asserted Claims 91-93. The

district court's construct of a hybridized, hypothetical claim from Invalidated Claims 7 and 87 was never before the PTAB.  This flaw in the district court's analysis is significant and case determinative because it demonstrates "the identical issue" was not previously adjudicated and the "the issue" was not "actually litigated."  *See Jean Alexander Cosmetics,* 458 F.3d at 249.  Indeed, given the above flaws in the district court's hypothetical, hybridized claim that was never at issue in the IPRs, the validity issue relative to Newly Asserted Claims 91-93 was not previously adjudicated and Kroy cannot possibly have had the opportunity to actually litigate it.  Therefore, collateral estoppel should not apply to any of those claims (*see id.*), and this is another reason the district court's decision collaterally estopping Newly Asserted Claims 91-93 and dismissing the Second Amended Complaint as to them should be reversed.

In addition, the fact that the PTAB's IPR decision were affirmed under Fed. Cir. R. 36 ("Rule 36") further supports that collateral estoppel is inappropriate here. Rule 36 does not endorse any specific issue decided below if the outcome could have been on multiple different grounds.  *See Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1356 (Fed. Cir. 2017) (Rule 36 judgment "does not endorse or reject any specific part of the trial court's reasoning").  Thus, there is nothing in the PTAB's final written decisions that one can point to as endorsed by this Court's affirmance in terms of the teachings of the prior art as compared to the Invalidated Claims.  In

any event, there is certainly no endorsement for the hypothetical claims constructed by the district court as hypothetically invalidated by the PTAB, in order to apply collateral estoppel to Newly Asserted Claims 92-93 and 107-110.

Indeed, issue preclusion requires that the "the previous determination was necessary to the decision." *United Access Techs., LLC v. CenturyTel Broadband Servs. LLC*, 778 F.3d 1327, 1331 (Fed. Cir. 2015). The Rule 36 affirmance here was silent as to which aspects of the multiple independent grounds relied on by the PTAB were those this Court approved of or not. Under this Court's precedent, collateral estoppel "cannot apply where the appellate court affirmed, without explanation, the judgment of a trial court that determined two issues, either of which could independently support the result, because it is not known which issue was 'necessary' to the final appellate judgment." *See Phil-Insul Corp.*, 854 F.3d at 1356 (Rule 36 judgment "does not endorse or reject any specific part of the trial court's reasoning") (internal citations and quotations omitted). This principle applies to the Federal Circuit Rule 36 affirmance of the PTAB's Final Written Decisions here, where the PTAB relied on no fewer than seven independent grounds to invalidate the various, overlapping sets of claims, where each ground involves multiple subsidiary issues such as disclosures of the prior art, motivations to combine, and claim construction. Absent such information, collateral estoppel cannot apply. *See id*.

**C. Collateral Estoppel Was Not Appropriate To Apply At The Pleadings Stage Here In Response To A Motion to Dismiss Under Rule 12(b)(6)**

Even if collateral estoppel might apply at the district court to claims in the '660 patent that were not part of the two IPRs, the district court erred in concluding that it was proper to require Kroy to address such estoppel allegations at the pleading stage of the case, in response to a motion under Fed. R. Civ. P. 12(b)(6). At the very least, such allegations should have been addressed and decided on summary judgment, where expert and other evidence could have been taken on the claims and teachings of the prior art, for example.

Issue preclusion requires, among other things, that "the identical issue was previously litigated." *See United Access Techs., LLC*, 778 F.3d at 1331. As demonstrated above, that is not the case here, particularly as to the Newly Asserted Claims 91-93, 103-104 and 107-110. In substantially similar circumstances to those here, other district courts have rightly determined that questions of "material differences" between claims are not resolvable on a motion to dismiss. Like here, the defendant in *Stragent, LLC v. BMW of N. Am., LLC,* 2021 WL 1147468 (D. Del. March 25, 2021) argued that each of the core elements of the at-issue claims or patentably indistinct variations thereof could be found in claims that were previously invalidated by the PTAB. *See* 2021 WL 1147468, at *6. Conversely, the plaintiff there identified a number of limitations in the at-issue claims that were not found in the prior claims, where such limitations may affect the patentability of the claims.

*Id.* The court held that it could not determine whether the additional limitations would not materially impact the question of patentability without the benefit of claim construction or expert opinion, and thus it could not reach a decision on issue preclusion at the motion to dismiss stage. *Id.* at *6-7.

Similarly, the court in *Purdue Pharma L.P. v. Mylan Pharms. Inc.* found that whether the claims at issue were patentably distinct from those that were invalidated in a prior litigation was an issue of fact that could not be resolved on a motion to dismiss. *Purdue Pharma L.P. v. Mylan Pharms. Inc.,* 2017 WL 2569604, at *2 (D. Del. June 13, 2017). Specifically, the Court's decision was supported by the existence of limitations in the at-issue claims that were not required by the invalidated claims, as well as the fact that the at-issue claims involved a process claim whereas the invalidated claims did not consider process limitations. *Id.* at *1.

Likewise, here, the district court should not have resolved the collateral estoppel allegations on the pleadings, pursuant to a Rule 12(b)(6) motion to dismiss. The complex and fact-intensive inquiries on which that decision rests are outlined in detail above. Thus, at the very least this Court should reverse and remand the district court's December 2 decision for consideration of the collateral estoppel allegations on summary judgment, where evidence could be taken and considered on these many issues.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, Kroy respectfully requests that the Court reverse or vacate the district court's collateral estoppel decision and remand.

June 12, 2023                                     Respectfully submitted,

                                                 */s/ Timothy Devlin*
                                                 Timothy Devlin
                                                 tdevlin@devlinlawfirm.com
                                                 (302) 449-9010
                                                 Paul M. Richter, Jr.
                                                 prichter@devlinlawfirm.com
                                                 (917) 254-5133
                                                 DEVLIN LAW FIRM LLC
                                                 1526 Gilpin Avenue
                                                 Wilmington, DE 19806

                                                 *Attorneys for Plaintiff-Appellant*
                                                 *Kroy IP Holdings, LLC*

**ADDENDUM**

**ADDENDUM TABLE OF CONTENTS**

| Document | Appx |
|---|---|
| District Court's Memorandum Opinion | Appx1-34 |
| District Court's Order of Dismissal with Prejudice | Appx35 |
| The '660 Patent | Appx54-109 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KROY IP HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1405-MN-CJB |
| | ) | |
| GROUPON, INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

David E. Moore, Bindu A. Palapura, and Brandon R. Harper, POTTER ANDERSON & CORROON, LLP, Wilmington, DE; David L. Hecht, Conor B. McDonough, and James Zak, HECHT PARTNERS, New York, NY, Attorneys for Plaintiff.

Steven J. Balick and Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; Thomas L. Duston, Tiffany D. Gehrke, Ryan N. Phelan, Kwanwoo Lee, Raymond R. Ricordati III and Chelsea Murray, MARSHALL, GERSTEIN AND BORUN LLP, Chicago, IL, Attorneys for Defendant.

---

## **MEMORANDUM OPINION**

December 2, 2022
Wilmington, Delaware

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

In this patent infringement action filed by Plaintiff Kroy IP Holdings, LLC ("Kroy" or "Plaintiff") against Defendant Groupon, Inc. ("Groupon" or "Defendant"), presently before the Court is Defendant's motion to dismiss, filed pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion"). (D.I. 117) For the reasons that follow, the Court orders that the Motion is GRANTED.

## I.     BACKGROUND

Plaintiff filed suit against Defendant on October 6, 2017, alleging that Defendant infringed United States Patent No. 6,061,660 (the "'660 patent"), which claims a method and system for providing incentive programs over a computer network. (D.I. 1 at ¶¶ 9-10) More specifically, the '660 patent discloses an incentive builder program with an award fulfillment system that permits multiple sponsors to customize and market incentive programs through a central market place using an interface. (*Id.*) In its original Complaint, Plaintiff asserted 13 "exemplary" claims of the '660 patent against Defendant: claims 1, 10, 16-21, 25, and 27-30. (*Id.* at ¶¶ 43-44 & ex. 3)[1]

In October 2018, Defendant timely filed two *inter partes* review petitions (the "IPRs"), challenging 21 total claims: claims 1, 7, 10, 12, 14, 16-21, 25, 27-30, 67-69, 87, and 101 of the '660 patent (the "Invalidated Claims") with the United States Patent and Trademark Office's

---

[1]     The original '660 patent issued on May 9, 2000, with 15 claims. ('660 patent) The patent thereafter went through an *ex parte* reexamination, and a reexamination certificate was issued on February 6, 2015. In the reexamination, claims 1, 2, 4, 7 and 14 were determined to be patentable as amended, claims 3, 5, 6, 8-13 and 15 were not reexamined, and new claims 16-115 were added. (*Id.*) The '660 patent is found on the docket in this case, (D.I. 1, ex. 1), and herein the Court will simply cite to the "'660 patent." The non-reexamined claims are found at the end of the original '660 patent, while the remaining relevant claims are found in the *Ex Parte* Reexamination Certificate for the '660 patent. (Tr. at 10)

2

**Appx2**

("PTO") Patent Trial and Appeal Board ("PTAB"). (IPR2019-00044, Paper 1 at 1 (P.T.A.B. Oct. 10, 2018); *id.*, Paper 10 at 1 (P.T.A.B. Jan. 3, 2019); IPR2019-00061, Paper 1 at 1 (P.T.A.B. Oct. 10, 2018)) This included all 13 of the "exemplary" claims identified by Plaintiff in its Complaint, plus eight additional claims of the patent.[2] In IPR2019-00044, Defendant relied on U.S. Patent No. 5,816,918 ("Kelly") as its primary reference; according to Defendant, Kelly disclosed a "system deploying promotional games over a wide area network, like the internet[,]" in which "players us[e] game units to interact with a 'host' server that provides promotional games, including games that may be supplied by a plurality of sponsors." (IPR2019-00044, Paper 10 at 4, 16-17) In that same IPR, Defendant also relied on Microsoft® FrontPage Unleashed (1st ed. 1996) ("Stanek"), U.S. Patent No. 5,890,175 ("Wong"), and U.S. Patent No. 5,905,895 ("Halter") as secondary references. (*Id.* at 3-4) In IPR2019-00061, Defendant relied on U.S. Patent No. 5,710,887 ("Chelliah") as its primary reference; according to Defendant, Chelliah disclosed an "electronic commerce system with an 'Incentives Subsystem' to create and host incentives programs on behalf of sponsors (i.e., stores)." (IPR2019-00061, Paper 1 at 4, 20) Defendant also relied on Halter and U.S. Patent No. 6,035,280 ("Christensen") as secondary references. (*Id.* at 3-4)

On February 6, 2019, a few months after Defendant filed its IPR petitions, Plaintiff filed an Amended Complaint in this case. (D.I. 76) In the Amended Complaint, Plaintiff now asserted not only the same 13 claims as it did in its original Complaint, but it also added an

---

[2] Defendant's counsel stated that at the time Defendant filed these IPR petitions, the 13 claims referenced in the original Complaint were the only claims that Plaintiff had indicated it would assert against Defendant in this case. (Tr. at 13-14) Since the '660 patent had 115 claims after reexamination, and since it is "not practical to pursue that many claims in the [PTO, Defendant]" took the 13 "exemplary" claims asserted against it in the original Complaint, added the eight above-referenced "additional [claims,]" and then filed the IPR petitions as to 21 claims in total. (*Id.*; *see also id.* at 108)

additional 22 newly-asserted claims:  claims 12, 75-76, 87-89, 91-93, 95-97, 100-04, and 107-11.  (D.I. 76 at ¶¶ 49, 63-64)  Because they were first raised after Defendant's IPR filing deadline had passed, nearly all of these 22 newly-asserted claims were not included in Defendant's IPR petitions.

In April 2019, the PTAB instituted IPR as to both IPR petitions and on all 21 challenged claims of the '660 patent.  (D.I. 93 at 1)  And in May 2019, the parties jointly stipulated that the instant case should be stayed, pending the issuance of Final Written Decisions by the PTAB in both IPR proceedings.  (*Id.*)

On April 16, 2020, the PTAB issued Final Written Decisions in both IPRs, determining that all of the Invalidated Claims were invalid.  *See Groupon, Inc. v. Kroy IP Holdings, LLC*, IPR2019-00061, 2020 WL 1900402 (P.T.A.B. Apr. 16, 2020) (hereinafter "*Groupon I*" or "IPR2019-00061"); *Groupon, Inc. v. Kroy IP Holdings, LLC*, IPR2019-00044, 2020 WL 1900398 (P.T.A.B. Apr. 16, 2020) (hereinafter "*Groupon II*" or "IPR2019-00044").  Plaintiff appealed, but it did not seek to lift the stay of the instant case at that time.  (D.I. 96)  And on June 14, 2021, the United States Court of Appeals for the Federal Circuit summarily affirmed the PTAB's decisions, pursuant to Federal Circuit Rule 36 ("Rule 36").  *Kroy IP Holdings, LLC v. Groupon, Inc.*, 849 F. App'x 930 (Fed. Cir. 2021).

In IPR2019-00061, the PTAB and Federal Circuit invalidated all of the Invalidated Claims with the exception of claims 10 and 12, on the grounds that either Chelliah anticipated these claims or that Chelliah in combination with Christensen rendered the claims obvious.  *Groupon I*, 2020 WL 1900402, at *1, *25.  And in IPR2019-00044, the PTAB and Federal Circuit invalidated all of the Invalidated Claims as obvious in light of Kelly and one or more of

the relevant secondary references (i.e., Stanek, Halter and/or Wong). *Groupon II*, 2020 WL 1900398, at *1, *27.

Following the Federal Circuit's affirmance, the instant case remained stayed. Plaintiff informed this Court that it was determining whether to proceed on the asserted claims that had not been at issue in the IPR (the "Additional Claims"). (D.I. 99) After Plaintiff obtained new outside counsel in the case, (D.I. 101), the parties asked this Court for additional time to address the case's status, (D.I. 102). In November 2021, Plaintiff informed Defendant that it intended to pursue the Additional Claims; both sides agreed that discovery should remain stayed, pending a decision on whether Plaintiff was collaterally estopped from litigating the Additional Claims here. (D.I. 104 at 2-3)

In December 2021, Plaintiff next sought leave to file a Second Amended Complaint (the "Operative Complaint"). (D.I. 107) United States District Judge Maryellen Noreika, to whom this case is otherwise assigned, granted-in-part and denied-in-part the motion to amend on March 2, 2022. The Operative Complaint, which was filed on March 10, 2022, now limited the present action to only 14 asserted claims: claims 91-93, 95-97, 100, 103-04, and 107-11 (the "Newly Asserted Claims"). (D.I. 111 at ¶¶ 48-80) Plaintiff asserted both direct infringement (Count I) and indirect infringement (Count II) of the Newly Asserted Claims. (*Id.*)

Defendant then filed the instant Motion, seeking dismissal of the Operative Complaint, on April 7, 2022. (D.I. 117) On April 12, 2022, the parties consented to the Court's jurisdiction to conduct all proceedings on and enter a final order on the Motion. (D.I. 119) Briefing on the Motion was completed on April 28, 2022, (D.I. 121), and the Court heard oral argument on the Motion on October 12, 2022.

## II.    LEGAL STANDARD

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based upon the failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  In assessing such a motion, the court first separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Ashcroft*, 556 U.S. at 679).

A Rule 12(b)(6) movant may also challenge a pleading by invoking an affirmative defense, as Defendant does here.  (Tr. at 16)[3]  The Court may dismiss a claim pursuant to Rule 12(b)(6) in light of an affirmative defense, but only where the well-pleaded factual allegations in the complaint (along with the other materials that the Court may properly consider), construed in the light most favorable to the plaintiff, clearly suffice to establish the defense.  *See Jones v.*

---

[3]    Collateral estoppel is an affirmative defense.  *United Therapeutics Corp. v. Liquidia Techs., Inc.*, Civil Action No. 20-755-RGA, 2022 WL 1503923, at *1 (D. Del. May 12, 2022).  This defense can be adjudicated at the motion to dismiss stage.  *M & M Stone Co. v. Pennsylvania*, 388 F. App'x 156, 162 (3d Cir. 2010).

6

**Appx6**

*Bock*, 549 U.S. 199, 215 (2007); *Wilson Wolf Mfg. Corp. v. Sarepta Therapeutics, Inc.*, Civil

Action No. 19-2316, 2020 WL 7771039, at *2 n.1 (D. Del. Dec. 30, 2020).[4]

## III. DISCUSSION

Defendant's primary basis for dismissal of the Operative Complaint is its assertion that

Plaintiff is collaterally estopped from alleging infringement of the Newly Asserted Claims. (D.I.

118 at 6-21)[5] In addressing this issue, the Court will first discuss the law relating to collateral

estoppel in the patent context. Thereafter, it will address the parties' arguments on the merits,

explaining why Defendant's Motion in this regard is well taken.

### A. Collateral Estoppel

The doctrine of collateral estoppel, also referred to as "issue preclusion," serves to

"'preclude parties from contesting matters that they have had a full and fair opportunity to

litigate,' which 'protects their adversaries from the expense and vexation attending multiple

lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the

possibility of inconsistent decisions.'" *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887

---

[4]     Defendant requested that the Court take judicial notice of the PTAB's Final
Written Decisions and the Federal Circuit's order affirming those decisions, (D.I. 118 at 4), and
Plaintiff did not object. Herein, the Court will do so. *See Princeton Digital Image Corp. v.
Konami Digital Ent. Inc.*, Civil Action No. 12-1461-LPS-CJB, 2017 WL 239326, at *3 n.7 (D.
Del. Jan. 19, 2017).

[5]     Defendant also sought dismissal of the Operative Complaint, in whole or in part,
on two other bases: (1) that the Newly Asserted Claims lack an inventive concept and are patent
ineligible under 35 U.S.C. § 101 ("Section 101"), (D.I. 118 at 22); and (2) that Count II of the
complaint, via which Plaintiff asserts indirect infringement, fails to allege a direct infringer and
should therefore be dismissed. (*Id.* at 23-24) Below, the Court will explain why it concludes
that dismissal of the Operative Complaint is warranted due to Defendant's affirmative defense of
collateral estoppel. In light of this, the Court need not and will not address the other two issues
raised by Defendant. (That said, the Court notes for the record that in its answering brief,
Plaintiff had agreed to dismiss Count II with prejudice.). (D.I. 120 at 8)

F.3d 1376, 1382 (Fed. Cir. 2018) (quoting *Mont. v. United States*, 440 U.S. 147, 153-54 (1979)).
When assessing the doctrine in a patent case, a district court must apply regional circuit law to
the general procedural question of whether collateral estoppel applies, while applying Federal
Circuit law to questions "involving substantive issues of patent law, issues of [collateral
estoppel] that implicate substantive patent law issues, or issues of [collateral estoppel] that
implicate the scope of [the Federal Circuit's] own previous decisions." *See Soverain Software
LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015). The
United States Court of Appeals for the Third Circuit has identified four standard requirements
that must be met in order for the doctrine of collateral estoppel to apply: "(1) the identical issue
was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination
was necessary to the decision; and (4) the party being precluded from relitigating the issue was
fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458
F.3d 244, 249 (3d Cir. 2006) (internal quotation marks and citation omitted).

The Federal Circuit has held that when the PTAB issues a final judgment on the
invalidity of a patent claim, this will have an issue-preclusive effect on any pending or co-
pending district court actions involving that same patent claim (even though the district court and
PTAB, *inter alia*, require a patent challenger to meet different burdens of proof in order to
establish invalidity). *See XY, LLC v. Trans Ova Genetics*, 890 F.3d 1282, 1294 (Fed. Cir. 2018);
*cf. MaxLinear, Inc. v. CF CRESPE LLC*, 880 F.3d 1373, 1376-77 (Fed. Cir. 2018) (applying
collateral estoppel based on a PTAB decision, and stating that "[i]t is well established that
collateral estoppel, also known as issue preclusion, applies" when the same issue is before a
court and an administrative agency) (citing *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S.
Ct. 1293, 1303 (2015)). The Federal Circuit has further held that "[c]omplete identity of claims

is not required to satisfy the identity-of-issues requirement for claim preclusion." *Soverain*, 778 F.3d at 1319; *see also Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013) ("Our precedent does not limit collateral estoppel to patent claims that are identical."). Rather, the inquiry in that instance hinges on the "identity of the *issues* that were litigated." *Ohio Willow Wood Co.*, 735 F.3d at 1342 (emphasis in original). In other words, if "the differences between the unadjudicated patent claims and adjudicated patent claims do not *materially alter the question of invalidity*, collateral estoppel applies." *Id.* (emphasis added).

Therefore, when one considers these two lines of authority together, it follows that: (1) if the PTAB issues a final judgment invalidating a patent claim; and (2) if another claim in the same patent is at issue in a district court litigation; and (3) if any differences between the two claims do not materially alter the question of invalidity regarding the district court claim; then (4) the patentee will be collaterally estopped from litigating the district court claim (assuming the other requirements of the collateral estoppel doctrine are met). *See M2M Solutions LLC, et al. v. Sierra Wireless Am., Inc. et al.*, Civil Action No. 14-1102-RGA, D.I. 213 at 5-7 (D. Del. Mar. 31, 2021) (granting summary judgment on collateral estoppel grounds regarding patent claims that were not materially different from claims in the same patent that had been previously invalidated by the PTAB); *Intellectual Ventures I LLC v. Lenovo Grp. Ltd.*, 370 F. Supp. 3d 251, 257 (D. Mass. 2019) ("PTAB decisions have a collateral-estoppel effect in district court on unadjudicated claims that do not 'materially alter the question of invalidity.'") (citation omitted); *see also* (Tr. at 24-26).[6]

---

[6]  This articulation of the law is not disputed by either side here. Plaintiff acknowledged at oral argument that collateral estoppel can, under certain circumstances, apply to bar litigation of patent claims that were not invalidated in an IPR proceeding, but which are not materially different from the claims that were invalidated in such a proceeding. (Tr. at 77, 82) Indeed, a number of district courts have granted motions to dismiss on the basis of collateral

### B.    Discussion

The parties' primary dispute regarding the Motion relates to the first collateral estoppel

requirement:  whether "the identical issue was previously adjudicated."[7]  As noted above,

---

estoppel, wherein the claims at issue were not identical to, but not materially different from, previously-invalidated/ineligible claims.  *See, e.g.*, *NetSoc LLC v. Oath, Inc.*, No. 18-CV-12267 (RA), 2020 WL 419469, at *5-8 (S.D.N.Y. Jan. 24, 2020); *Arunachalam v. Exxon Mobil Corp.*, CIVIL NO. 6:19-CV-00171-ADA, 2019 WL 10303695, at *2-4 (W.D. Tex. June 26, 2019). Here, the key dispute between the parties is over whether, in fact, each of the Newly Asserted claims is materially different from an invalidity perspective than certain Invalidated Claims.

[7]       In its answering brief, Plaintiff also raised an issue relating to the third collateral estoppel requirement:  whether the previous determination was necessary to the decision.  Here, Plaintiff argued that because the Federal Circuit summarily affirmed the PTAB's Final Written Decisions pursuant to Rule 36, this precludes application of the collateral estoppel doctrine. (D.I. 120 at 4-5)  More specifically, Plaintiff asserts that collateral estoppel cannot apply because the "Rule 36 affirmance here was silent as to which aspects of the multiple independent grounds relied on by the PTAB [to invalidate the Invalidated Claims] were those the Federal Circuit approved of or not."  (*Id.* at 4)

In response, however, Defendant explained why the fact of the Rule 36 affirmance does not impede its collateral estoppel argument.  Defendant argued, and the Court agrees, that the fact of the Rule 36 affirmance is immaterial here because Plaintiff cannot show how the affirmance could have been premised on a ground that *would not* collaterally estop the assertion of any Newly Asserted Claim.  (D.I. 121 at 4-6; *see also* D.I. 118; Tr. at 59-64); *cf. Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1356-57 (Fed. Cir. 2017) (noting that a Rule 36 judgment can be utilized for collateral estoppel purposes, so long as there is "no uncertainty as to whether the precise issue was raised and determined [by the Federal Circuit] in the prior suit"); *A.H. ex rel. Hubbard v. Midwest Bus Sales, Inc.*, 823 F.3d 448, 455 (8th Cir. 2016) (noting that even if a state court jury's general verdict meant that the jury's decision of no liability could have been premised on one of two independent grounds, collateral estoppel applied to preclude the instant suit in federal court against the defendant, because either of those grounds led to a determination that the defendant could not be liable in the instant suit).

During oral argument, the Court asked Plaintiff's counsel to point out an example of how the Rule 36 summary affirmance created the possibility that the Federal Circuit could have affirmed the PTAB's judgment of invalidity as to an Invalidated Claim on a ground that would not collaterally estop Plaintiff from litigating a Newly Asserted Claim.  (Tr. at 98-102) Plaintiff's counsel acknowledged that he could not do so, and stated that he was "not aware" of this having occurred here.  (*Id.* at 101)  In light of this, the Court rejects Plaintiff's argument that Defendant has failed to establish the applicability of the third collateral estoppel requirement. (*Id.* at 29 (Defendant's counsel noting that "every conceivable ground upon which the Federal

10

**Appx10**

Defendant contends that Plaintiff is collaterally estopped from raising the Newly Asserted

Claims because those Claims are not materially different from the Invalidated Claims for

invalidity purposes. Below, the Court will assess each of the Newly Asserted Claims, explaining

why it agrees with Defendant that Plaintiff is collaterally estopped from litigating those claims in

this case.

### 1. Newly Asserted Claims 111 & 95

Newly Asserted Claim 111 is nearly identical to Invalidated Claim 14. (D.I. 118 at 7-8)

The PTAB found that claim 14 was invalid as: (1) anticipated by Chelliah, *Groupon I*, 2020 WL

1900402, at \*15; (2) obvious over Chelliah and Christensen, *id.* at \*22; (3) obvious over Kelly

and Stanek, *Groupon II*, 2020 WL 1900398, at \*14; and (4) obvious over Kelly and Wong, *id.* at

\*21. Claims 14 and 111 are reproduced below:

| Invalidated Claim 14 | Newly Asserted Claim 111 |
|---|---|
| A method of incentive program generation, comprising: | A method of incentive program generation, comprising: |
| providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network; | providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network; |
| providing an incentive program builder application, running on the host computer; | providing an incentive program builder application, running on the host computer; |
| providing a database of objects associated with parameters of said incentive program builder application; | providing a database of objects associated with parameters of said incentive program builder application; |
| providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive | providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive |

Circuit could have premised its affirmance would invalidate the claims that the plaintiff is
asserting"); *see also id.* at 32, 34)

It is not disputed that the second and fourth collateral estoppel requirements have been
met. And so for the remainder of this opinion, the Court will focus on the parties' arguments
about the first requirement.

Appx11

| Invalidated Claim 14 | Newly Asserted Claim 111 |
|---|---|
| program by interacting with the incentive program builder application; | program by interacting with the incentive program builder application; |
| receiving first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors; | receiving first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors; |
| receiving second input from a consumer selecting an incentive program from among the plurality of incentive programs; | receiving second input from a consumer selecting an incentive program from among the plurality of incentive programs; |
| issuing an award to the consumer corresponding to the selected incentive program; | issuing an award to the consumer corresponding to the selected incentive program; |
| receiving a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program; and | receiving a request to validate the award; and |
| validating the award. | validating the award. |

('660 patent, Reexamination Certificate, cols. 2:33-61, 10:11-36)

As for Newly Asserted Claim 95, it is nearly identical to Invalidated Claim 87. The PTAB found claim 87 invalid as: (1) anticipated by Chelliah, *Groupon I*, 2020 WL 1900402, at *18; (2) obvious over Chelliah and Christensen, *id.* at *22; (3) obvious over Kelly and Stanek, *Groupon II*, 2020 WL 1900398, at *15; and (4) obvious over Kelly and Wong, *id.* at *25. Claims 87 and 95 are reproduced below:

| Invalidated Claim 87 | Newly Asserted Claim 95 |
|---|---|
| A system for incentive program generation, comprising: | A method of incentive program generation, comprising: |
| a network; a sponsor computer connected to the network; a host computer connected to the network, the host computer having a server; | providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network; |
| an incentive program builder application, running on the server; | providing an incentive program builder application, running on the host computer[]; |
| a database of objects associated with parameters of the incentive program builder application; and | providing a database of objects associated with parameters of said incentive program builder application; |
| an interface of the incentive program builder application for sponsor entry of parameters | providing an interface of the incentive program builder application for sponsor entry |

12

Appx12

| Invalidated Claim 87 | Newly Asserted Claim 95 |
| --- | --- |
| for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program builder application, | of parameters for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program builder application, |
| wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer, | wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer, |
| wherein the host, the sponsor, and the consumer are different entities, | wherein the host, the sponsor, and the consumer are different entities, and |
| wherein the host and the sponsor are different individuals or corporate entities, | wherein the host and the sponsor are different individuals or corporate entities, |
| wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host, | wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host; and |
| wherein an interface of a website of the host receives consumer interaction to participate in the incentive program, | receiving consumer interaction through a website of the host to participate in the incentive program, |
| wherein the consumer interaction comprises a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors. | wherein the receiving comprises: receiving a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors. |

('660 patent, Reexamination Certificate, cols. 5:56-6:19, 7:4-34)

Defendant argued that Newly Asserted Claims 111 and 95 are essentially "identical" to their respective Invalidated Claims, and thus, that collateral estoppel should apply. (D.I. 118 at 7-8, 11-12 (emphasis omitted)) In response, Plaintiff noted that the respective claims are not literally identical, asserting that "at least one entire element differs between" the respective Invalidated and Newly Asserted Claims. (D.I. 120 at 6)[8] It suggested that these differences will make a difference when assessing the first collateral estoppel requirement.

---

[8] In this opinion, the Court will only address the arguments that Plaintiff actually made in its briefing regarding asserted material differences between the Invalidated Claims and the Newly Asserted Claims. (D.I. 120 at 5-6) As will become clear, those arguments were few in number, as they took up less than one full page of Plaintiff's answering brief. (*Id.*; *see also* Tr. at 5 (Plaintiff's counsel stating that Plaintiff "did not accept the implication to go claim by claim [in explaining why particular Newly Asserted Claims were materially different from an invalidity perspective from certain Invalidated Claims]"); *id.* at 79-80) To the extent there are

**Appx13**

other differences between a particular Invalidated Claim and Newly Asserted Claim that Plaintiff did not identify as material in its briefing, the Court will assume those differences are not relevant to the collateral estoppel issues discussed herein.  Plaintiff has waived any argument to the contrary.  (Tr. at 81-82 (Plaintiff's counsel agreeing that it must make arguments in its briefing if it wishes the Court to consider those arguments in resolving the Motion); *id.* at 85 (same)); *SmartGene, Inc. v. Advanced Biological Labs., SA*, 555 Fed. App'x 950, 954 (Fed. Cir. 2014) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived."); *see also Kiger v. Mollenkopf*, Civ. No. 21-409-RGA, 2021 WL 5299581, at *2 n.2 (D. Del. Nov. 15, 2021) (deeming arguments not made in the plaintiff's answering brief regarding a motion to dismiss to be waived); *Freed v. St. Jude Med., Inc.*, 364 F. Supp. 3d 343, 351 n.6 (D. Del. 2019) (same).

At times during oral argument, Plaintiff's counsel suggested that one reason why the arguments on this point in its briefing were not more developed is that "there were page limits here."  (Tr. at 72; *see also id.* at 78)  But pursuant to this Court's Local Rules, Plaintiff could have filed an answering brief of up to 20 pages (or, to the extent that 20 pages was not sufficient, Plaintiff could have sought leave of the Court to permit additional pages of briefing).  D. Del. LR 7.1.3(a)(4).  Instead, Plaintiff filed an answering brief that was seven and a half pages long.  (D.I. 120; Tr. at 79)  So Plaintiff had more than enough briefing space to make detailed arguments about the collateral estoppel issues at play here.  (D.I. 121 at 11; Tr. at 80)  The Court will only address herein the arguments Plaintiff *did* make.

Plaintiff's counsel also suggested during oral argument that a reason why Plaintiff did not say more in its briefing about questions of materiality was because Plaintiff did not want to risk being "boxed in" to those positions "without the proper claim construction [having yet occurred]" or being "trapped into making arguments now that could impact our infringement case" in the future.  (Tr. at 73, 81-83)  But this cannot be a viable defense to Defendant's Motion.  Patentees, for example, face similar circumstances when responding to motions to dismiss premised on Section 101 grounds; there, as here, a movant is arguing that the presence of an affirmative defense, evident in the complaint and exhibits attached thereto, warrants dismissal of the plaintiff's pleading.  In the Section 101 context, it is not enough for a patentee to simply point to the fact that the case is at an early stage and suggest that, as a result, it need not persuasively address the merits of the defendant's motion.  Instead, if there are reasons why the motion should be denied, the patentee is expected to actually express those reasons to the Court; failure to do so could lead to a grant of the motion.  *See Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) (affirming the district court's grant of a motion to dismiss based on Section 101 grounds, and rejecting the plaintiff's argument that the district court had erred in determining ineligibility without first conducting claim construction, because the plaintiff "ha[d] not explained how it might benefit from any particular term's construction under an *Alice* § 101 analysis"); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1359-60 (Fed. Cir. 2017) (affirming the district court's dismissal of a complaint on Section 101 grounds at the pleading stage and rejecting the plaintiff's argument that "the district court should have undertaken claim construction and developed the factual record before analyzing whether the claims were eligible" under Section 101, by further noting that the plaintiff "provided no proposed construction of any terms or proposed expert testimony that

14

**Appx14**

More specifically, for Newly Asserted Claim 111, Plaintiff focused on the "receiving a request to validate the award" element; here, it noted that this element is "different from the allegedly 'corresponding' element in [Invalidated Claim] 14[,]" in that claim 111's element has no further content to it, but claim 14 claims "receiving a request to validate the award *from a sponsor among the plurality of sponsors associated with the selected incentive program*." ('660 patent, Reexamination Certificate, col. 2:58-60 (emphasis added); *see also* D.I. 120 at 6 n.4)  Similarly, with regard to Newly Asserted Claim 95, Plaintiff pointed to the fact that the "host computer" referenced therein "does not include the limitation of '*having a server*' [that is] present in [Invalidated Claim] 87." (D.I. 120 at 6 n.4 (emphasis added))

The Court finds this argument to be deficient.  To start, as Plaintiff has acknowledged, the fact that the claim language of the relevant element of the Invalidated Claim and the Newly Asserted Claim is *different* is not dispositive as to whether collateral estoppel applies here.  (Tr. at 82)  Instead, the issue is whether the differences between the respective claims *materially alter the question of invalidity*; if they do not, then collateral estoppel can apply.  *See, e.g.*, *Ohio Willow Wood*, 735 F.3d at 1342.  Beyond pointing out the superficial differences in language between the respective claims, Plaintiff made no further argument as to why those differences actually are material to the invalidity inquiry.  *See NetSoc LLC v. Oath, Inc.*, No. 18-CV-12267

---

would change the § 101 analysis"); (Tr. at 83-84).  So too here—Plaintiff's failure to sufficiently articulate reasons why Defendant's Motion is not well taken can be a factor that leads to grant of the Motion.  (Tr. at 19-20, 108-09); *cf. Fellowes, Inc. v. Acco Brands Corp.*, Case No. 10 cv 7587 (consolidated), Case No. 11 cv 8148 (related), 2019 WL 1762910, at *4 (N.D. Ill. Apr. 22, 2019) (concluding that it would be futile for a patentee to amend its pleading to assert certain patent claims because the patentee would be collaterally estopped from doing so, and explaining that the court's conclusion regarding collateral estoppel as to certain claims was bolstered by the fact that "Plaintiff . . . fail[ed] to explain how [a particular limitation found in certain of the asserted claims but not in the adjudicated claims] would change an invalidity analysis").

15

**Appx15**

(RA), 2020 WL 419469, at *7 (S.D.N.Y. Jan. 24, 2020) (granting a motion to dismiss on collateral estoppel grounds, where the patentee merely pointed to facial differences between the invalidated and unadjudicated patent claims, in part because "while Plaintiff's assertions as to how the '107 Patent and '591 Patent differ are accurate, these differences do not alter the patents in any material way."). Furthermore, as Defendant persuasively points out, Newly Asserted Claims 95 and 111 are, in fact, *broader* than their comparable Invalidated Claims. (D.I. 121 at 6-7) Claim 111 does not require, as Invalidated Claim 14 did, that the request to validate the award at issue must come from one of the sponsors associated with the incentive program. And claim 95 does not require, as Invalidated Claim 87 did, that the host computer referenced therein must be one "having a server." In these circumstances, where the claim found invalid by the PTAB and the Federal Circuit is narrower in scope than the Newly Asserted Claim, that must mean that the broader Newly Asserted Claim is similarly invalid.[9] (D.I. 121 at 6-7)

Plaintiff makes one other argument about the purported materiality of a difference between Newly Asserted Claim 95 and Invalidated Claim 87; it notes that claim 95 is a method claim, while claim 87 is directed to a system. (D.I. 120 at 6 n.4) But Plaintiff put forward no further argument as to how or why this difference should matter in the invalidity/collateral estoppel analysis. And absent any further elucidation on this point from Plaintiff, the Court

---

[9]     *Cf. AstraZeneca LP v. Breath Ltd.*, 542 F. App'x 971, 982 n.2 (Fed. Cir. 2013) ("[T]his Court observes that broader claims are necessarily invalid where narrower claims have been found to be obvious."); *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1319-20 (Fed. Cir. 2007) (finding that where the Federal Circuit had previously decided that two dependent claims of a patent were invalid as obvious, that necessarily meant that the two "broader" independent claims from which the previously-invalidated claims depended must also be invalid); *see also Microsource, LLC v. Eco World Grp., LLC*, 587 F. Supp. 3d 770, 790-93 (N.D. Iowa 2022) (noting that "[i]f a prior claim is invalidated for obviousness, then asserted claims of broader scope raise no new issues of invalidity[,]" and determining that certain claims of an asserted patent were invalid for obviousness on collateral estoppel grounds, where the PTAB had previously declared invalid nearly identical, narrower claims of a different, related patent).

**Appx16**

cannot fathom why it should. After all, the Federal Circuit has held in the analogous Section 101/eligibility context that system and method claims that "contain only minor differences in terminology [but] require performance of the same basic process . . . should rise or fall together." *Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1344 (Fed. Cir. 2013) (internal quotation marks and citation omitted) (alteration in original); s*ee also Bancorp Servs. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1276-77 (Fed. Cir. 2012) (explaining that if the claims at issue in an eligibility analysis are otherwise comparable, the fact that some are system/machine/medium claims and others are method/process claims need not make a difference in the patentability analysis). As is indicated above, Newly Asserted Claim 95 is a method claim that is: (1) worded nearly identically to Invalidated Claim 87 and (2) makes use of all material elements of claim 87's system in the claimed method. Thus, the Court discerns no material difference regarding invalidity between the two claims.

For these reasons, it is clear that any differences between Newly Asserted Claims 111 and 95 and Invalidated Claims 14 and 87, respectively, are insufficient to preclude the application of collateral estoppel.

## 2. Newly Asserted Claim 100

Newly Asserted Claim 100 recites a method of incentive program generation and redemption utilizing websites through which a sponsor and a consumer interact with the host, wherein the sponsor builds the incentive program, and the consumer interacts with the interface to participate. Much (though not all) of the content of claim 100's method is found in the similarly-worded system claim of Invalidated Claim 16. The PTAB found claim 16, which depends from claim 1, invalid as: (1) anticipated by Chelliah, *Groupon I*, 2020 WL 1900402, at *12; (2) obvious over Chelliah and Christensen, *id.* at *22; and (3) obvious over Kelly and

Stanek, *Groupon II*, 2020 WL 1900398, at *11. Claim 16[10] and most of claim 100 are

reproduced below:

| Invalidated Claim 16 | Newly Asserted Claim 100 |
|---|---|
| A system for incentive program generation, comprising: | A method of incentive program generation and redemption, comprising: |
| a network; a sponsor computer connected to the network; a host computer connected to the network, the host computer having a server; | providing a host computer, said host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network; |
| an incentive program builder application, running on the server; | providing an incentive program builder application, running on the host computer; |
| a database of objects associated with parameters of the incentive program builder application; | providing a database of objects associated with parameters of said incentive program builder application; |
| and an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program builder application, wherein the host computer is configured to receive first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors, | providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program offered to a customer, wherein the sponsor builds an incentive program by interacting with the interface of the incentive program builder application; |
| receive second input from a consumer selecting an incentive program from among the plurality of incentive programs, | |
| issue an award to the consumer corresponding to the selected incentive program, | issuing an award to the consumer in accordance with the incentive program, |
| wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host. | wherein the incentive program is a promotion of the sponsor to the consumer facilitated by the host; |
| receive a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program, | receiving, from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer; |
| and validate the award, | validating the award using the database, |

---

[10]    Below, the elements of claim 1 (from which claim 16 depends) and the additional element of claim 16 are reproduced together as "Invalidated Claim 16."

18

**Appx18**

| Invalidated Claim 16 | Newly Asserted Claim 100 |
|---|---|
| wherein the host, the sponsor, and the consumer are different entities, and wherein the host and the sponsor are different individuals or corporate entities. | wherein the host, the sponsor, and the consumer are different individuals or corporate entities, |
| . . . wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host. | wherein the host computer is provided by a host through which the sponsor offers the incentive program to a consumer, |

('660 patent, Reexamination Certificate, cols. 1:23-54, 2:62-64, 7:53-8:14)

There is a remaining portion of claim 100, not excerpted above, that relates to the websites through which sponsors and consumers interact with the host. These website elements are referenced, in similarly worded form, in Invalidated Claims 17 and 29, as is depicted below:

| Invalidated Claims 17 and 29 | Remaining Elements of Newly Asserted Claim 100 |
|---|---|
| 17. The system of claim 16, wherein the host computer is configured to host a website of the host through which the sponsor builds the incentive program. | wherein the host computer hosts a website of the host through which the sponsor builds the incentive program; |
| 29. The system of claim 16, wherein an interface of a website of the host receives consumer interaction to participate in the incentive program. | and providing an interface of a website of the host, wherein the consumer interacts with the interface to participate in the incentive program, wherein the website of the host provides to the consumer incentive programs of a plurality of sponsors. |

('660 patent, Reexamination Certificate, cols. 2:65-67, 3:27-29, 8:14-21)

The PTAB determined that claim 17, which encompasses the system of claim 16 with the added limitation that the host computer hosts a website through which the sponsor builds the incentive program, was invalid for several reasons. First, the PTAB concluded that claim 17 was anticipated by Chelliah, and was obvious over Chelliah in view of Christensen, because Chelliah disclosed a "graphical interface (e.g., the Store Management Dashboard ['the Dashboard interface']) for the sponsor to build incentive programs"; even though Chelliah did not explicitly state that the Dashboard interface is a web interface, the PTAB found that "[a person of ordinary

19

**Appx19**

skill in the art] would have known to implement the Dashboard interface as such." *Groupon I*, 2020 WL 1900402, at *12-13 (alteration in original); *see also id*. at *21-22. The PTAB also found that claim 17 was obvious over Kelly in view of Stanek because "Stanek teaches that the host's web server can be configured to provide a sponsor with functionality necessary to build a promotional web game employing the FrontPage Editor." *Groupon II*, 2020 WL 1900398, at *11 (internal quotation marks and citation omitted).

As for claim 29, which encompasses the system of claim 16 and adds that the interface of a website of the host receives consumer interaction to participate in the incentive program, the PTAB also found the claim invalid for several reasons. The PTAB first concluded that claim 29 was anticipated by Chelliah, and obvious over Chelliah and Christensen, because Chelliah discloses "a consumer participating in the incentive programs via the website of the host 'using a WWW browser application across a TCP/IP connection[.]'" *Groupon I*, 2020 WL 1900402, at *13-14; *see also id*. at *19-22. The PTAB also found claim 29 as obvious over Kelly and Stanek where Kelly disclosed that a "player . . . may interact via a website of the host to participate in the promotional game[.]" *Groupon II*, 2020 WL 1900398, at *12.

Defendant therefore argues that in invalidating claims 17 and 29, "the PTAB necessarily found that Chelliah, as well as a system combining Kelly and Stanek, disclosed host systems having websites with which sponsors interacted to build incentive programs, and consumers interacted to participate." (D.I. 118 at 11) And thus, it asserts that Newly Asserted Claim 100, which contains requirements similar to claims 17 and 29, is not materially different from an invalidity perspective. (*Id.*)

In its briefing, Plaintiff responded only by noting Defendant's argument (i.e., "that the PTAB found that 'website' elements of asserted claim 100 were found in the prior art") and by

**Appx20**

accusing Defendant of wrongly "attempting a 'mix-n'-match' style of patent validity analysis" (hereafter, Plaintiff's "mix-and-match" argument).  (D.I. 120 at 6) [11]

The Court sides with Defendant.  The PTAB found that Chelliah and Kelly/Stanek disclosed the website elements of claims 17 and 29, and it found that the remaining system elements describing those two claims were disclosed in:  (1) Chelliah; (2) Chelliah in combination with Christensen; and (3) Kelly in combination with Stanek.  And relatedly, claim 100's elements (as is shown in the charts above), appear to include all of the important content of claims 17 and 29, including the website elements.  Now to be sure, claim 100 has two website elements, and both of those elements are not found in the same Invalidated Claim; instead, one element apiece is found in Invalidated Claim 17 and 29, respectively.  But that fact should not make a difference to the collateral estoppel analysis.  If Chelliah or Chelliah/Christensen or Kelly/Stanek all invalidate claim 17 *and* claim 29, then this must mean that the same

---

[11]     In explaining what it meant by this "mix-and-match" argument, Plaintiff simply cited to the Federal Circuit's opinion in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007), and particularly to *KSR*'s statement that a claim "composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." 550 U.S. at 418.  *KSR* does say this, of course.  In *KSR*, the Federal Circuit explained that in order to find a claim invalid as obvious, an accused infringer must not only demonstrate that each of the claim elements was found in the prior art references at issue, but must also, *inter alia*, "identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does."  *Id.*

However, the Court does not understand why this portion of *KSR* is in conflict with the analysis it is undertaking here.  In finding that certain of the Invalidated Claims were invalid as obvious, the PTAB necessarily found both that the invalidating references at issue disclosed all of the Invalidated Claims' elements, *and* that a POSITA would have been motivated to combine those elements in the way that the claimed invention does.  (D.I. 121 at 8)  In this opinion, the Court is simply assessing, from there, whether any limitations found in the Newly Asserted Claims that differ from those in the Invalidated Claims are material to an invalidity analysis.  This is not a wrongful "mix-and-match style of patent validity analysis."  It is the very type of collateral estoppel analysis that the Federal Circuit has instructed federal district courts to conduct.  (*Id.*)

reference/reference combinations disclose all of the content found in claim 100 too. And while there are otherwise a few words in claim 100 that differ from the words used in claims 17 and 29 (and claim 16, from which they depend), Plaintiff did not offer any argument as to why such wording differences are material to the Court's analysis here. *See Ohio Willow Wood*, 735 F.3d at 1343 ("Thus, the mere use of different words in these portions of the claims does not create a new issue of invalidity."). Nor can the Court discern any reason why they would be.

Therefore, the Court concludes that Plaintiff is collaterally estopped from asserting claim 100. *See In re Arunachalam*, 709 F. App'x 699, 703 (Fed. Cir. 2017) (applying collateral estoppel where "any differences between the two sets of claims[, one set in one patent having been deemed unpatentable by the PTAB, the other set in a related patent having been asserted in the instant district court litigation, were] not material such that those differences would affect the patentability of the challenged claims").

### 3. Newly Asserted Claims 103, 104 and 107-110

Next, the Court addresses six additional claims: Newly Asserted Claims 103, 104 and 107-110. The Court will begin with claims 103 and 107 and in doing so, it will focus solely on claim 107.[12]

Defendant argued that claim 107 recites the use of a nearly identical asserted invention to that found in Invalidated Claim 1, a system claim. (D.I. 118 at 14) The PTAB concluded that

---

[12]    In its briefing, Defendant asserted that claim 107 is "representative" of claim 103 because the two claims are "essentially identical[.]" (D.I. 118 at 14) Plaintiff did not dispute this. (D.I. 120) And claim 103 and claim 107 are indeed very similar; the former is a "method of incentive program generation" and the latter is a "method of incentive program generation and redemption[.]" ('660 patent, Reexamination Certificate, cols. 8:56-9:16, 9:24-10:3) Claim 107 appears to contain nearly all of claim 103's meaningful limitations, and it also adds a few additional narrowing limitations (e.g., its "issuing an award" and "receiving, from the sponsor" elements) relating to an award issued to a consumer. The Court thus sees no reason not to treat claim 107 as representative of claim 103 for these purposes. It will do so here.

the system in claim 1 was invalid as obvious over Kelly and Stanek. *Groupon II*, 2020 WL

1900398, at *10. Claim 1 and claim 107 are reproduced below:

| Invalidated Claim 1 | Newly Asserted Claim 107 |
|---|---|
| A system for incentive program generation, comprising: | A method of incentive program generation and redemption, comprising: |
| a network; a sponsor computer connected to the network; a host computer connected to the network, the host computer having a server; | providing a host computer, said host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network; |
| an incentive program builder application, running on the server; | providing an incentive program builder application, running on the host computer; |
| a database of objects associated with parameters of the incentive program builder application; and | providing a database of objects associated with parameters of said incentive program builder application; |
| an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program building application, | providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program offered to a customer, wherein the sponsor builds an incentive program by interacting with the interface of the incentive program builder application; |
| wherein the host computer is configured to receive first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors, receive second input from a consumer selecting an incentive program from among the plurality of incentive programs, | |
| issue an award to the consumer corresponding to the selected incentive program, and | issuing an award to the consumer in accordance with the incentive program, wherein the incentive program is a promotion of the sponsor to the consumer facilitated by the host; |
| receive a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program, and | receiving, from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer; |
| validate the award, | validating the award using the database, |
| wherein the host, the sponsor, and the consumer are different entities, and wherein | wherein the host, the sponsor, and the consumer are different individuals or corporate entities; and |

23

**Appx23**

| Invalidated Claim 1 | Newly Asserted Claim 107 |
|---|---|
| the host and the sponsor are different individuals or corporate entities. | |
| | issuing an electronic card to the consumer, the electronic card storing information of the consumer for accessing the promotion of the sponsor offered to the consumer. |

('660 patent, Reexamination Certificate, cols. 1:23-54, 9:24-10:3)

As can be seen in the chart above, the only element in Newly Asserted Claim 107 that does not have a clear analogue in Invalidated Claim 1 is claim 107's final "electronic card" limitation ("issuing an electronic card to the consumer, the electronic card storing information of the consumer for accessing the promotion of the sponsor offered to the consumer"). But in its briefing, Defendant noted that another Invalidated Claim—Invalidated Claim 12— *did* have an electronic card limitation. (D.I. 118 at 15) Claim 12 recites in relevant part:

> A method of providing incentive program generation and award fulfillment, comprising: . . .
>
> providing an electronic card for fulfillment of an award, having memory for storing information associated with the consumer, wherein the information may be a personal identification number or information associated with the consumer's participation in an incentive program; . . .

('660 patent, cols. 48:58-59, 49:13-18) In IPR2019-00044, the PTAB concluded that Kelly and Stanek disclosed the electronic card limitation found in claim 12. *Groupon II*, 2020 WL 1900398, at *18-21. In support of this conclusion, the PTAB cited, *inter alia*, to the following arguments that Defendant made during the IPR:

> Kelly contains numerous disclosures regarding the use of a smart card to store player-specific prize information:
>
> [A] player can insert a card or other medium which stores electronic data into a suitable output device 18. The game unit 10 then can write electronic data on the medium indicating the specific prize that was won by the player, and/or indicating a

24

**Appx24**

> number of tickets or prize credits which the player has won.  The
> player can then take the card and insert the card into a suitable card
> reader connected to a prize selection apparatus[.] . . .
>
> Kelly discloses that such smart cards may include a personal
> identification number or information associated with the
> consumer's participation in the incentive program.

(IPR2019-00044, Paper 10 at 50-51 (citations omitted) (*cited in Groupon II*, 2020 WL 1900398,

at *19))

 In light of all of this, Defendant argues that the electronic card limitation in Newly

Asserted Claim 107 is not materially different from the electronic card limitation in Invalidated

Claim 12.  It therefore asserts that the PTAB necessarily found that Kelly and Stanek disclosed

all of the elements of claim 107 (as part of its validity analysis of claims 1 and 12), including the

electronic card limitation, such that Plaintiff is collaterally estopped from asserting claim 107

(and, relatedly, claim 103).  (D.I. 118 at 17)

 In response, Plaintiff again said very little in its briefing.  It merely noted that the

"electronic card" element was absent from Invalidated Claim 1, and it again suggested that

Defendant was somehow wrongly attempting a "mix-and-match" invalidity argument.  (D.I. 120

at 6)

 At oral argument, Plaintiff's counsel added a bit more.  Counsel stated that its "strongest"

arguments against estoppel relate to the claims with the electronic card limitation in them.  (Tr. at

86)  Counsel then pointed to claim 107's requirement that the method not only "issu[es] an

electronic card to the consumer, the electronic card storing information of the consumer" but that

this information is to be used "for accessing the promotion of the sponsor offered to the

consumer."  ('660 patent, Reexamination Certificate, col. 10:1-3; *see also* Tr. at 86 ("Here the

claim language includes the accessing feature, and that was not disclosed in the prior art.  So

right there is a difference.")) That said, aside from noting that this "for accessing the promotion" language was "different" from the language in claim 12, and making the bald statement that this limitation "was not disclosed in the prior art[,]" counsel did not say any more about why this additional claim language was material to patentability. (Tr. at 86) The Court then followed up. It asked why it was "plausible . . . from an invalidity perspective [that] there could be a material difference between what was disclosed in this prior art [i.e., Kelly] . . . versus what the electronic card limitation [discloses] in [c]laim 107[.]" (*Id.* at 86-87) On that front, Plaintiff's counsel acknowledged that Plaintiff "did[ not] make [that type of] argument" in its briefing (i.e., about why claim 107's "for accessing the promotion" language was material to patentability); instead, counsel acknowledged that its briefing had relied on "conclusory" statements regarding materiality. (*Id.* at 87-89) Counsel noted that Plaintiff had not yet assessed the prior art in order to be able to better answer the Court's question, and so he was not "prepared to" make such an argument at this stage of the case. (*Id.* at 87-91)[13]

The Court concludes that Plaintiff is collaterally estopped from asserting Newly Asserted Claim 107 (and thus, also Newly Asserted Claim 103). The electronic card limitation in claim 107 first requires that an electronic card be issued and that it be for "storing information of the consumer[.]" ('660 patent, Reexamination Certificate, col. 10:2) There can be no question that this concept is found in claim 12 and was disclosed in Kelly, (Tr. at 50); indeed, Plaintiff does not argue otherwise. As for the electronic card limitation's additional requirement that the card

---

[13] Twice during this portion of oral argument, Plaintiff's counsel suggested that claim construction might illuminate why the "for accessing the promotion" language in claim 107 makes a material difference regarding patentability. (Tr. at 88, 90) The Court then asked why this was so—i.e., what construction would Plaintiff give to that term, and how would such a construction help to demonstrate that this aspect of claim 107 was not disclosed by Kelly? (*Id.* at 92) To that, Plaintiff's counsel responded that he could not answer that question now, but would be prepared to do so at the summary judgment stage of the case. (*Id.*)

be "for accessing the promotion of the sponsor offered to the consumer[,]" ('660 patent,

Reexamination Certificate, col. 10:2-3), the record clearly indicates that this aspect of the

invention was also implicated by claim 12 and disclosed in Kelly.  More specifically:

- Claim 12 had a limitation requiring that the electronic card described therein was one "for fulfillment of an award" and that the information retained by the card was "associated with the consumer's participation in an incentive program[.]"  ('660 patent, col. 49:13-17)  In other words, the claim facially required that the electronic card must be capable of being used by the consumer to participate in the incentive program and to obtain (or "fulfil[l]") an award offered by the program's sponsor.  (Tr. at 50 (Defendant's counsel noting that the electronic card in claim 12 contains "information for accessing the promotion of a sponsor because it . . . is an electronic card that is intended to fulfill an award [and it] has information necessary for the customer's or consumer's participation in the in[c]entive program"); *id.* at 51)  In order to be able to use an electronic card to fulfill an award offered by a sponsor (i.e., what is described in claim 12), the card would necessarily have to be able to be used for "accessing the promotion of the sponsor" (i.e., what is described in claim 107).

- In determining that Kelly disclosed the electronic card limitation in claim 12, the PTAB cited to Defendant's description of Kelly.  That description noted how Kelly disclosed that:  (1) the consumer information on the electronic card described therein is "associated with the consumer's participation in the incentive program"; and (2) the electronic card can be inserted "into a suitable card reader connected to a prize selection apparatus[.]"  This demonstrates that Kelly disclosed use of an electronic card "for accessing the promotion of the sponsor offered to the consumer."  (*Id*. at 51-52)

Therefore, in light of the PTAB's finding that claims 1 and 12 were invalid as obvious in light of

Kelly and Stanek, Plaintiff is collaterally estopped from asserting claims 103 and 107, since no

additional elements in those claims would materially alter the question of invalidity.

This then leads to the analysis of Newly Asserted Claims 104 and 108-10, all of which

depend from Claims 103 and 107.  Claims 104 and 108-10 each contain further limitations

27

**Appx27**

relating to the electronic card element of claims 103 and 107—in that they require "validating participation of the consumer in the promotion using the electronic card" or "validating the award using the database and the electronic card" or "wherein the electronic card indicates participation of the consumer in the promotion." ('660 patent, Reexamination Certificate, cols. 9:17-19, 10:4-11)  Defendant argues that these four additional claims each simply "recite[ further] use of the electronic card in connection with the consumer's participation in the incentive program or the validation of the award" and that Kelly "disclosed use of an electronic card for each of these purposes." (D.I. 118 at 17)  The Court cannot see why Defendant's position is incorrect. (S*ee* IPR2019-00044, Paper 10 at 50-51 (Defendant noting to the PTAB that Kelly discloses use of the electronic card for insertion into a card reader that is connected to the prize selection apparatus))  And crucially, Plaintiff provided *no specific argument to the contrary*, either in its briefing or at oral argument, and thus has waived any such argument here. *See supra* n.8.  Thus, the Court finds that collateral estoppel precludes Plaintiff's assertion of these additional claims, as well.

### 4. Newly Asserted Claim 91

Defendant next argued that Newly Asserted Claim 91 "duplicates limitations found in Invalidated Claims 7 and 87[,]" and, therefore, "[t]he PTAB necessarily determined the method recited in Claim 91 was anticipated by, and obvious in light of, the prior art." (D.I. 118 at 18)  The PTAB found that Claims 7 and 87 were invalid as:  (1) anticipated by Chelliah, *Groupon I*, 2020 WL 1900402, at *14-15, *17-18; (2) obvious over Chelliah and Christensen, *id.* at *22; (3) obvious over Kelly and Stanek, *Groupon II*, 2020 WL 1900398, at *13, *15; and (4) obvious over Kelly and Wong, *id.* at *21.  The relevant portions of claim 7, along with the entirety of claim 87 and claim 91, are reproduced below:

| Invalidated Claims 7 and 87 | Newly Asserted Claim 91 |
|---|---|
| A method for generating an incentive program, comprising: (Claim 7)<br><br>A system for incentive program generation, comprising: (Claim 87) | A method for generating an incentive program, comprising: |
| providing a computer; (Claim 7)<br><br>a network; a sponsor computer connected to the network; a host computer connected to the network, the host computer having a server; (Claim 87) | providing a computer; |
| providing an incentive program builder application of such computer; (Claim 7)<br><br>an incentive program builder application, running on the server; (Claim 87) | providing an incentive program builder application of such computer; |
| providing a database of objects associated with parameters of an incentive program; (Claim 7)<br><br>a database of objects associated with parameters of the incentive program builder application; (Claim 87) | providing a database of objects associated with parameters of an incentive program |
| providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program; (Claim 7)<br><br>an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program builder application, (Claim 87) | providing an interface of the incentive program builder application for user entry of parameters for an incentive program |
| associating an object in the database with each parameter entered by the plurality of sponsors; (Claim 7) | associating an object with each parameter entered by the user |
| generating the plurality of incentive programs comprising the objects associated with all of the parameters entered by the plurality of sponsors; (Claim 7) | generating an incentive program comprising the objects associated with all of the parameters entered by the user |
| wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer, wherein the host, the sponsor, and | wherein the computer is a host computer provided by a host through which a sponsor offers the incentive program to a consumer, wherein the host, the sponsor, and the |

29

**Appx29**

| Invalidated Claims 7 and 87 | Newly Asserted Claim 91 |
| --- | --- |
| the consumer are different entities, wherein the host and the sponsor are different individuals or corporate entities, wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host,  (Claim 87) | consumer are different entities, wherein the host and the sponsor are different individuals or corporate entities, wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host; |
| receiving second input from a consumer selecting an incentive program from among the plurality of incentive programs[.]  (Claim 7)<br><br>wherein an interface of a website of the host receives consumer interaction to participate in the incentive program, wherein the consumer interaction comprises a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors.  (Claim 87) | receiving consumer interaction through a website of the host to participate in the incentive program wherein the receiving comprises:  receiving a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors. |

('660 patent, Reexamination Certificate, cols. 2:1-31, 5:56-6:19, 6:28-57)

Plaintiff's only rejoinder to Defendant's argument was to note that certain "elements of claim 91" were not found in claims 7 or 87 (it did not say which ones it was talking about), and to make its "mix-and-match" argument.

Again here, the Court sides with Defendant.  Although there are certain elements of claim 91 whose equivalent is not found in claim 7 or claim 87, respectively, Defendant sufficiently demonstrated how the equivalent of every element in claim 91 was found in *either* claim 7 or 87. (D.I. 118 at 20)  As a result, because the PTAB found that Chelliah anticipated both claims 7 and 87, here that necessarily means that Chelliah anticipates claim 91 as well.  And because the PTAB found that Chelliah/Christensen, Kelly/Stanek and Kelly/Wong all rendered both claims 7 and 87 obvious, here that necessarily means that these combinations also render claim 91 obvious.  Moreover, though it is true that some of the wording in claim 91 is slightly different

**Appx30**

than that in claims 7 and 87,[14] Plaintiff has not articulated (and the Court cannot see) how those slight differences would make a difference in a validity analysis. *See Ohio Willow Wood*, 735 F.3d at 1342. The Court therefore concludes that Defendant has established that the assertion of Claim 91 is precluded by collateral estoppel.

### 5.      Newly Asserted Claims 92-93 & 96-97

Lastly, the Court assesses Newly Asserted Claims 92-93 and 96-97. It begins with the latter two claims.

Claims 96 and 97 depend from Newly Asserted Claim 95; as discussed above, Plaintiff is collaterally estopped from litigating claim 95 here in light of the PTAB's decision regarding Invalidated Claim 87. Claim 95 required, *inter alia*, that the claimed method comprises "receiving a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors." ('660 patent, Reexamination Certificate, col. 7:32-34) Claim 96 simply adds that the consumer request must involve searching for the promotions "using a *name of the sponsor*[,]" while claim 97 adds only that the request has to involve searching by "*type of promotion*[.]" (*Id.*, col. 7:37-39, 7:43-45 (emphasis added))

---

[14]      By way of example, Invalidated Claim 7 includes a limitation requiring that the method comprises "associating an object in the database with each parameter entered by *the plurality of sponsors*[,]" while Newly Asserted Claim 91 includes a limitation requiring that the method comprises "associating an object with each parameter entered *by the user*[.]" ('660 patent, Reexamination Certificate, cols. 2:16-17, 6:38-39 (emphasis added)) Does this difference in wording (regarding who enters the parameters at issue) materially alter the question of invalidity? Again, Plaintiff *never specifically argued that it did*. At oral argument, the Court questioned Defendant's counsel about this issue, and counsel persuasively explained that in claim 91, the term "user" can include reference to the "sponsor." (Tr. at 55) This is because the claim explains that it is the "sponsor" who offers the incentive program, and that the "user" is the one who is associating objects with certain parameters that are used to build that very same incentive program. (*Id.*) So it does in fact appear that the "user" in claim 91 can be a "sponsor" (as described in claim 7). Thus, these two claim limitations do not appear to be materially different in scope from an invalidity perspective.

With regard to claim 96's add of searching by sponsor name, Defendant argued that the PTAB found claim 87 invalid "based upon prior art disclosing the search for incentive programs using the identity of the *sponsor* (*i.e.*, the supplier's 'storefront' or 'brand name')." (D.I. 118 at 12-13 (emphasis in original)) More specifically, in IPR2019-00061, the PTAB found claim 87 anticipated by Chelliah; in doing so, it noted that: (1) claim 87 required that, *inter alia*, a consumer make a request to "search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors"; and (2) this limitation was found in Chelliah, which involved a consumer request that "prompts a search of the database for incentive programs *of th[e] supplier*[.]" *Groupon I*, 2020 WL 1900402 at *17 (emphasis added). Additionally, the PTAB also found claim 87 obvious in light of Chelliah in combination with Christensen; in doing so, the PTAB agreed that Christensen disclosed the customer's "ability to search for promotions by *brand name*[.]" *Id.* at *20 (internal quotation marks and citations omitted) (emphasis added). These do appear to be clear indications from the PTAB that Chelliah and Chelliah/Christensen disclosed the ability to search for incentive programs by sponsor name.

As for claim 97's limitation that requires searching by type of promotion, Defendant noted that the PTAB found claim 87 invalid as obvious and, in doing so, "found that it would have been obvious to search by program *type*." (D.I. 118 at 13 (emphasis in original)) More specifically, in IPR2019-00061, when assessing claim 87's limitation that the method include a "consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors[,]" the PTAB agreed that Christensen revealed the limitation because it disclosed the customer's ability to search for promotions by "*category*[.]" *Groupon I*, 2020 WL 1900402, at *20 (emphasis added). And in IPR2019-00044, the PTAB also found the limitation disclosed in light of Kelly and Stanek, in that Kelly "disclos[ed] presenting 'a

**Appx32**

consumer with icons representing a variety of games, and the ability to cause the system to retrieve available games in order to make a selection,'" and so "it would have been obvious 'to employ this existing search functionality to also *deliver game categories* to the participants, given its usefulness in permitting selections where there are a large number of potential games available of differing types.'" *Groupon II*, 2020 WL 1900398, at *15 (citations omitted) (emphasis added). These also appear to be clear indications from the PTAB that Chelliah/Christensen and Kelly/Stanek disclosed the ability to search for incentive programs by promotion type.

Plaintiff did not respond to these arguments at all in its briefing or at oral argument. In light of that, and in light of the analysis set out above, the Court agrees with Defendant that the limitations added by claims 96 and 97 are found in the same prior art that invalidated claim 87. Thus, these additional limitations in Claims 96 and 97 do not materially alter the question of invalidity, such that collateral estoppel applies. *See Chrimar Sys., Inc. v. Ruckus Wireless, Inc.*, Case No. 16-cv-00186-SI, 2020 WL 4431787, at *5-6 (N.D. Cal. July 31, 2020) (concluding that the patentee was collaterally estopped from litigating amended claim 145, which included the requirement that a "BaseT Ethernet hub" be utilized, because in concluding that claim 1 of the patent was invalid, the PTAB had explained that a reference ("Hunter") disclosed use of such a hub, and Hunter and another reference would otherwise render amended claim 145 obvious).

This leaves Newly Asserted Claims 92 and 93, which depend from Newly Asserted Claim 91. Above, the Court concluded that Plaintiff is collaterally estopped from pursuing claim 91 in light of the PTAB's determination that claims 7 and 87 were invalid in light of Chelliah, Chelliah/Christensen, Kelly/Stanek and Kelly/Wong. Claims 92 and 93 add to claim 91 the very same additional limitations found in claims 96 and 97—that is, claim 92 adds a limitation that

33

**Appx33**

the method receives a request to search for incentive programs by sponsor name, while Claim 93 adds that the request requires searching by program type. (D.I. 118 at 21; '660 patent, Reexamination Certificate, col. 6:58-67) Given the application of collateral estoppel to claims 96 and 97 in light of the disclosures in certain of the invalidating art listed above, the Court similarly concludes that Plaintiff is also estopped from asserting claims 92 and 93. Like with claims 96 and 97, Plaintiff did not make any argument regarding material differences found in claims 92 and 93, and the Court sees none.

## IV. CONCLUSION

This is one of those (perhaps somewhat rare) circumstances where, even at the motion to dismiss stage, a defendant has demonstrated that a plaintiff is collaterally estopped from asserting certain patent claims in light of the PTAB's decision that other (slightly-differently-worded) claims of the same patent were invalid. Defendant here made fulsome arguments as to why any differences in the Newly Asserted Claims and Invalidated Claims did not materially alter the question of invalidity. And Plaintiff did not provide much in the way of response. Thus, for the foregoing reasons, the Court GRANTS Defendant's Motion.

Plaintiff did not seek to amend its Operative Complaint in lieu of dismissal, and the Court has not been provided with an example as to how amendment would be anything other than a futile exercise. So, the Court further rules that the operative complaint be dismissed WITH PREJUDICE.

An appropriate Order will issue.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| KROY IP HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-1405-MN-CJB |
| | ) | |
| GROUPON, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

At Wilmington this **2ⁿᵈ day of December, 2022**, consistent with and for the reasons

stated in the Memorandum Opinion issued this same date, **IT IS HEREBY ORDERED** that:

1.    Defendant Groupon, Inc.'s motion to dismiss based on collateral estoppel, (D.I.

117), is GRANTED.

2.    Plaintiff Kroy IP Holdings, LLC's Second Amended Complaint, (D.I. 111), is

dismissed WITH PREJUDICE.


*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

US006061660A

# United States Patent [19]

## Eggleston et al.

| [11] | Patent Number: | **6,061,660** |
|---|---|---|
| [45] | Date of Patent: | **May 9, 2000** |

[54] **SYSTEM AND METHOD FOR INCENTIVE PROGRAMS AND AWARD FULFILLMENT**

[75] Inventors: **York Eggleston**, Baltimore, Md.; **Andrey Ukhov**, Washington, D.C.

[73] Assignee: **York Eggleston**, Baltimore, Md.

[21] Appl. No.: **09/040,490**

[22] Filed: **Mar. 18, 1998**

### Related U.S. Application Data

[60] Provisional application No. 60/063,180, Oct. 20, 1997, and provisional application No. 60/067,776, Dec. 10, 1997.

[51] Int. Cl.⁷ ............................................... G06F 157/00
[52] U.S. Cl. ...................................... 705/14; 705/7
[58] Field of Search ........................... 705/7, 10, 14, 705/17, 26, 27, 501, 513; 395/200.47–200.49; 707/100–104, 200

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,697,729 | 10/1972 | Edwards et al. . |
| 3,698,718 | 10/1972 | Kuhn . |
| 3,790,070 | 2/1974 | Schnitzer et al. . |
| 3,941,388 | 3/1976 | Isaac et al. . |
| 4,140,319 | 2/1979 | Aycock et al. . |
| 4,194,242 | 3/1980 | Robbins . |
| 4,321,672 | 3/1982 | Braun et al. . |
| 4,346,442 | 8/1982 | Musmanno . |
| 4,378,941 | 4/1983 | Derby . |
| 4,385,285 | 5/1983 | Horst et al. . |
| 4,554,446 | 11/1985 | Murphy et al. . |
| 4,561,658 | 12/1985 | Peterson . |
| 4,566,066 | 1/1986 | Towers . |
| 4,585,160 | 4/1986 | Fiske, II . |
| 4,597,046 | 6/1986 | Musmanno et al. . |
| 4,601,490 | 7/1986 | Brandon . |
| 4,619,457 | 10/1986 | Small . |
| 4,634,147 | 1/1987 | McClure . |
| 4,694,397 | 9/1987 | Grant et al. . |
| 4,711,454 | 12/1987 | Small . |
| 4,722,554 | 2/1988 | Petit . |
| 4,723,212 | 2/1988 | Mindrum et al. . |
| 4,725,719 | 2/1988 | Oncken et al. . |
| 4,739,478 | 4/1988 | Roberts et al. . |

| | | |
|---|---|---|
| 4,742,457 | 5/1988 | Leon et al. . |
| 4,775,154 | 10/1988 | Clinnin et al. . |
| 4,781,378 | 11/1988 | Clinnin et al. . |
| 4,902,020 | 2/1990 | Auxier . |
| 4,908,761 | 3/1990 | Tai . |
| 4,982,346 | 1/1991 | Girouard et al. ...................... 364/550 |
| 5,009,429 | 4/1991 | Auxier . |
| 5,018,975 | 5/1991 | Todd . |
| 5,025,372 | 6/1991 | Burton et al. . |
| 5,053,955 | 10/1991 | Peach et al. . |
| 5,056,019 | 10/1991 | Schultz et al. . |
| 5,074,566 | 12/1991 | Desbiens . |
| 5,085,470 | 2/1992 | Peach et al. . |
| 5,197,884 | 3/1993 | Roemer, Jr. et al. . |
| 5,207,792 | 5/1993 | Anderson . |
| 5,249,807 | 10/1993 | Peterson . |
| 5,255,456 | 10/1993 | Franklin . |
| 5,292,133 | 3/1994 | Alexander . |
| 5,321,604 | 6/1994 | Peach et al. . |

(List continued on next page.)

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO 97 22058 | 6/1997 | WIPO . |
| WO 97 23838 | 7/1997 | WIPO . |

#### OTHER PUBLICATIONS

Carl G. Kline, MBA, "Virtual Store—Using Contests for Promotions . . . Exclusive to Smart Business Supersite", http://www.smartbiz.com/sbs/columns/kline15.html, 1997.
"Cybercash Sweepstakes", Interactive PR & Marketing News, http://prizelink.com/cc–press.html, 1997.

*Primary Examiner*—Frantzy Poinvil
*Attorney, Agent, or Firm*—Foley, Hoag & Eliot LLP

[57] **ABSTRACT**

A method and system for providing incentive programs over a computer network is provided in which a host may provide sponsoring companies with the capability to buy prepackaged or self-built incentive programs, offer such incentive programs to consumers, provide sponsoring companies and retailers with the capability to associate prizes with incentive programs, provide sponsoring companies, retailers and consumers with convenient fulfillment of prizes, and store and manipulate databases regarding all of the foregoing.

**15 Claims, 23 Drawing Sheets**



**6,061,660**

Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,342,056 | 8/1994 | Ajaji . |
| 5,393,964 | 2/1995 | Hamilton et al. . |
| 5,435,565 | 7/1995 | Benaderet . |
| 5,482,139 | 1/1996 | Rivalto . |
| 5,572,005 | 11/1996 | Hamilton et al. . |
| 5,576,951 | 11/1996 | Lockwood . |
| 5,636,346 | 6/1997 | Saxe . |
| 5,664,115 | 9/1997 | Fraser . |
| 5,699,310 | 12/1997 | Garloff et al. ......................... 395/701 |
| 5,774,870 | 6/1998 | Storey ..................................... 705/14 |
| 5,794,210 | 8/1998 | Goldhaber et al. ...................... 705/14 |



Fig. 1



Fig. 2



Fig. 3



Fig. 4



Fig. 5



Fig. 6



Fig. 7



Fig. 8

Fig. 9



Fig. 10

Case: 23-1359    Document: 20    Page: 102    Filed: 06/12/2023



Fig. 11

Fig. 12



Fig. 13



Fig. 14



NEW SPONSOR
REGISTRATION INTERFACE
MEMBERSHIP PACKET
NETWORKED SPONSOR
VALIDATION INTERFACE
PROMOTION GENERATOR
WINNING CONDITIONS
PROMOTION PARAMETERS / OBJECTS
ELECTRONIC SHOPPING CART
QUERIES
NEW RETAILER
REGISTRATION INTERFACE
MEMBERSHIP PACKET
NETWORKED RETAILER
RETAILERS' INVENTORY
ELECTRONIC DATA INTERCHANGE
SPONSOR DATABASE 202
AWARD POOLS
CONSUMER DATABASE 200
AWARD DATABASE 204
SEARCH FOR RETAILER
NEW USER
REGISTRATION INTERFACE
CARD
MEMBERSHIP PACKET
NETWORKED CONSUMER
VALIDATION INTERFACE
QUERIES
WINNING CONDITION MET
YES
OBJECT
USER/WINNER
VERIFICATION, NOTIFICATION, INSTRUCTIONS
CREDIT USER ACCOUNT: ITEM/RETAILER INFORMATION
FULFILLMENT: WINNER (USER), RETAILER
USER PRESENTS HIS CARD TO RETAILER
RETAILER/PROCESSOR VERIFIES/AUTHORIZES WINNER'S AWARD
RETAILER RELEASES THE PRIZE

Fig. 15



Fig. 16



Fig. 17



Fig. 18



Fig. 19

| GENERAL TYPE | TARGET OF INCENTIVE EFFORT | COMMON DESCRIPTIVE LANGUAGE | DESCRIPTIVE TYPE | SHORT-TERM | LONG-TERM | IMPLEMENTATION VISUAL MECHANISMS (USED TO DISPLAY RESULT) | PRIZE TYPES |
|---|---|---|---|---|---|---|---|
| WITHIN FIRM | EMPLOYEES | *INCENTIVE PROGRAMS *EMPLOYEE MORALE PROGRAMS | *ONLINE TESTING *ATTENDANCE MONITORING *GAMES OF SKILL (TRIVIA) *GAMES OF CHANCE (PRESS TO WIN) | INSTANT-WIN | *SWEEPSTAKES *PERFORMANCE REWARDS *EMPLOYEE LOYALTY | BUTTONS BANNERS SCRATCH & WIN PUZZLES PIN-BALL OTHER TEXTS GRAPHICS | MERCHANDISE SERVICES DISCOUNTS COUPONS POINTS |
| | SUPPLIERS (EX. VIA EXTRANETS, OR PRIVATE INTERNETS) | | | | | | |
| OUTSIDE FIRM | CUSTOMERS | PROMOTIONS SWEEPSTAKES GIVEAWAY EFFORTS COUPONS | *GAMES OF SKILL (TRIVIA, "SURVEY MATCH"), PUZZLES, SCRATCH & WIN) *GAMES OF CHANCE (PRESS TO WIN) *CUSTOMER SERVICE (SURVEY, QUESTIONNAIRE COMPLETION) | INSTANT WIN | *SWEEPSTAKES *CUSTOMER LOYALTY | BUTTONS BANNER SCRATCH & WIN PUZZLES PIN-BALL | MERCHANDISE SERVICES DISCOUNTS COUPONS POINTS |
| | | | | | *CUSTOMER LOYALTY | SCRATCH & WIN PUZZLES PIN-BALL | POINTS |

Fig. 20



INCENTIVE COMPANY
660
CONSUMER DB
200
662
664
668
QUERY FOR WINNING CONSUMERS
WINNERS' FILE
PRIZE WINNERS' BY FULFILLMENT METHOD
TRANSFER TO THIRD PARTY FOR FULFILLMENT
MAIL/THIRD PARTY FILE
RETAIL FILE
SPONSOR FILE
TRANSFER FILE TO SPONSORING FIRM FOR FULFILLMENT
676
674
670
672
678
680
PRIZE RETAIL FILE BY RETAILER
682
TRANSFER FILES TO RETAILER
686
CONSUMER COLLECTS UNIQUE PRIZE ON OUR PAYMENT
684
RETAILERS VERIFY UNIQUE CARDHOLDER IS WINNER OF UNIQUE PRIZE
AWARDS FILLED REPORT CREATED BY RETAILER
688
704
CONSUMER PRESENTS CARD & PRIZE AT RETAIL CHECK-OUT
FULFILLMENT FILE
690
700
692
CONSUMER INSTRUCTED TO RETRIEVE PRIZE AT RETAILER X
CONSUMER COLLECTS UNIQUE PRIZE AT RETAILER X
FILE UPLOADED FOR PAYMENT BY INCENTIVE FIRM VIA ISSUER
702
698
CONSUMER WIN'S PROMOTION ACROSS NETWORK
696
INCENTIVE FIRM CONFIRMS & PAYS RETAILER VIA ISSUER
694
CARD ISSUED TO CONSUMER REGISTERED IN PROMO OFFERING

Fig. 21



Fig. 22



Fig. 23



502
CONSUMER JOINS THE PROMOTIONS CLUB ON TIME
504
CONSUMER FILE CREATED IN INCENTIVE CLUB DB
508
CONSUMER UNIQUE ID GENERATED &ASSIGNED
510
CONSUMER IDENTIFICATION FILE CREATED
CONSUMER ID FILE TRANSFERRED TO CARD ISSUER
512
500
CARD ISSUER ENCODES & EMBOSSES CARD
514
CARD MAILED TO INCENTIVE CLUB MEMBER
518
CONSUMER PARTICIPATES IN NETWORK PROMOTIONS
520
CONSUMER WINS PRIZE X
522
CONSUMER INSTRUCTED TO PICK-UP PRIZE X AT STORE Y
524
CONSUMER VISITS STORE
528
CONSUMER SELECTS ITEM X AT STORE
530
CONSUMER PRESENTS CARD AT POINT OF SALE TERMINAL
532
540
538
CONSUMER EXITS
PRIZE INVENTORY ID MATCHED WITH CONSUMER CARD ID AND AWARD UNIT
CARD SCANNED
534

Fig. 24



544
REGISTERED CONSUMER WINS
RECEIVES INSTRUCTION TO VISIT STORE Y FOR AWARD X
552
PRESENTS FULFILLMENT CARD AT POINT OF SALE -POS
554
QUERY UPLOADED WINNER'S FILE (IN CONSUMER DATABASE)
558
546
DATA ENTRY IN WINNERS' TABLE
564
REFER TO ISSUER
562
CORRECT INPUT ?
NO
560
FULFILLMENT CARD WINNER ?
548
WINNER'S FILE
PRESENTS FROM ITEM Y FOR AWARD Y AT (POINT OF SALE) POS
568
550
548
INCENTIVE FIRM TRANSFERRED WINNER'S FILE TO RETAILER
RETAILER CONFIRMS AWARD UNITS
ITEMS IDENTIFIED VIA RETAIL INVENTORY SYSTEM
570
578
NOTIFY CONSUMER
QUERY UPLOADED WINNER'S FILE
572
542
YES
582
580
576
574
REFER TO ISSUER
NO
SUBSTITUTE ?
NO
IS AWARD AVAILABLE ?
NO
IS WINNERS AWARD AT POINT OF SALE ?
584
PROVIDE SUBSTITUTE PRODUCT AND NOTE
CREDIT BILL FOR PAYMENT DISCOUNT OF ITEMS
586
RECEIVES AUTHORIZATION CODE ON A RECEIPT
588
598
FUNDS FULFILLMENT TRANSFERRED TO RETAILER
CONSUMER SIGNS RECEIPT AND EXITS
590
594
596
INCENTIVE FIRM CONFIRMS AWARD UNIT AND ID OF CONSUMER
TRANSACTION FILE TRANSMITTED TO INCENTIVE FIRM VIA ISSUER
FULFILLMENT TRANSACTIONS COLLECTED
592

Fig. 25



602
REGISTERED CONSUMER WINS
608
RECEIVES INSTRUCTION TO VISIT STORE Y FOR AWARD X
PRESENTS PROMO ITEM Y FOR AWARD Y OR (POINT OF SALE) POS
610
PRESENTS FULFILLMENT CARD
612
STORE DIAL-UP TO CARD ISSUER ONLINE WINNERS, DATABASE
INPUT CARD ID
614
604
DATA ENTRY IN WINNERS' TABLE
606
DATA ENTRY IN WINNERS' TABLE
620
REFER TO ISSUER
618
CORRECT INPUT ?
616
MATCH ?
622
INPUT ITEM SKU
628
REFER TO ISSUER
626
CORRECT INPUT ?
624
MATCH ?
630
RECEIVES AUTHORIZATION CODE #
600
632
CONSUMER SIGNS RECEIPT AND EXITS
634
FULFILLMENT TRANSACTION COLLECTED
636
TRANSACTION FILE SUBMITTED TO INCENTIVE FIRM VIA ISSUER
638
INCENTIVE FIRM CONFIRMS AWARD UNIT & ID OF CONSUMER
640
FOCUS FULFILLMENT TRANSACTION TO STORE X

Fig. 26

6,061,660

**1**

## SYSTEM AND METHOD FOR INCENTIVE PROGRAMS AND AWARD FULFILLMENT

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is based upon U.S. Provisional Patent Application No. 60/063,180, entitled SYSTEM AND METHOD FOR INCENTIVE PROGRAMS AND AWARD FULFILLMENT, filed Oct. 20, 1997, naming Eggleston and Ukhov as inventors, and U.S. Provisional Patent Application No. 60/067776, entitled METHOD AND SYSTEM FOR INCENTIVE PROGRAMS AND AWARD FULFILLMENT, filed Dec. 10, 1997, naming Eggleston as inventor. The entirety of both such provisional patent applications is incorporated by reference herein.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to systems and methods for conducting incentive programs and systems and methods for fulfilling awards and prizes won in incentive programs.

The present invention relates more particularly to systems and methods for conducting incentive programs over computer networks, such as the Internet.

2. Description of Related Art

Incentive award programs, in which incentive companies contract with sponsoring companies for programs to promote sales of the sponsoring companies' products or services, are well-known. Incentive programs include discount coupon programs; customer loyalty programs, such as frequent flyer programs, and promotional games, such as sweepstakes prizes, scratch-and-win games, and the like, in which a sponsoring company's products or services are won by successful participation in the incentive program.

Incentive programs offer awards and incentives to modify behavior of individual consumers and to direct the consumers to some pre-determined action, such as purchase of products or services upon visiting a retail site, viewing advertising, testing a product, or the like. Companies use awards and incentives to increase awareness of product offerings, to launch new products, to attract the attention of a newly identified audience, to differentiate products to encourage certain behavior, to obtain information, and for other purposes.

Traditional incentive programs systems suffer drawbacks in terms of convenience of tracking data, changing promotions, and the like. For example, for a consumer who participates in multiple incentive programs it may take time and effort to track his or her participation in each program. For example, time is required to keep track of loyalty points earned in each separate incentive program. Therefore, when a consumer receives an offer to participate in an incentive program, the consumer may decide against participating in it, not because the incentive program is not attractive, but because the cost to the consumer, in terms of the time and effort to tracking another incentive program, exceeds the expected benefit of the incentive program. Accordingly, a consumer need has arisen for a streamlined system and method for tracking consumer participation in a variety of incentive programs from different sponsors.

A similar problem exists for sponsoring companies who wish to offer promotions. The collective costs of generating incentive programs, administering the incentive programs, tracking the participation of consumers in the incentive programs and fulfilling the awards or prizes won in such

**2**

incentive programs may exceed the benefits of offering the incentive program. These costs may be particularly high in instances where the activities associated with an incentive program must be carried out by different companies, or by different organizations within the same company. Accordingly, a need has arisen for a unified system that provides for program generation and administration, data tracking and award fulfillment.

Existing incentive programs do not meet all of the consumer and sponsor needs associated with incentive programs. One form of incentive program that is used extensively is that of promotional mailings. The processing of promotions, i.e., providing the appropriate check or discount coupon to the customer as a reward for the initial purchase, involves high volume and labor intensive activity, including collection, verification and organization of initial proofs of purchase and related information, preparation of the checks, coupons or other items using preprinted stock provided by the sponsor in connection with the particular promotion, and finally the sorting of individual items based on their mailing destinations.

At any given time, a typical provider of promotion services is involved with many different promotions of various sponsoring manufacturers. Preprinted forms, when provided by different sponsors, can vary in size and shape, thus creating the need to handle individual promotions separately. This increases handling expense, not only in added labor, but also in the mailing cost, as it is difficult with a single promotion to accumulate a volume of items sufficient to qualify for certain reduced postage rates, e.g. the reduced rate available for mail presorted by zip code of the destination. Manual recombination and sorting of items for multiple promotions would be prohibitively expensive.

Another form of promotional program is coupon distribution and redemption. Many problems exist with the coupon distribution and redemption system. For example, few consumers will go through all the steps necessary to redeem their coupons. More commonly, many consumers forget to bring coupons that they have clipped and saved to the store. Thus, consumer reluctance to take all necessary steps partially defeats the manufacturer's purpose for offering the purchase incentive. A manufacturer distributes coupons with the expectation that the coupons will induce sales of its product by offering a discount. However, when the coupon is forgotten or disregarded, the consumer is usually not aware of the incentive when he is selecting a product among different brands at the retail store.

Another problem with coupon redemption systems is verification. Because the verification of redemption conditions is performed by a check-out clerk, a consumer can in some instances present so many coupons that it is impractical to verify the required purchases for all of them. As a result, some coupons are redeemed without the required purchase.

The introduction of the digital computer and the computer network eliminates some of the inconveniences of conventional incentive programs, particularly those that relate to data tracking and manipulation. The digital computer is a powerful data processing tool that allows a user to organize, store and analyze data at volumes and rates that would be impossible by any prior known techniques.

Computers have been used in connection with incentive programs and other programs that have characteristics in common with incentive programs, but known computer incentive programs address some, but not all of the drawbacks of traditional promotions. For example, U.S. Pat. No.

6,061,660

3

5,053,955 to Peach et al. discloses an improved process of printing and assembling coupons. Peach et al. discloses a computer-based system for merging certain information for various promotions, so that a single stream of data can be used as a source for printing and mailing coupons for multiple promotions. Thus, the system of Peach et al. reduces some of the paperwork associated with a single-promotion systems, but it merely mitigates, rather than solves, the problems inherent in paper-based promotions.

Computer-based promotional games are also known. Such games include scratch-and-win games, treasure hunts, video pinball and the like. Such incentive programs have advantages over paper promotions, in that data regarding participation is easily stored and manipulated. However, existing incentive programs do not solve all consumer and sponsor needs. In particular, such promotional games do not assist consumers in tracking participation in multiple pro-motions and do not assist sponsors in generating incentive programs, tracking participation in incentive programs and fulfilling awards and prizes.

Computer-based systems exist for tracking some aspects of consumer participation in incentive programs. For example, U.S. Pat. No. 5,056,019 to Schultz et al. discloses an automated purchase reward accounting system and method. In particular, Schultz et al. discloses a marketing method for providing manufacturer purchase reward offers by automatically tracking the purchases of member consum-ers through the use of bar-coded membership cards and using the purchase records in a data processing system to determine if the required purchases have been made to earn a reward. Each member consumer receives a reward booklet disclosing the available reward offers, a periodic status report indicating the member consumer's progress toward earning rewards, and a reward certificate for those rewards earned. The card-based system of Schultz takes advantage of certain data processing capabilities of computer systems and certain data storage capabilities of electronic card technolo-gies; however, among other drawbacks, the system of Schultz does not address the need for a system that assists sponsor companies in generating incentive programs, in tracking participation of consumers in multiple incentive programs, or in fulfilling awards.

The computer network offers the possibility of improved systems for offering incentive programs and for tracking participation in an incentive program. By linking together several computers and by providing shared resources and cross-platform communications, the computer network pro-vides improved access to sophisticated applications by users at remote locations.

One of the most widely accepted and heavily used net-works is the Internet. The Internet is a global system of interconnected computer networks formed into a single world wide web. A user, through the Internet, can interactively transmit messages with users in different coun-tries. Similarly, a user in the U.S. connected to files and libraries and other jurisdictions such as Europe and Asia, can download files for personal use. Accordingly, the Internet computer network provides strong communications func-tions similar to the communications functions provided by ham radio operators. Moreover, the Internet computer net-work acts like a universal library, providing electronic access to resources and information available from Internet sites throughout the world.

Various systems and methods are known which permit a sponsor to track data of multiple parties in databases and to update information in the databases based on transactions

4

entered into by the parties to the transactions. For example, U.S. Pat. No. 5,664,115 to Fraser discloses an interactive computer system to match buyers and sellers of real estate using the Internet. Similarly, banks, credit card companies, and other financial institutions have developed computer-based systems that track client account information and update the information upon entry of various transactions. Some such systems involve use of electronic cards and operate over computer networks. Such systems have requirements peculiar to their respective industries, and none of the existing systems address all of the problems inherent in known incentive programs, particularly the prob-lem of the need for an incentive program system that conveniently tracks participation while offering automated generation of incentive programs and automated fulfillment of awards won in incentive programs.

Computer incentive programs are offered on the Internet; however, such systems are generally offered by a single sponsor and are generally limited to offering consumers the ability to participate in incentive programs. Known systems do not offer sponsors the ability to conveniently generate incentive programs, to track participation of consumers in multiple incentive programs, or to provide for automated fulfillment of awards.

Another important drawback of known computer incen-tive program systems is that the obligation to fulfill the awards promised in a promotional campaign is often a logistically difficult and expensive task. The coordination of delivering or arranging for the retrieval of the awards for the specified winner, in volumes that permit successful incentive programs, requires coordination of prize inventory, systems and information.

One system that addresses award fulfillment is disclosed in U.S. Pat. No. 5,025,372 to Burton, et al. Burton et al. discloses a system and method for administration of incen-tive award programs through letters of credit. In the Burton et al. system, a computer system for an incentive award program allocates monetary amounts available for expendi-ture through credit instruments issued to program partici-pants when the participants perform to a designated level of achievement. Participants' identifying information and credit instrument account numbers are stored in memory. Levels of performance are calculated and assigned for each participant in order for a monetary amount to be available for expenditure through the participant's credit instrument. Calculations, adjustment and reporting concerning amounts allocated for instrument use, withheld amounts, instrument transactions and account balances are made. Calculations and printed invoices for payment by a financial institution to an incentive company based on the credit instruments issued under the incentive program are made and are dependent upon the monetary volume of expenditures through the credit instruments, the total interest income on the credit instruments, and the number of instruments issued.

The system of Burton et al. takes some advantage of a computer system for tracking data, but it has a number of drawbacks. Among other things, Burton et al. offers no advantage to a company sponsoring an incentive program in terms of the investment of skill and labor in developing an incentive program. Further, the complex letter of credit scheme of Burton et al. is likely to require participation of other entities, such as banks and attorneys in order for it to operate properly. Also, Burton et al. does not provide for tracking of data for participation of a given consumer in incentive programs of multiple program providers. Finally, Burton et al. does not provide a system for automated generation of incentive programs.

6,061,660

**5**

Many existing promotional systems are also subject to the drawback that they require specific computer software or computer hardware to be purchased in order to participate in the incentive program. Historically, computer promotional games were of limited utility, because in order to participate the user was required to purchase specific software to participate in the incentive program, and no convenient mechanism existed to convey the information that the customer had won a prize to the party who was required to fulfill the prize.

Computer networks, such as the Internet, offer a convenient solution to some of these problems, permitting easy transmission of such computer software for promotional games and easy transmission of information about the success of the consumer to the sponsoring company. However, current incentive program and award systems available over the Internet are quite limited. First, most such systems are limited to a specific type of incentive program or to products and services of a single sponsoring company. Also, most such systems require a sponsoring company to use an independent contractor to code the computer software necessary for running the incentive program. Further, most such systems rely on conventional mechanisms for award fulfillment, such as issuing a paper certificate to the customer by mail that is redeemable at a retail location of the sponsoring company.

Computer systems and methods for generation of computer software programs based on underlying data are also known. For example, U.S. Pat. No. 5,576,951 to Lockwood discloses an automated sales and services system that composes individualized sales presentations from various textual and graphical information data sources to match customer profiles entered into the system. However, known computer systems do not provide for automatic generation of incentive programs based on parameters entered by a sponsor company.

Accordingly, a need has arisen for an incentive program and award fulfillment system that provides easy access to consumers who have standard computer hardware and software, that permits sponsors to build or purchase incentive programs easily and efficiently, and that provides for convenient tracking of participation and convenient, automated award fulfillment.

SUMMARY OF THE INVENTION

The present invention provides a new incentive program and award system for using a computer network, preferably the Internet, to provide consumer access to expanded incentive programs using a conventional computer, to permit sponsors to build, buy, store, modify, offer, track and administer incentive programs and to permit sponsors and retailers to offer improved award fulfillment for participants in incentive programs.

The increased processing power and ability to access remote users of the Internet and other computer networks offer substantial opportunities for improved award fulfillment systems and incentive program systems. In particular, the Internet offers access to consumers who have standard equipment such as a personal computer, without requiring specific hardware or software. The Internet also offers free communications, in contrast to traditional communications channels, such as mail, in which Promotional materials are sent. The Internet also offers dynamic opportunities to transmit, store and retrieve data, so that new or different incentive programs may be conducted on a much more frequent basis than is the case with traditional paper systems.

**6**

Systems and methods according to the present invention allow a consumer who has access to a computer, the computer typically referred to as a "client," to connect to a web site located on a server of a host system for participating in incentive programs. The consumer may, through the graphical user interface of the consumer's computer, participate in incentive programs by logging-in to a site, spending a certain amount of time on the site, entering data, clicking on pre-determined icons in a pre-determined order, or other activities involving use of the computer. If the consumer satisfies certain pre-determine a criteria, the consumer can win promotional prizes.

Systems and methods of the present invention also permit sponsors to list incentive programs on an Internet site, to obtain pre-packaged incentive programs from a host, to build incentive programs using computer software provided by the host, to associated prizes with incentive programs offered through the site, and to fulfill awards won by consumers.

Systems and methods of the present invention further permit retailers to make retail items in their inventory available to sponsors for association with incentive programs as prizes.

Systems and methods of the present invention further provide for the creation of databases of retail, catalog, sponsor and other items that permit automated fulfillment of specific items. The systems and methods of the present invention are accomplished by use of a computer network, which may be the Internet.

In particular, without limitation, systems and methods of the present invention comprise a host computer connected to a network, a client computer of a consumer connected to the network, a sponsor computer of a sponsor connected to the network, an incentive participation application program for participation by the consumer in an incentive program, wherein the participation may be in incentive programs of a plurality of sponsors, a server of the host computer, a web site, located on the server of the host computer, wherein the consumer may participate in an incentive program via the web site, a database of the host computer of awards associated with the incentive participation application programs, an award association application program for associating an award with an incentive program and a fulfillment automation application program for associating a fulfillment method with an award.

Systems and methods of the present invention further comprise an electronic card for fulfillment of an award, having memory for storing information associated with the consumer, wherein the information may be a personal identification number or information associated with the consumer's participation in an incentive program.

Systems and methods of the present invention further comprise an incentive builder application program, running on the server of the host computer, wherein the sponsor may build an incentive program by interacting with the incentive builder application program, wherein the incentive builder application program comprises a database of objects associated with incentive programs, wherein each object is associated with an action that is associated with the incentive program, an interface for permitting a sponsor to enter parameters associated with an incentive program, an object association application for associating objects with the parameters entered by a sponsor and building a file comprising the objects associated with all of the parameters entered by a sponsor, an editor for generating an electronic file containing code for the incentive program, a classifying

6,061,660

**7**

application program for classifying the code in numbers that represent the elements of the code, a generator application program for generating tables of the numbers that represent the code for the incentive program, and an executor application that is capable of interpreting the tables and executing the code.

Systems and methods of the present invention further comprise a graphical image file that is displayed in connection with an object, wherein the graphical image file is a branded image, wherein the object is a game piece in an incentive program, wherein the object is displayed upon winning an incentive program, wherein the graphical image file may change, and wherein the graphical image file that is displayed depends on characteristics of the user.

The present invention may be better understood by reference to a number of commonly used terms, definitions of which are as follows:

The term "client," as used herein, encompasses any data processing systems suitable for operating a processor according to the invention and for establishing a communication link to an Internet site. An Internet site can be any program running on a data processing platform that connects to the Internet and that receives access requests, whether under HTTP, FTP or any other conventional or proprietary transfer protocol.

The term "application program," as used herein, encompasses any computer file that contains data in a format for being accessed and processed by the processing unit of a computer.

The term "disk," as used herein, encompasses any memory device that can store computer data and that provides an interface for accessing the stored data.

The term "network," as used herein, encompasses any system comprising a series of computers linked by telecommunications networks and may include the Internet, intranets, or other computer networks.

The term "Internet" means the largest global computer communications network.

The phrase "incentive program" should be understood to include any program for creating incentives, including programs within a sponsoring firm, such as employee incentive programs, and outside the firm, such as customer promotions. The term "promotion," as used herein should be understood to encompass all types of incentive programs.

The term "prize" and the term "award" should be understood to be synonymous and to encompass all types of incentives, including merchandise, coupons, points, cash, services and other forms of incentives.

The term "World Wide Web" means a large global computer communications network that comprises a significant part of the Internet.

The term "sponsor," as used herein, encompasses any individual or company that wishes to offer an incentive program or promotion.

The term "retailer," as used herein, encompasses any individual or company that wishes to provide awards and prizes to be associated with incentive programs. The term "retailer database" should be understood to encompass a database of awards and prizes for fulfillment to consumers who have successfully won or completed incentive programs. Thus, the retailer database should be understood to include awards and prizes provided by sponsors, by the host, or by other parties, not only retailers. The terms "retailer database" and "award database" should be understood to be synonymous.

**8**

The term "consumer," as used herein, encompasses any individual or user who wishes to participate in awards or incentive programs offered by sponsors. Consumers may be third parties, such as partners or suppliers, may be employees of sponsors, or may be customers of the sponsor's merchandise or the merchandise of third parties; thus, the present invention is intended to encompass systems and methods by which a company offers incentive programs to individuals within its organization, such as via a computer intranet, as well as systems and methods for providing incentive programs to third parties via external computer networks.

The term "host," as used herein, encompasses any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company, and for creation of databases of retail, catalog, sponsor and other items that permit automated fulfillment of specific items listed in computer inventory systems of retailers at a retail location.

The term "server," as used herein, encompasses any data processing system on which application programs and Internet sites may be stored for access and processing by client computers.

The term "web browser," as used herein, encompasses any application program which allows for multimedia presentation of information, including text, images, sound and video clips. A web browser **50** allows the user to connect by the Internet to different sites on the Internet.

The term "hypertext link" as used herein, encompasses any graphical icon, button, highlighted text or other symbol that permits a client computer to direct a server to display a page of an Internet site which is associated with the hypertext link.

The term "URL" means "uniform resource locator" and means the address of an Internet site that is accessed by clicking or initiating a hypertext link that is associated with the URL.

The term "HTML" means hypertext markup language, which refers to a language for the creation of pages of Internet sites on the World Wide Web.

The term "HTTP" as used herein, shall encompass the "HyperText Transfer Protocol," which shall mean a protocol under which messages are sent over the Internet from client computers to server computers in the client server model of distributed computing.

The term "CGI" shall mean "Common Gateway Interface," which shall refer to a specification for communication between a server computer and an application program.

The term "EDI," or "electronic data interchange" shall mean a protocol for the transfer of data between an application program and a proprietary computer system, such as an inventory system.

BRIEF DESCRIPTION OF DRAWINGS

FIG. **1** is a schematic diagram illustrating the basic components of the World Wide Web.

FIG. **2** is a schematic diagram of the primary hardware components of the host system of the present invention.

FIG. **3** is a schematic diagram of a consumer computer **12** in accordance with an embodiment of the present invention.

FIG. **4** is a schematic diagram of a sponsor computer in accordance with the present invention.

FIG. **5** is a schematic diagram of a retailer computer in accordance with an embodiment of the present invention.

6,061,660

**9**

FIG. **6** is a schematic diagram of an operating system and related applications of a consumer computer **12**, a sponsor computer, or a retailer computer in accordance with an embodiment of the present invention.

FIG. **7** is a schematic diagram of a host computer **18** of the present invention.

FIG. **8** is a flow chart depicting the steps by which a consumer may participate in incentive programs and win awards in accordance with an embodiment of the present invention.

FIG. **9** is a flow chart depicting the steps by which a sponsor may offer incentive programs, select prizes, and participate in related incentive program activities in accordance with an embodiment of the present invention.

FIG. **10** is a flow chart depicting steps by which a sponsor may purchase a pre-packaged incentive program from the host of the system of the present invention.

FIG. **11** is a flow chart depicting steps by which a sponsor may build an incentive program in accordance with an embodiment of the present invention.

FIG. **12** is a flow chart depicting steps by which a sponsor may select and purchase prizes in accordance with an embodiment of the present invention.

FIG. **13** is a flow chart depicting the steps by which a database of awards is established and maintained in accordance with an embodiment of the present invention.

FIG. **14** is a flow chart depicting steps by which an award or prize is fulfilled in accordance with an embodiment of the present invention.

FIG. **15** is a schematic diagram depicting the logical connections of the consumer database, the sponsor database and the award database of the present invention with the consumer site, the sponsor site and the award site of the present invention.

FIG. **16** is a schematic diagram of the data structures of the sponsor database of the present invention.

FIG. **17** is a schematic diagram depicting the data structures of the consumer database **200**.

FIG. **18** is a schematic diagram depicting the data structures of the award database.

FIG. **19** is a diagram depicting a page displayed by the graphical user interface of the incentive program builder of the present invention.

FIG. **20** is a table depicting classifications of incentive programs that can be used to establish parameters for building an incentive program.

FIG. **21** is a flow chart that depicts the flow of information among the components of the present invention.

FIG. **22** is a flow chart depicting the steps of the present invention leading to award fulfillment.

FIG. **23** is a flow chart depicting the participation of a sponsor in the present invention.

FIG. **24** is a flow chart disclosing the overall steps of a consumer participation in the present system and method.

FIG. **25** is a flow chart disclosing the steps of award fulfillment for a retailer using an electronic inventory tracking and consumer database.

FIG. **26** is a flow chart disclosing steps of award fulfillment for a retailer implementing manual inventory tracking procedures.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT(S)

The present invention is a system for building and conducting incentive programs over computer networks, such as

**10**

the Internet, for tracking and administering participation in such incentive programs and for fulfilling awards won in such incentive programs. The present system includes participation of a host, who manages the system, one or more consumers, who participate in incentive programs and in certain instances win awards, one or more sponsors, who offer incentive programs through the host system, and one or more retailers who provide awards for the incentive programs and who fulfill delivery of awards to customers.

FIG. **1** is a schematic diagram illustrating the basic components of the World Wide Web. FIG. **1** depicts client computers **34** which are connected by telecommunications links **38** to one or more server computers **32**. The client computers **34** are equipped with web browsers **50** that permit the client computers **34** to view HTML pages. The HTML pages are preferably displayed in graphical format. Well-known web browsers **50** such as NetScape navigator and Microsoft Explorer automatically format data that is programmed in the HTML language according to well-known protocols. Information is transported back and forth between the client computer **34** and one or more servers **32** according to a well-known protocol known as the HyperText Transport Protocol. The messages sent according to the HTTP are addressed according to Uniform Resource Locators, or "URLs", which determine where the Internet resource is and which protocol to use to access the resource. Other protocols, such as FTP, are also available.

In the so-called "client-server" model of distributed computing, messages are sent from client computers to one or more servers. Servers that use the World Wide Web are typically called "HTTP servers" or "web servers." "A web server may have installed on it files that include HTML documents that can be displayed on a client's computer screen when accessed from a client computer. Also, web servers may include or provide access to other servers that include Common Gateway Interface ("CGI") programs that permit access to other resources on the web server, such as application programs and databases. Thus, without the need for any hardware or software, other than a standard personal computer and a common web browser **50**, a consumer can access dynamic applications and content that are stored on the web server.

Referring to FIG. **2**, the particular systems necessary for operation of the present invention are depicted. Thus, a consumer computer **12**, a sponsor computer **14**, and a retailer computer **16** are connected by a telecommunications connection **38** over the Internet to a host computer **18**. The host computer **18** may include a gateway computer **19**, or may be configured to provide a direct connection to the telecommunications connection **38**. The system may further include an electronic data interchange **126** from the retailer computer **16** to a retailer inventory system **212**, which permits access between the retailer components and the host computer **18** over the Internet.

Referring to FIG. **3**, a client computer may include various standard components, including a central processing unit (CPU) **20** and associated read-only memory ("ROM") **22**, both of which are connection along data and address bus lines **23** to a random access memory **40**. The consumer computer **12** may be such a "client" computer. Also connected to the RAM **40**, the CPU **20** and the ROM **22** via the bus **23** are an input/output interface ("I/O") **28** and I/O device **24**. The CPU **20** is operatively connected to the I/O interface **28** to control any corresponding I/O devices **24**. Typical I/O devices may include a video display, a keyboard, a scanner, a mouse or joystick or other input or output devices. The consumer computer **12** may also include a

6,061,660

11

storage device **45**, which may be any conventional device for storing data, such an external hard disk. The consumer computer **12** may further include a system for connection to telecommunications links, which may be a modem **54**. The consumer computer **12** is thus equipped similarly to any typical personal computer that is capable of playing graphical computer games.

Referring to FIG. **6**, installed on the consumer computer **12** is an operating system **42** that controls various applications of the consumer computer **12**. Applications include applications for data management, storage and retrieval **44**, a web browser application **50** that is capable of formatting HTML documents, a communications application **52** capable of controlling communications between the consumer computer **12** and other computers over the Internet, and other applications **48**. The operating system **42** may be any standard operating system, but is preferably an operating system capable of providing a graphical user interface, such as the Windows95 operating system or the MacIntosh operating system.

Referring to FIG. **4**, the sponsor computer may also be a client computer comparable to the consumer computer **12**. The sponsor computer **14** may also include a CPU **58**, ROM **60**, I/O device **62**, I/O interface **64**, RAM **68**, bus **63**, and modem **90**. Thus, the configuration of the sponsor computer **14** is similar to the consumer computer **12**. The sponsor computer **14** may also include an operating system **42** for control of various applications, including applications for data management, storage and retrieval **44**, a web browser **50**, a communications application **52** and other applications **48**. The operating system **42** is preferably capable of providing a graphical user interface **70** with graphical icons. Thus, the operating system may be in a system such as Windows95. The sponsor computer **14** may also include a storage disk **75** for storing data, such as an external hard disk.

Referring to FIG. **5**, a retailer computer **16** is provided. The retailer computer **16** may also be a client computer of configuration similar to the consumer computer **12** and the sponsor computer **14**. The retailer computer **16** may thus include a CPU **92**, ROM **94**, I/O device **98**, I/O interface **100**, RAM **102**, BUS **93**, modem **124** and storage device **109**. The retailer computer **16** is also controlled by an operating system **42** which governs various applications, including an application program for data management, storage and retrieval **44**, a web browser **50**, a communications application **52** and other applications **48**. The retailer computer **16** also preferably includes a graphical user interface **70** capable of viewing HTML documents that include graphical icons. The retailer computer **16** further includes an application for controlling an electronic data interchange connection ("EDI") **126**. The EDI connection **126** is to a proprietary retailer inventory system **212**. Thus the retailer computer **16** is configured to query and retrieve information from the retailer inventory system **212** regarding the exact products in the retailer inventory system **212**.

It should be noted that although the Internet is the preferred embodiment of the present invention, the invention may be operated over an intranet within a corporation or may include an ATM, or KIOSK, which could include a dedicated terminal that is capable of an online connection to a host computer and capable of executing commands through an input/output device. Also, in an embodiment of the invention, certain aspects of the invention may be completed through stand-alone software, which may be downloaded by the user to a disk.

Referring to FIG. **2**, the host system **10** may further include a host computer **18**. Referring to FIG. **7**, the host

12

computer **18** may include a CPU **170**, ROM **172**, modem **174**, a host gateway **19**, a data storage device **178**, RAM **180**, I/O interface **182** and I/O device **184**. The host system **10**, in particular, may include an HTTP server **188**, or web server, and may optionally also include a separate application server capable of communication to the HTTP server **188**. The host computer **18** may be any conventional server, such as a DEC server, with a conventional operating system, such as UNIX. The host computer **18** must be capable of receiving messages according to standard Internet protocols, such as HTTP.

Referring to FIG. **15**, the data storage device **178** of the host computer **18** stores files containing code for implementing a consumer site **192**, a sponsor site **194** and an award site **198**. In addition, the data storage device **178** stores a consumer database **200**, a sponsor database **202**, and an award database **204**. The databases may be of common database types, such as Oracle databases.

An overview of the functions accomplished by the system and method of the present invention is as follows.

A consumer operating on a consumer computer **12** uses the web browser **50** to locate the consumer site **192** of the host computer **18**. Once the consumer has located the consumer site **192**, the consumer is given various options. The consumer may register to become a member of the host incentive program system by entering various information in a predetermined format. If the consumer registers, the consumer is then issued an identification number and an associated password. Registration may also be completed through stand-alone computer software, in which case the consumer is issued a disk on which a program is stored that, when installed, prompts the consumer to complete the information necessary for registration. In the case of the software version of registration, the consumer downloads the software to a disk and can send it to the host system by electronic mail.

In addition to registration, the consumer site **192** includes hypertext links or other connections to various other sites, applications, and information. Thus, the consumer can link to information pages that describe the host incentive program system, that describe particular incentive programs, or that provide other information related to the system. Also, the consumer may link to incentive programs that are provided in a directory of incentive programs. The incentive programs may be incentive programs provided by the operator of the host system, or third party incentive programs that have been identified by the host for listing on a directory.

The consumer web site **192** also permits the consumer to search for information or for particular incentive programs by topic or keyword; for example, the consumer may search for incentive programs by company, by type of incentive program, by type of prize, or the like. The consumer site **192** also includes a link to the sponsor site **194**, so that a consumer may also consider whether the consumer wishes to provide incentive programs for the consumer's own products or services.

The consumer site also permits the consumer to query a database that provides status information for the consumer regarding participation in host incentive programs. Thus, the consumer can determine the number of points awarded for participation in past incentive programs, the prizes won in past incentive programs, and similar information regarding incentive program activities using the host system. Among other things, the consumer may download rules and directions for participation in the incentive programs that have been registered by the sponsors as incentive programs of the

6,061,660

13

14

host system. Included in the rules may be information on the specific prizes to be awarded, the odds of winning, and the like. Consumer participation in incentive programs results in the automatic updating of the consumer database **200** and the sponsor database **202**, which contain such information in records associated with the consumer.

When the consumer registers, a record is created in the consumer database **200** reflecting the registration of the consumer and including the personal associated identification number, password, or the like. Referring to FIG. **17**, the consumer database **202** includes records that may include the name **800**, address **802**, e-mail address **804**, phone number **806**, identification number **808**, password **810**, and account number **812**. Other database records of the consumer database **200** may include sub-records **814** recording various data. A set of participation sub-records **816** may record historical participation in each of the incentive programs by the consumer. A winning sub-record **818** may record information regarding winning activities by the consumer. An award or points sub-record **820** may record loyalty points or prizes won by the consumer. A psychographic or demographic sub-record **822** may include information obtained through consumer responses to inquiries answered by the consumer during participation in incentive programs. Any number of other sub-record containing information about the consumer or about the consumer's participation in incentive programs should be understood to be encompassed within the present system.

Once the consumer registers, the registration may be transmitted to any third party provider of electronic cards. The electronic card provider then may issue a card to the consumer that reflects the consumer's identification number and password, so that the consumer can be verified to be the particular consumer who has won a particular incentive program for the fulfillment stage of the present method and system. The card may be any type of electronic payment card, such as a card with a magnetic stripe, similar to an ATM card or credit card, or a microchip-embedded smart card. In the smart card embodiment of the present invention, the smart card may store additional information from the consumer database **200**, such as prizes won, points awarded through loyalty programs, or the like.

Thus, a typical consumer may log on to the web site, register as with the host system, and participate in one or more incentive programs. The incentive programs could include, for example, scratch-and-win games, sweepstakes games, treasure hunt games, or computer games. Participation in the incentive programs could include entering data, completing surveys, clicking on one or more icons in a predetermined manner, or other "win eligible" activities, such as answering questions. When the consumer wins an incentive program, the incentive program software algorithm indicates that a "win" has been accomplished and informs the consumer of the appropriate prize. The databases are then updated to reflect that the consumer has won the prize. The prize could not only retail merchandise, but loyalty points, discounts, coupons, and the like. Thus, for example, a consumer participating in a scratch-and-win game for a rental car company might receive, upon winning the scratch-and-win game, a number of loyalty points in the rental car loyalty program. Incentive program award techniques for all types of incentive programs can be embodied in the present invention. Thus, loyalty points can be awarded for participation with respect to multiple retailers, and merchandise can be awarded by the sponsor offering the incentive program or by third party retailers. Further, incentive programs can include additional benefits to the retailer, such as including advertising or product logos as part of the graphical object viewed by the consumer when playing an incentive program; thus, a scratch-and-win game could, for example, include a branded product logo that appears when the product is won.

Further functions of the present invention may be accomplished by participation of a sponsor. A sponsor initiates participation through the sponsor computer **14** by accessing a web browser **50** and entering the URL of the sponsor site **194**. The sponsor site **194** then displays a sponsor home page **195**, which provides various options for the sponsor. The sponsor, for example, may register as a sponsor in the host system. The registration process includes identification of the sponsor and various information about the sponsor, including the sponsor's mailing address, web address, contact information, types of incentive programs, and other information relevant to the sponsor. The information is then stored in a sponsor database **202** that includes records associated with the particular sponsor.

Once a sponsor is registered, and a verification of the information submitted by the sponsor is conducted, the sponsor site **194** is updated to reflect any incentive programs that the sponsor wishes to include on the sponsor site **194**. Thus, the sponsor database **202** is updated, as is the sponsor site **194**, upon registration of a sponsor.

A sponsor, in addition to providing a link to a pre-existing incentive program site, may purchase an incentive program from the host. Incentive programs available from the host may be pre-packaged incentive programs that are computer software applications of pre-determined incentive program types, such as scratch-and-win games, treasure hunts, sweepstakes games, or the like. The host may include third party incentive programs, such as computer games, for purchase by sponsors. The sponsor can view samples of different incentive programs and select incentive programs based on review of the samples. Selection of the incentive program prompts the sponsor to define certain parameters relative to the incentive program, such as the starting date and duration of the incentive program. The sponsor may also choose to build an incentive program. A sponsor may build an incentive program through interaction with the host system's computer automated incentive program building capability. A sponsor who wishes to build an incentive program is asked to select among various types of incentive programs or combinations of incentive programs and to enter parameters that are associated with those types of incentive programs, so that an application program of the host computer **18** can generate an incentive program that has the characteristics selected by the sponsor.

Whether the sponsor purchases a pre-packaged incentive program or chooses to build an incentive program, the completed incentive program is downloaded to the sponsor for installation on a web site of the sponsor. The sponsor database is updated to reflect the presence of the new incentive program, and the sponsor site **194** is updated to include a link to the new incentive program. There several ways in which the online code can be embedded into the website of the sponsoring firm, as follows. The sponsoring firm may receive instructions on how to the place of HTML tags in desired locations throughout the site. The tags would serve as addresses for the code to be embedded. The sponsor or the sponsor's webmaster could leave a port open through which the incentive firm could embed the code in designated areas. A set of files could be mailed to the sponsoring firm for their placement and incorporation into their site.

Once a new incentive program is installed, the sponsor is prompted to select prizes for the incentive programs. The

6,061,660

15

prizes may be fulfilled by the sponsor, in which case the sponsor simply enters the prizes into the sponsor database as being associated with the incentive program. The sponsor may also select prizes from the award database **204** of retailer merchandise, catalog company merchandise, sponsor merchandise, and other prizes and awards provided by the host system, described more particularly below, for prize fulfillment. The sponsor may pay for the selected prizes, if the sponsor does not wish to self-fulfill, and the sponsor may pay for the incentive program, through electronic payment channels, such as entering a credit card number over the Internet. Once the payment has been verified, the code for the incentive program is generated and transmitted to the sponsor. The code includes registration information, including an identification number for the sponsor.

The sponsor may also link from the sponsor site **194** to pages that contain various information about the host incentive program method and system, about the host, and about opportunities to participate in incentive programs. The sponsor site **194** also permits the sponsor to link directly to the consumer site **192** and to query the consumer database **200** to obtain information regarding consumer participation in that sponsor's incentive programs. Thus, the sponsor can obtain psychographic, demographic, or other information relevant to the participation of consumers in the sponsor's incentive programs.

The participation of retailers in the present method and system is also by an Internet connection of a personal computer or similar computer to an award site **198**. The retailer initiates the connection by entering the URL for the award site **198** in the web browser **50**. The award site which is a collection of files on the host system, displays information and links that permit the retailer to accomplish various functions. The retailer may, among other things, register as a retailer, in which case a retailer data base **204** is updated to reflect the presence of the retailer and to include records that reflect the name of the retailer, the mailing address of the retailer, the web address of the retailer and other related information. After registration the retailer may participate in various activities; however, the primary function of the award site **198** is to permit the retailer to list information regarding prizes the retailer wishes to include in a menu of various prizes offered by the retailer. Thus, the retailer can list prizes for selection by sponsors. The award database **204** that is created by participation by the retailer is also connected via an electronic data interchange **126** to the retailer's proprietary inventory system **212**. Thus, the award database **204** can be automatically updated to reflect the retailer's current inventory according to inventory numbers, such as SKUs, type of inventory, or the like. Thus, the system automatically permits sponsors to enter the award site **198** to search the site via topic or keyword to obtain particular prizes, to select the prizes and to update the sponsor database to reflect the association of a particular prize with a particular incentive program. The award site **198** also includes links to the consumer site **192** and the sponsor site **194**.

The function of the present method and system may be further understood by reference to the flow charts depicted in the figures.

Referring to FIG. **8**, a flow chart **300** is depicted describing the steps by which a consumer participates in incentive programs via the consumer web site **192**. First, at a step **301** the consumer logs into the consumer computer **12**. The consumer then uses the web browser **50** in a step **302** to browse to the consumer site **192**, at which point the consumer views a consumer home page **193**. The consumer home page **193** includes a directory of links to other pages

16

within the consumer site **192**, as well as links to incentive programs offered by third parties. Further, the consumer home page **193** offers various options to the consumer. At a step **308** the consumer is prompted to enter the consumer's name. Next, at a step **309** the host computer **18** searches the consumer database **200** to determine whether the consumer is listed in the consumer database **200**. If the consumer is found in the consumer database **200** at the step **309**, the consumer is prompted to enter the consumer's password at a step **311**, and, upon confirmation of the password with a conventional password utility, the consumer is sent to a step **304** which the consumer can view the various options available at the consumer home page **193**.

If the consumer is not found in the consumer database **200** at the step **309**, then the consumer is prompted to respond whether the consumer wishes to register as a member of the host system at a step **306**. If the consumer wishes to register at the step **306**, then the consumer is prepared to complete a registration process at the step **306**. If at the step **306** the consumer declines to register, then the consumer is returned at a step **320** to a message informing the consumer that the host system's capabilities require registration and that the consumer may log out by using the back key of the consumer's browser.

Once the consumer is registered via the registration process, the consumer database **200** is updated at a step **321** and the consumer returned to a page at a step **304** reflecting the directory of options available to the consumer. Thus, the consumer at a series of steps may determine whether the consumer wishes to conduct various options. At a step **310**, the consumer may choose to search the sponsor database for incentive programs. The search may be by topic, keyword, company or other parameters. If the consumer wishes to search, then the consumer is transferred to a search algorithm in a step **311**.

Once the search is complete, or if the consumer does not wish to search, then at a step **312** the consumer chooses whether the consumer wishes to link to an incentive program. If the consumer wishes to link to an incentive program, then the consumer is linked by a hypertext link to the incentive program in a step **313**. Upon completion of the incentive program, or upon execution of the back key of the consumer's web browser **50**, the consumer is returned to the directory at a step **304**, at which point the consumer has the various steps and options available.

If the consumer does not wish to search, or to link to an incentive program, at the steps **310** and **312**, then the consumer may elect to query the consumer database **200** at a step **314**. At a step **315**, the consumer may, in querying the database, determine information about the consumer's participation in past incentive programs, the status of the consumer's participation in such incentive programs, including whether the consumer has won prizes and the nature of the prizes, and the number of points the consumer has accumulated in loyalty programs offered by sponsoring companies. Upon completion of the query, the consumer is returned to the directory at the step **304** and is offered the various options again. If the consumer does not wish to search, link to an incentive program, or query a database, the consumer may also, at a step **316**, elect to view information regarding incentive programs. If so, at a step **317** the consumer is linked to pages containing information, including the rules of participation in incentive programs, a description of the consumer site, and other information regarding the host system. At a step **318**, the consumer may also choose to link to the sponsor site **194** by responding affirmatively to a prompt that queries whether the consumer

6,061,660

17 18

wishes to become a sponsor in the host system. Upon the completion of each of the steps **310**, **312**, **314**, **316** and **318** the consumer is returned to the directory at the step **304** and offered all of the options again. If the consumer does not select any of the options, then the consumer may log out at a step **320**, which may be completed by use of the back key in the consumer's browser, or by entering a URL for a different site in the browser.

Referring to FIG. **23**, participation of the sponsor in the present system may be understood by reference to a flow chart **708**. At a step **710** a sponsor decides to sponsor an incentive program. The host system determines whether the firm has established an account at a step **712**. If not, the sponsor registers at a step **714** and an account is created at a step **716**. Once an account is established, at a step **716** the firm selects or builds an incentive program online. The sponsor account is updated in the sponsor database at a step **718**. The sponsor then queries the award database **204** at a step **720**. The sponsor selects the award at a step **722**. The sponsor account is updated at a step **724** to associate the award with the incentive program. The sponsor pays for the incentive program and any award units, as described more particularly below at a step **726**. The sponsor account is then activated to reflect a new promotion at a step **728**.

Referring to FIG. **9**, participation of a sponsor in the method and system of the present invention may be further depicted by a flow chart **330**. First, at a step **332** the sponsor locates the sponsor site **194** at which time a sponsor home page **195** is depicted, which is a series of home pages, which may be HTML pages stored in the data management, storage and retrieval application **44** of the sponsor site **194** located on the host system and dedicated to sponsor activities. Upon entering the home page, the sponsor is prompted at a step **334** to enter the sponsor's name. Next, at a step **336** the host computer **18** conducts a search of the sponsor database **202** to determine whether the sponsor is registered as a member of the host system. If at the step **336** the sponsor is found to be in the database, then the sponsor is prompted at a step **337** to enter the sponsor's password, using a conventional password utility. Upon entering the password at the step **337**, the sponsor is sent to a directory at a step **339**. If the sponsor is not found in the database at the step **336**, then the sponsor is sent to a step **338** at which the sponsor is prompted to register as a member of the host system. If, at the step **338**, the sponsor wishes to register, then the sponsor is sent to a registration algorithm at the step **341**. Upon completion of the registration algorithm **341** the sponsor is returned to the step **339** at which point the system displays the directory. If at the step **338** the sponsor does not wish to register, then the sponsor is prompted in a message at a step **343** to log out of the system at a step **356**.

At the step **339** the sponsor is prompted with various options reflected by the steps **340**, **342**, **344**, **348**, **350**, **352**, **354** and **355**. Upon completion of any of these steps, the sponsor is returned to the directory at the step **339** so that any step may be repeated as desired by the sponsor.

Options available to the sponsor are as follows. At a step **340** the sponsor may choose to review information regarding the host system, including information regarding rules and regulations of incentive programs, the requirements for the sponsor to participate in the host system, and the like. At a step **342**, the sponsor may choose to launch an incentive program. If the sponsor chooses to launch an incentive program, the sponsor is prompted to indicate whether the sponsor wishes to view samples at a step **343**. If the sponsor wishes to view samples, the sponsor is given the opportunity at a step **345** to view sample incentive programs of various types, such as scratch-and-win games, treasure hunts, sweepstakes and the like.

Once the sponsor has viewed samples, or if the sponsor does not wish to view samples, the sponsor is prompted to indicate whether the sponsor wishes to purchase a pre-packaged incentive program of the type displayed in the samples at the step **344**. If at the step **344** the sponsor wishes to purchase an incentive program, then the sponsor is transferred to the algorithm for purchase of an incentive program which is reflected by off-page connector "I" in FIG. **9**. Off-page connector "I" connects to similar off-page connector "I" in FIG. **10**, which depicts the algorithm for buying a prepackaged incentive program.

Upon completion of buying a prepackaged incentive program, or if the sponsor does not wish to buy a prepackaged incentive program, the sponsor is prompted at a step **348** to indicate whether the sponsor wishes to build a new incentive program. If the sponsor wishes to build a new incentive program, then the sponsor is transmitted to a set of algorithms that permit the sponsor to build an incentive program or programs. The connection to the incentive program builder function is depicted by off-page connector "J" in FIG. **9** which connects to connector "J" of FIG. **11**, which depicts the incentive program building function.

If the sponsor has bought an incentive program at the step **344** or built an incentive program at the step **348** then the sponsor is prompted at a step **352** to select a prize or group of prizes. Selection of a prize is depicted in a flow chart **402** in FIG. **12**. The connection between FIG. **9** and FIG. **12** is depicted by off-page connector "K".

Upon completion of the prize selection function, the sponsor is returned to the directory of the step **339** and may choose again to view information or launch an incentive program at steps **340**, **342**. If the sponsor wishes to view information the sponsor may link to HTML pages containing such information at a step **341**. If these steps are not desired, another option is to choose at a step **350** to query the sponsor database. If at the step **350** the sponsor chooses to query the database, then at a step **353** the host-computer **18** conducts a search of the sponsor database for various information, such as the nature of incentive programs offered by the sponsor, the participation of the consumers in the incentive programs, the prizes associated with each incentive program, and the like.

Next, at a step **354**, the sponsor may choose to query the consumer database **200**. If the sponsor wishes to query the consumer database **200** at the step **354**, then at a step **357** the host computer **18** conducts a search of the consumer database **200** for various information relating to consumer's participation in the sponsor's incentive programs. For example, such information may include demographic or psychographic information about the types of consumers who are participating in the sponsor's incentive programs. For example, the sponsor may be able to determine the median age of consumers who are participating in the sponsor's incentive programs. Upon completion of a query, or if the sponsor does not wish to execute a query at the steps **350** or **354**, the sponsor may, at a step **355**, link at a step **359** to the consumer site **192**. Again, upon completion of each of the steps **340**, **342**, **350**, **354** and **355**, the sponsor is offered all of the options again. If none of the options are selected, then the sponsor is prompted to log out at the step **356**.

Referring to FIG. **10**, the steps by which a sponsor may buy a pre-packaged incentive program are included in a flow chart **358**. Upon choosing to buy a prepackaged incentive program at the step **344** of FIG. **9**, the sponsor is presented

6,061,660

**19**

with a menu at a step **360** of FIG. **10**. Next, at a step **362** the sponsor is prompted to select a type of incentive program. Incentive programs may classified into different types, such as intra-firm or inter-firm, games or chance or games or skill, etc. Incentive programs may also have different implementations. Implementations include conventional incentive program games such as bingo, scratch-and-win, treasure hunt, sweepstakes, and the like, other computer games, such as Tetris or pinball, or surveys or questionnaires. On selecting a type of incentive program, the sponsor is prompted at a step **364** to enter parameters that are associated with that type of incentive program, such as the duration of the incentive program, the number of winners who may participate in the incentive program, the frequency of winning, and the like. Next, at a step **368** the pre-packaged incentive program is transmitted to the sponsor by electronic mail or other file transfer protocol, so that the sponsor can download the incentive program on the sponsor's own server. Alternatively, the code could be mailed on a disk with instructions for downloading into the sponsor's own site. The sponsor can be sent instructions on creating an HTML tag to the sponsor site, informing the host of the tags. The host can then add the incentive program to the consumer site with a hypertext link to the incentive program on the site. Next, the sponsor database is updated at a step **370** reflecting the presence of a new incentive program for that sponsor. Next, at a step **372**, the host computer **18** updates the consumer home page **193** of the consumer site **192** to reflect the presence of a new incentive program and a link to the new incentive program. Upon completion of the purchase the sponsor is returned by off-page connector "I" to the step **339** of FIG. **9**.

Referring to FIG. **11**, the steps for building a new incentive program are depicted in a flow chart **374** which is connected by off-page connector "J" to FIG. **9**. The sponsor is first prompted to view a menu of incentive program at a step **378**. Next, at a step **380**, the sponsor is prompted to select a type of incentive program or a combination of types of incentive program. Next, at a step **382** the sponsor is prompted to define parameters for the incentive program or combination of incentive programs. Next, at a step **384**, an incentive program builder function of an application program running on the host computer **18** builds an application program that executes an incentive program of the type defined in the step **382**. Next, in a step **388** the incentive program that was built is transmitted to the sponsor by conventional means such as electronic mail, disk or file transfer, so that the sponsor can install the new incentive program on the sponsor's server for the sponsor's own site. Next, the sponsor database is updated to reflect the presence of a new incentive program at a step **390**. Next, at a step **392**, the consumer home page **193** of the consumer site **192** is updated to reflect the presence of the new incentive program. Upon completion of the incentive program building functions of the flow chart **374**, the sponsor is returned to the flow chart of FIG. **9**, as reflected by off-page connector "J."

Referring to FIG. **12**, a flow chart **402** depicts the prize selection process. If a sponsor has either bought an incentive program at the step **344** of FIG. **9** or has built a new incentive program at the step **348** of FIG. **9**, then the sponsor is prompted to select prizes for the incentive program at a step **352**. FIG. **12** is connected to FIG. **9** by offpage connector "K". Referring to FIG. **12**, at a step **404** the sponsor is prompted to view a menu of available prizes. The menu may be divided by types of prize, companies offering the prize, or other categories. The sponsor may find an appropriate prize by choosing at a step **406** to conduct a search.

**20**

If the sponsor chooses to search at the step **406**, then the sponsor is transferred at a step **408** to the award database **204** and provided with conventional search algorithms for searching the award database by type of prize, retailer, party offering the prize, mode of fulfillment, or other topics or keywords. Upon completion of the search, or if the sponsor wishes to select the prize directly from the menu, the sponsor is then prompted at a step **410** to select a prize by clicking on the appropriate prize. Prize selection requires the sponsor to enter various data for each incentive program, including the number of prizes, the frequency of winning, relative prize weighting (e.g., grand prize, second prize, etc.). When a consumer wins, then the prize is selected based on an algorithm that depends on the selected prize frequency. Each prize also must have a selected mode of fulfillment, which is entered by the sponsor at the step **410** through a menu, a set of icons, or the like. Next, at a step **412** the sponsor is prompted to pay for the prize. Payment may be by any conventional means, such as electronic transmission of the sponsor's credit card number. Next, the sponsor is prompted to associate the prize with the appropriate incentive program at a step **414**, identifying the frequency of winning, type of prize and other information for the incentive program. Once purchase is made, the award database is updated to reflect that the prize has been purchased. Next, the sponsor database is updated by the host computer **18** to reflect the association of the prize with the incentive program at a step **416**. Next, the award database is updated by the host computer **18** at a step **418** to reflect the purchase of the prize by the sponsor. Upon association of the prize and updating of the databases, the sponsor is returned to the directory at the step **339** of FIG. **9**.

Referring to FIG. **13**, the steps necessary for retailer participation in the method and system of the present invention are described in a flow chart **450**. Sponsors, the host, catalog companies and other parties may also participate in the system according to these steps. To participate in the method and system of the present invention, the retailer first logs in at a step **451** and locates the award site **198** in a step **452**, at which point the retailer home page **197** is displayed offering various options to the retailer. The retailer is then prompted at a step **454** to enter the retailer's name. Next, at a step **456**, the host computer **18** searches the award database to determine whether the retailer's name is included in the database. If at the step **456** the retailer's name is in the database, then the retailer is prompted at a step **460** to enter the retailer's password, after which the retailer is sent to a step **464** at which a directory of options is displayed to the retailer.

If the retailer's name is not in the award database **204** at the step **456**, then the retailer is sent to a step **462** at which the retailer is prompted to register. Upon registration, the award database **204** is updated to reflect the presence of the retailer. The retailer is assigned a unique identification number and is permitted to select a password with a conventional password utility. Next, the retailer is sent to the step **464** at which a directory of options is available. The primary option available to the retailer is at the step **465** in which the retailer builds the award database **204**. The award database **204** is built by the retailer's entering data regarding retailer inventory available for selection as prizes into the award database **204**. The data may be entered by the retailer by an input/output device, or through a direct link to the retailer inventory system and through gateway programs and application programs that may be customized to update the award database automatically upon updating of the retailer inventory system at a step **468**. The award database **204**

6,061,660

21

includes information regarding prizes, such as the prices of prizes and the geographic location of individual prizes that are available for incentive programs.

Once the retailer has completed any changes to be made to the award database **204** at the steps **465** and **468**, the retailer may also select other options at the steps **466, 467, 469, 471** and **472**. Upon completion of any of the steps **465, 466, 467, 468, 469, 471** or **472** the retailer is returned to the step **464**, at which the retailer may again select any of these steps. At the step **466** the retailer may choose to view information regarding participation in the host system and other information regarding incentive programs in which case a link is made to HTML page with the information in a step **473**. At the step **467**, the retailer may elect to link in a step **475** to the consumer's site to participate in incentive programs. At the step **469**, the retailer may elect to link in a step **477** to the sponsor's site to act as a sponsor in addition to being a retailer. At the step **471**, the retailer may elect to query the award database **204** in a step **479** to determine the current status of the prizes in the database. At a step **472**, the retailer may elect to update the award database **204** in a step **481** by adding or deleting prizes or changing prices or fulfilment options; however, these activities may also be controlled by the host of the host system. If the retailer does not wish to execute any further steps among the steps **465**–**472**, the retailer may log out, which may be accomplished by entering the back key on the retailer's web browser **50**.

Referring to FIG. **14**, a flow chart **419** depicts the steps by which a prize is awarded upon successful completion of an incentive program. When the consumer participates in an incentive program, as depicted in FIG. **8**, successful participation in the incentive program, which may be accomplished by clicking on icons in a pre-determined order, or other "win-eligible" activities, as defined by the parameters of the incentive program, results in a "win" message being sent by the application program of the incentive program to the consumer database **200**. At a step **422** the host computer **18** queries the consumer database **200** to determine whether a "win" message is associated with the consumer's name in the consumer database **200**. After a win message is determined, an algorithm queries the sponsor database to determine the promotion implementation method and to determine the form of win message, if any, that is required. Next, at a step **424**, the host system determines via a query to the sponsor database **202** what prize or group of prizes has been purchased for the particular incentive program won by the consumer, given what prizes have been won and the predetermined frequency of winning particular prizes. If a particular prize cannot be fulfilled without undue burden; that is, if no retail location is near enough to the consumer's address, then a catalog prize may be automatically substituted. Next, in a step **426**, the consumer database **200** is updated to reflect the association of the prize or group of prizes with the name of the consumer and the consumer database **200**. Next, at a step **428** the sponsor database **202** is updated to reflect the association of the prize with the consumer and the fact that the prize should be removed as an eligible prize from the sponsor database **202**. Next, at a step **430**, the award database **204** is updated to reflect the association of the prize with the particular consumer who has won the prize. Next, at a step **432**, the award database **204** may be queried to determine the available geographic locations of prizes of the type won by the consumer.

Next at a step **434**, the host computer **18** executes an algorithm that selects the appropriate fulfillment option for the prize. In particular, by comparing the geographic infor-

22

mation of the consumer in the consumer database **200** and the information in the award database **204**, the host computer **18** identifies the nearest retail location for fulfillment of the prize or, if no location is suitable, the prize may be mailed to the consumer. The unique prize information is uploaded from a sub-segment of the award database **204** to a card processor, who may be a third party, which permits the prize to be cleared via a card network, such as a credit card network. Alternatively, prize winners and the amounts or prizes won by the winners may be uploaded to the card processor, and the prize or award could be verified by a verification process whereby the retailer or merchant can query the award database **204** online or by phone and receive a confirmation number for the prize for auditing purposes. Verification can also take place via the upload to a network with card processing and verification built in. Next, at a step **436**, the information regarding a retailer location for purchase of the prize is transmitted to the consumer. Finally, when the consumer goes to the retail location, the consumer displays the consumer's electronic card **11** which includes the personal identification number that permits the retailer to confirm that the consumer is the consumer who has participated in the incentive program and has won the prize. Confirmation is obtained by a query of the award database **204** that is conducted by the retailer, either by telephone to the host, or by a computer query to the award database **204**. Confirmation may come from a processor verifying the amount and particular item (e.g., SKU or product number match) at the particular store associated with the winning consumer with credit on a credit or debit account. Thus, the merchandise won by the consumer is easily obtained by the consumer at the most convenient retail location.

A more detailed description of the system for an embodiment of the present invention is set forth below, including a description of computer systems and code that may be used to accomplish the functions described herein.

Once a consumer has registered as a consumer member of the host system, the consumer's name, address, password, and PIN may be sent to a third party provider of electronic payment cards. The electronic payment card provider may then issue the card **11** to the consumer. The card **11** may have a magnetic strip coded for the PIN number or password that links the consumer to the consumer's entry in the consumer database **200**. The card **11** may be any conventional electronic payment card, or may be a microchip-embedded smart card, in which case additional data selected from the consumer database **200** may be included for access by retailers verifying prize information.

Referring again to FIGS. **2, 3** and **8**, the apparatus and method that permits a consumer's participation in the host system is described in more detail. In order to participate in the system, the consumer logs on to the consumer computer **12**, which may be any "client" computer in a client/server system. The consumer computer **12** includes the CPU **20**, ROM **22**, I/O interface **28**, I/O Device **24**, RAM **40**, modem **54**, and storage device **45**. The consumer computer **12** further includes the operating system **42**, which controls the applications running on the consumer computer **12**, such as the data management, storage and retrieval application **44**, the web browser **50**, the communications application **52** and the other applications. The consumer computer **12** is preferably equipped with a graphical user interface, permitting the user to click on icons, buttons, highlighted text, or the like in order to initiate functions. References in this application to "icons," "buttons" or "links" should be understood to include any mechanism that permits the user to initiate a function by locating the cursor at an associated screen

6,061,660

23

location and clicking a mouse, striking the "ENTER" key, or otherwise selecting the function. Thus, the operating system **42** is preferably an operating system capable of supporting such an interface, such as WINDOWS 95, UNIX or the MacIntosh. The consumer computer **12** is connected by the modem **54** to the telecommunications connection **38** of a network, which may be the Internet, an intranet, or any other computer network. The consumer computer **12** may, in an alternative embodiment, constitute a dedicated terminal, such as an ATM or kiosk, that is capable of inputting of data and connecting to the consumer site **192**. References to the Internet in this application should be understood to cover embodiments of the invention using any computer network.

In order to participate, the consumer logs onto the consumer computer **12** and initiates the web browser **50**, which may be any conventional browser, such as NetScape Navigator, Microsoft Explorer, or the like. Due to the graphical nature of many incentive program games, the browser is preferably one that supports a graphical user interface.

The browser **50** permits the consumer computer **12** to connect to the host gateway **19** over the telecommunications connection **38**. Thus, the consumer may locate the consumer site **192** by entering the URL for the consumer site **192** in the browser **50**. The browser then transmits a message, in the form of a package of data according to a network protocol, such as the HTTP protocol or the FTP protocol, to the host computer **18**. The host gateway **19** of the host computer **18** is capable of receiving messages according to the HTTP protocol. Thus the host gateway **19** may be an HTTP server. The host computer **18** may be an HTTP server, or may be another server linked to an HTTP server. The host computer **18** may thus be any conventional server, such as DEC server with a UNIX operating system. The host computer **18** and the browser **50** permit communication between the computers in the form of data transmitted according to the HTTP protocol (or other conventional protocol). Data may be transmitted in various forms. One important form of transfer is pages of data coded in the HyperText Mark-up Language ("HTML"). HTML is the language used to prepare hypertext documents for distribution on the World Wide Web for viewing by client computers, such as the consumer computer **12**. HTML contains commands, known as "elements" or "tags", to mark text as headings, paragraphs, lists, quotations, and the like. HTML also has tags for including images within documents, for including fill-in forms that accept user input, and for including hypertext links connecting documents being viewed to other HTML documents or other resources on the web, such as databases or FTP sites. The hypertext link feature allows the user to click on a string of highlighted text and access a new document, an image, a film clip or other resource from a computer located at a remote location. HTML specifies the location of other resources through URL's, which instruct a browser to find the designated resources. Conventional web browsers **50** are all equipped with the capability of reading and executing hypertext links coded in HTML documents.

Referring to FIG. **8**, the consumer links to the consumer site by entering the URL for the consumer home page **193** into the consumer's browser **50**. The consumer site **192** consists of a set of pages coded in the HTML language. The browser interprets and displays graphical and text images from the HTML pages on the consumer's personal computer. The pages are linked by hypertext links so that pointing and clicking on the hypertext link in the consumer home page **193** connects the client to a page associated with the hypertext link, so that the computer displays a new

24

HTML page to the consumer. Thus, each of the functions accomplished in the flow chart **300** of FIG. **8** may be selected by initiating a hypertext link, button, or graphical icon that describes the link. For example, a consumer may choose to search by clicking a button labeled "search", or a line of highlighted text with the word "search." Similarly, the consumer may execute the step **312** of linking to an incentive program by clicking on the text string describing the incentive program. When the consumer logs on to the consumer home page **193**, the consumer is initially prompted to enter the consumer's name. This may be accomplished by displaying an HTML page that includes a table on which the consumer's name is entered through the input/output device of the client computer. A JAVA applet or application may also provide this function. Once the consumer presses "Enter" or "submit" to execute the entering of the name, the program calls a program that searches the consumer database **200** for the consumer's name.

While HTML is suitable for preparing documents to be reviewed by the client computer and for accepting user input, such as the consumer's name, additional software is necessary or desirable in order to process information entered through the HTML page. Interactive HTML-based applications are typically prepared through use of a program according to the common gateway interface "CGI" specification, or a "CGI script." The CGI specification defines the mechanisms by which HTTP servers communicate with gateway programs. Gateway programs such as CGI scripts essentially transfer processing of data that is inputted through HTML documents to application programs running at a particular site. These application programs typically include specific functionality that is not easily incorporated into a universal server, such as an HTTP server, although application programs can be run on the HTTP server itself. Thus, when an application program is required to process data entered through the HTML page, it is typically done through a gateway program such as a CGI script. For example, when the user name is entered in the step **308** of the flow chart **300** of FIG. **8**, the HTTP server calls a CGI script which instructs an application program to search the consumer database **200** to determine whether the consumer is listed in the database.

Consumer database **200** searching is accomplished through any common search application, which may be included within the database program used to build the consumer database **200**. For example, the consumer database **200** may be an Oracle database with an Oracle application which permits searching of the Oracle databases. If at the step **309** the name is found in the consumer database **200**, then the HTTP server is instructed by the application program to display an HTML page that prompts the user to input the user's password at the step **311**. If the user's name is not found on the consumer database **200** at the step **309**, then the HTTP server causes the system to display an HTML page that queries whether the consumer wishes to register as a member of the host system in a step **306**. The HTML page includes a "yes" button and a "no" button, or similar ability to respond in the affirmative or negative to the query. Such buttons may be graphical objects coded by an application suitable for running in a web page, such as a Java applet. When the user responds with a "no", the HTTP server displays an HTML message that indicates that registration is required in order to participate in the site, and the user is logged out of the site at a step **320**.

If the user indicates the desire to register, then the HTTP server displays an HTML page that may include a table format for input of data by the consumer necessary for

6,061,660

25

registration. Upon registration via the inputted data on the HTML page, the HTTP server calls a CGI script which calls an application program to update the consumer database **200** to add the consumer to the consumer database **200** and to add records in the database that reflect the data entered through the HTML page at registration step. Once the consumer has entered a name and password, or a new consumer has registered, the consumer is sent to step **304** of FIG. **8**. The step **304** of viewing a directory is accomplished by the HTTP server of the host computer **18** displaying an HTML page that displays various icons that permit the user to select available options. Thus, the steps **310**, **312**, **314**, **316** and **318** may be selected by clicking a hypertext link that is associated with a string of text or icon that reflects the desired step.

Upon registration, the information entered by the consumer is stored in the consumer database **200** for retrieval and updating, and the information is also sent, by conventional means, such as electronic mail, file transfer protocol or the like, to a provider of electronic cards. The electronic card provider then issues a card **11** containing the identification of the consumer that is associated with the password assigned to the consumer by an application program that is called by the CGI script upon completion of the registration process. It should be noted that the application program may be an application in any programming language, such as C ++initiated by CGI script, or may be a program such as a Java applet, designed to run within a web page. The application code for the registration process may also register the user for a global pool of incentive programs stored on the sponsor database **202** and record the consumer's participation in the global incentive program pool. It should be noted that the incentive programs that are built or purchased through the sponsor system as described elsewhere herein are coded to permit a consumer to enter an incentive program at a different site without requiring additional registration or additional entering of a name or password. That is, the registration routine of the incentive program running on a sponsor's site automatically initiates, by a CGI script or similar application, a query to the consumer database **200** to confirm that the user is a registered consumer. Upon receiving confirmation that the user is a consumer of the host system, the application program automatically registers the consumer for the incentive program, avoiding unnecessary multiple registrations for different incentive programs by the same consumer. Alternatively, the consumer may initially register at a particular sponsor's site, in which case registration is effective for all sites, because the registration routine automatically updates the consumer database **200**.

Referring still to FIG. **8**, the step **310** of searching the sponsor database **202** for incentive programs by topic or by keyword may be accomplished by initiating a hypertext link designated as "search" or the like that appears as a graphical icon or button on the Consumer Home Page. Selecting the "search" function initiates a link to the HTTP server **188**, at which time a gateway program, which may be programmed according to the common gateway interface (CGI) specification, via a CGI script, turns over processing to an application program running on the server for conducting a search. The application program is a conventional search engine, such as those available on the World Wide Web. The search engine permits the user to search the sponsor database **202** for incentive programs by company, type of prize, type of incentive program or other parameters of the user's choosing.

A directory of sites appears in graphical format on the consumer home page **193**, in the form of hypertext links to

26

selected sites that have Incentive program games. Sites include sites of sponsor members of the host system, as well as third party sites. The directory may be an HTML page, with the links listed as unordered list elements within the page, and with each element of the list comprising a hypertext link identifying the URL to a site associated with the link. Thus, a string of text describing or naming a particular incentive program may be included within a hypertext link coded in HTML, so that clicking on the description or name causes the HTTP server **188** of the host computer **18** to call the site associated with the URL. The directory can also consist of a series of linked HTML pages in menu format, so that the consumer can select categories, such as types of prizes, types of incentive programs, directory topic, such as industry, or specific sponsoring companies, by clicking on associated strings of text or icons that cause the HTTP server to display other HTML pages that display further menu items, down to the level of the individual incentive program. The incentive programs displayed on the consumer site **192** are automatically updated by application programs that update the sponsor database **202** to reflect new Incentive programs and changes in Incentive program offerings.

Incentive programs other than host incentive programs may consist of application programs of any type such as computer games and may be accessed through a gateway program, such as a CGI script. A consumer would typically return to the consumer site **192** after participating in such an incentive program by using the "Back" function of a browser.

The consumer site may include graphical icons, buttons, and highlighted text strings that permit the user to select current incentive programs of the host, which are designated as host incentive programs by any convenient means, such as association with an asterisk or formatting as "<STRONG>" elements within HTML. The icons may be HTML hypertext links or may be programmed through the use of embedded programs that can run inside World Wide Web pages, such as Java applets. Selection of the icon initiates a link that causes the server to display a new HTML page for the relevant incentive program. The relevant incentive program may be programmed in any language suitable for building incentive programs, such as Java, C++, or the like. A CGI Script may be used as a gateway to connect to the application program for the incentive program. Host incentive programs may be of a wide variety of types, but have common characteristics of defining "win-eligible" activities for the user and being capable of transmitting the message that a consumer has won a particular incentive program. Win-eligible activities are coded in the application program of the incentive program, so that predetermined user input results in a win or loss for the consumer. Various implementations may exist to reflect the underlying algorithm to determine a win or loss. For example, a scratch-and-win game may be coded so that a prize is displayed if the user clicks on the correct icon, or a message to try again is displayed if the user selects another icon. Any host incentive program is required to include, as part of the program, an algorithm that instructs the HTTP server to send a message to the consumer database **200** that updates the consumer database **200** to reflect that the consumer has won that incentive program.

In order to participate in an incentive program, the consumer simply selects the incentive program by searching or by initiating the hypertext link associated with the incentive program on the directory on the consumer site **192**. The incentive program resides on the incentive program developer's server and may be an application program in any of

6,061,660

27 28

a variety of programming languages, such as C++ or Java. The link to the application program may be accomplished by a gateway program, such as a CGI script. Participation in the incentive program may include entering information, clicking on predetermined icons in a predetermined order, or simply visiting a site. A variety of incentive programs are known, such as conventional "scratch-and-win," "treasure hunt," "sweepstakes," "tic-tac-toe" and the like.

Consumers may also choose, in the step 314, to obtain information about their status by initiating a link entitled "Query," or the like, which may be an icon programmed by a Java applet, a hypertext link, or similar application capable of running within a web page. Upon the consumer's initiating a query, the HTTP server displays a new HTML page that includes a table of defined search fields that can be completed by the consumer, such as name, password, incentive program status, and the like. Upon completion of desired search fields, the initiation of the query calls a gateway application, such as a CGI script, which runs an application program that searches the consumer database 200, retrieves the information in response to the searched fields, and displays a new HTML page reflecting the updated information. For example, the consumer may wish to know the number of points achieved in a loyalty program of a particular sponsoring company or sponsor between two dates. The table would permit entry of two dates and the name of the sponsoring company, and the application program would search the consumer database 200 for points awarded to the identified Consumer between the designated dates. The search program and database may be implemented by any conventional database program, preferably a program capable of dynamic data structures, such as an Oracle database program. The system would then display a new HTML page with the searched information in a predetermined graphical format.

At the consumer site 192, the consumer may also link to various information through hypertext links that appear as graphical icons or highlighted text, as reflected by the step 316 of FIG. 8. The information may be contained in HTML pages and may include information about the host system, information about membership, information about the rules for various incentive programs, and the like. If the consumer wishes to become a sponsor, the consumer may link, at the step 318, to the sponsor site 194.

Referring still to FIG. 8, the step 310 of searching the sponsor database 202 for incentive programs by topic or by keyword may be accomplished by initiating a hypertext link designated as "search" or the like that appears as a graphical icon or button on the Consumer Home Page. Selecting the "search" function initiates a link to the HTTP server 188, at which time a gateway program, which may be programmed according to the common gateway interface (CGI) specification, via a CGI script, turns over processing to an application program running on the server for conducting a search. The application program is a conventional search engine, such as those available on the World Wide Web. The search engine permits the user to search the sponsor database 202 for incentive programs by company, type of prize, type of incentive program or other parameters of the user's choosing.

Incentive programs other than host incentive programs may consist of application programs of any type and may be accessed through a gateway program, such as a CGI script. A consumer would typically return to the consumer site 192 after participating in such an incentive program by using the "Back" function of a browser.

A more detailed description of the participation of a sponsor in the method and system of the present invention may be accomplished by reference to FIGS. 2, 9, 10, and 11. Referring to FIG. 4, the sponsor computer includes the CPU 58, ROM 60, I/O device 62, I/0 interface 64, RAM 68, bus 63, data storage device 75, and modem 90. As with the consumer computer 12, the sponsor computer 14 further includes the operating system 42, which controls the applications running on the consumer computer 12, such as the data management, storage and retrieval application 44, the web browser 50, the communications application 52 and the other applications. The sponsor computer 14 is preferably equipped with a graphical user interface, permitting the user to click on icons, buttons, highlighted text, or the like in order to initiate functions. Thus, the operating system 42 is preferably an operating system capable of supporting such an interface, such as WINDOWS 95, or the MacIntosh. The sponsor computer 14 is connected by the modem 90 to the telecommunications connection 38 of a network, which may be the Internet, an intranet, or any other computer network.

Referring to FIG. 2, the sponsor site 194 is preferably a site located on the World Wide Web. Thus, as is the consumer site, the sponsor site 194 is located as a series of files stored on the HTTP server 188 of the host computer 18. The sponsor home page 195 is an HTML document stored on the server 188, which is linked to a network, preferably the Internet. The sponsor home page 195 maybe reached by message packets from a browser of the sponsor computer 14, a hypertext link from consumer home page 193 or other web site, or on-line connection from dedicated terminal, such as kiosk or ATM. The message may be sent according to standard protocols, such as FTP or HTTP protocols.

The sponsor home page 195 displays an HTML page that graphically displays a list or directory of hypertext links, graphical icons, or buttons that represent actions that can be taken or that consist of links to other web pages containing information of the type indicated by the links. The sponsor site 194 may include a series of HTML pages linked by hypertext links in a menu format, so that clicking on a link associated with particular subject matter causes the HTTP server to display HTML pages that have further information or links regarding that subject matter.

Referring to FIG. 9, upon entering the site, sponsors are prompted to enter a name in an HTML page at the step 334. The HTML page then calls a gateway program, such as a CGI script, to call a database program, such as an Oracle database program, to search the sponsor database 202 for the sponsor's name at the step 336. If the name is found, then the HTTP server is instructed by the application program to display an HTML page prompting the sponsor to enter the sponsor's password at the step 337. Upon entry of the correct password, the user is transmitted to the step 339 at which the sponsor may view a directory of options in the form of an HTML page. If the sponsor's name is not found at the step 336 in the sponsor database 202, then the HTTP server 188 is instructed by the application program to display an HTML page querying the sponsor at a step 338 whether the sponsor wishes to register and providing "yes" and "no" icons or buttons permitting the sponsor to answer in the affirmative or negative. If the sponsor indicates "no" by clicking on the appropriate icon, then the HTTP server 188 is instructed to display an HTML page containing a message informing the sponsor that registration is required and to transfer the sponsor to the log-out step 356.

If, at the step 338, the sponsor wishes to register and indicates so by clicking the "yes" icon as similar indication of assent, the HTTP server calls an application program via a CGI script or similar gateway program that displays an HTML page, Java applet, or the like containing a table for

6,061,660

29

input of data necessary for incentive program, such as sponsor name, the contact person, the addresses of existing sites desired to be listed, descriptions of the sites, description of incentive program, awards, and other information relating to the incentive program. Completion of the table initiates an application program, such as a Java applet or HTML document, that updates the sponsor home page to include any listed incentive programs among those listed in the site and to place a hypertext link to the incentive program on the sponsor home page. Completion of the table also initiates an application program, such as an Oracle program, to update the sponsor database **202**, which may be an Oracle database, to reflect the information provided by the sponsor.

In an alternative embodiment, the sponsor may also register by completing a table generated by an application program supplied on a disk or on-line, in which case the information may be downloaded to a disk and sent by electronic mail to the host computer **18** for manual input of the information necessary to list the incentive program in the sponsor home page.

Once a sponsor has entered the sponsor's password at the step **337**, or a sponsor has registered at the step **341** of FIG. **9**, the sponsor may select various options that are associated with icons or buttons, which may be hypertext links or Java applets, or displayed as an HTML page, at the step **339**. The sponsor may choose, at the step **342**, to launch an incentive program by clicking on a link associated with the option to launch an incentive program, which causes the HTTP server **188** to display a new HTML page containing text that offers the sponsor the choice, in the form of additional hypertext links, graphical icons, or buttons to view samples of pre-packaged incentive programs, to buy a prepackaged incentive program, or to build an incentive program using the host system's incentive program building application. These choices may be initiated by clicking on the icon or link associated with the choice and are reflected in steps **344**, **348** and **352** of FIG. **9**. The icon or link may be coded by a JAVA applet or similar application running within a web page.

If the sponsor elects to view samples of an incentive program by selecting the appropriate icon in the step **343**, the HTTP server **188** displays an HTML page that lists a menu of types of available sample incentive programs in the form of hypertext links. Clicking the hypertext link for a sample causes the HTTP server to access samples. Samples may be displayed in the form of HTML pages. Interactive samples may be programmed in the form of Java applets or application programs that are accessed through a gateway application, such as a CGI script. Upon completion of viewing, the sponsor is returned to the step **339** and may select other options from the directory.

If the sponsor wishes to buy a prepackaged incentive program, the sponsor may initiating a link that causes the HTTP server **188** of the host computer **18** to display an HTML page, Java applet, or the like that includes icons, buttons or links associated with each incentive program. Upon selecting an incentive program, a hypertext link is initiated that calls an HTML page that provides a table for completion by the user through the keyboard or mouse. The user is asked to complete the table by defining various predetermined parameters that depend on the incentive program. Parameters may include start date, eligibility parameters, duration of the incentive program, and the like. Once an incentive program is selected by clicking on an icon, button, or the like, which may be programmed by a Java applet or similar method, the sponsor is prompted to pay for the incentive program by credit card or electronic funds transfer. Once payment is confirmed, an application

30

program sends a file containing the incentive program by electronic mail to the sponsor, who can then download the incentive program at the sponsor's site. The application program may also be used to update the sponsor database **202** to reflect the new incentive program via the HTTP server **188**. The application program also updates the sponsor home page **195** at the sponsor site **194** to list the incentive program and to provide a link to the URL for the incentive program.

The incentive programs are prepackaged application programs, typically written in languages suitable for conventional, graphics-based, on-line computer games, such as Java or C++. Incentive programs may be any type of program that results in a "winning" activity. Typical incentive programs include scratch-and-win, sweepstakes, treasure hunt, instant win, and loyalty programs. Incentive programs may include question and answer formats, such as trivia games, or may involve completion of a survey. Incentive programs may also include proprietary computer games, such as TETRIS, pinball, or the like. Any computer program that results in a successful outcome can serve as an incentive program, as long as the program is capable of generating a "win" statement after successful completion of a predefined activity. In addition, prepackaged incentive programs may be customized by permitting the sponsor to select from a menu of available icons; for example, a scratch-and-win incentive program may include the logo or trademark of a company, including the sponsor company, which permits an advertising function directly within the incentive program. The logo may be downloaded by the sponsor to a disk and sent to the host computer **18** by electronic mail, in which case the operator of the host computer **18** may insert the logo as a graphical image file, such as a JPEG or GIF image, into the code for the incentive program via a standard routine, such as a C or C++ image insertion routine. Alternatively, the sponsor may select a logo from a menu generated by the incentive program application. It is also possible to include JPEG or GIF images or logos to replace parts of the graphics of third party computer games for inclusion in incentive programs. Images may also be rotated periodically via an image server, so that different images appear in the same graphical portions from time to time. Incentive programs may also be computer games licensed from third party game providers. The incentive programs are preferably designed to obtain and hold close attention of the consumer to the information on the screen.

If the sponsor chooses, at the step **339** of FIG. **9**, to build an incentive program by clicking the appropriate icon, the HTTP server **188** of the host computer **18** displays an HTML page in which the sponsor is prompted to input parameters for the incentive program, which may be accomplished by data entry in an HTML table format, or may be accomplished through a Java applet or Java application. Sponsors may select from a menu of different incentive program types by clicking on icons associated with the incentive programs. Types of incentive programs are predetermined by the operator of the host system. As with prepackaged incentive programs, the incentive programs that are build by the host system may be of any type, ranging from computer games, such as TETRIS and pinball, to question and answer or trivia games, to surveys, to scratchand-win, treasure hunt, sweepstakes, customer loyalty programs and other typical incentive programs. Combinations of different types of incentive programs may be selected; for example, an incentive program may be built in which the consumer plays a pinball game in which the consumer is eligible to win customer loyalty points, and upon winning enough points,

6,061,660

31

the consumer is eligible for a sweepstakes prize. Alternatively, a consumer could complete a survey in order to become eligible to play a scratch-and-win game.

Once sponsors select the incentive program type or combination of types, by initiating Java applets or link for each type or types, the HTTP server **188** may cause the host computer **18** to display HTML pages that prompt the sponsor to enter, in table format, the parameters for the incentive program. The tables may be generated as HTML pages, with each incentive program or combination or incentive programs being associated with a different HTML page that displays a table requesting information relating to predefined parameters that are necessary to generate the incentive program. For example, if the sponsor selects a sweepstakes incentive program, the sponsor is prompted to indicate the number of winners, and the frequency of winning. Once the parameters are entered at the step **382** of FIG. **11**, the HTTP server **188** updates the sponsor database **202** via a gateway program, such as a CGI script, to a database application program, such as an Oracle database program, to reflect the presence of the new incentive program. The HTTP server **188** also updates the sponsor home page by providing a new hypertext link or icon permitting the consumer to link to the incentive program.

The parameters that may be selected by the sponsor can be categorized by a number of different characteristics, as more particularly set forth on the table of FIG. **20**. Incentive programs may be divided into a number of different classifications, which can be associated with pull-down menus, icons, tables or other formats for selection or data input by the sponsor building the incentive program. Thus, the sponsor may select the general type of incentive program, which may be within the sponsor's firm or outside the sponsor's firm. Inside the firm, employees are typically rewarded for certain actions by winning prizes or points. Outside the firm, consumers typically earn rewards or win or earn awards or prizes by playing games of chance or games of skill. The sponsor can select the target of the incentive program, which can, for example, be employees, suppliers, or customers of the sponsor. The sponsor can select from a set of common descriptions of incentive programs from a list including employee morale programs, promotions, incentive programs, sweepstakes, giveways, games, and coupons. The sponsor can select from a selection of descriptive types of incentive programs, such as online testing, attendance monitoring, games of skill, such as trivia, games of chance (submit to win), and customer services (surveys, questionnaires, and the like). Games of skill are embodied by an algorithm that determines whether a "win" has occurred based on the play of the game by the consumer. Games of chance are typically embodied by algorithms that determine, based on a random number generator or similar algorithm, whether the consumer has won before the consumer plays. The sponsor can select whether the incentive program is short-term, such as with an instant win incentive program, or long-term, such as in a sweepstakes, performance reward program, employee loyalty program, or customer loyalty program. The sponsor can select from a wide variety of visual or graphical implementations for incentive programs, including, without limitation buttons, hypertext links, banners, scratch-and-win games, puzzles, pinball, text games, and other text and graphics. Any text or graphical element that can appear in a computer game or text screen could be implemented as part of the selected graphics of an incentive program. The graphical or text implementation objects can also constitute individual incentive programs themselves. Single incentive program types can also be

32

combined to build larger, combined incentive programs. The sponsor can also define other "win-eligible" activities, such as clicking the URL for the sponsor's site, spending a certain amount of time on a particular web page, or the like. Finally, the sponsor can select from a wide variety of prize types, including merchandise, cash, services, discounts, coupons, and points (such as loyalty points). The host embodies the choices in each of the above areas, as well as any other classifications, as parameters that can be selected by the sponsor who is interacting with the incentive builder program; thus, by interacting with a simple graphical user interface, the sponsor can easily build an incentive program having the desired visual effects and having code associated with those effect to execute a running incentive program of the type represented by the visual effects. Once the sponsor has selected all parameters, the incentive builder program can build the incentive program that satisfies all of the parameters, by combining preexisting code for each of the individual components into larger files that embody the entire incentive program.

Referring to FIG. **11**, at the step **384** the HTTP server **188** of the host computer **18** also initializes an application program that builds the underlying code for the incentive program. The application program may be programmed in a language for building incentive programs, such as C++. The application program inserts algorithms and generates code to create an incentive program satisfying the parameters entered by the sponsor. The code is a series of statements, such as C++ statements, each statement reflecting the implementation of one of the incentive program parameters defined by the sponsor. For example, a sweepstakes incentive program would include, as a step in the generated code, the generation of a random number, as well as the selection of a winner based on the random number. Once the incentive program is complete, the sponsor may pay for the incentive program by electronic funds transfer, credit card, or the like. Once the payment is confirmed, a file containing the code for the incentive program is transmitted, in the step **388**, to the sponsor for downloading on the sponsor's site, whether by electronic mail, an HTTP link, or similar conventional transmission. As with the prepackaged incentive programs bought by the sponsor, the incentive program must be capable of generating a signal indicating that a consumer has won. The "win" signal calls an application program that updates the consumer database **200** to reflect that the consumer has won the prize associated with the incentive program and the application program updates the sponsor database **202** to reflect that the prize associated with the incentive program has been won by the customer. An HTML page is generated for the individual consumer indicating whether a win or loss has occurred and, in the case of a win, identifying the prize and fulfillment option.

The incentive program builder could also be implemented as standalone software, with a front end menu similar to the HTML pages described above for selecting an incentive program or combination of incentive programs, so that the program, which may be a C++ program or similar program, builds code based on the predetermined parameters of the incentive program. Code could then be downloaded into files containing complete incentive programs for installation on a user's site, or stored on the sponsor database of the host system, where upon action by the consumer, a CGI call may be made to the sponsor database to verify parameters and constraints to determine whether a win has occurred.

Additional details regarding an embodiment of the incentive program builder are as follows. The incentive program builder permits the sponsoring company to quickly and

6,061,660

33

efficiently design incentive programs. The incentive program builder is a computer automation tool. The incentive program builder may be provided either as a set of interactive web pages, on the host server, by which a sponsoring company defines an incentive program by going from page to page, or as a stand-alone software application, with menu fields and a substantially empty field where incentive program pieces and objects are placed as the incentive program is built. The incentive program builder may include a graphical user interface through which the sponsor designs the incentive program.

Designing an incentive program entails specifying parameters for the incentive program. When all parameters for the incentive program are specified, the incentive program builder creates a set of files that embody the incentive program. An incentive program in the network embodiment consists of a number of different components, each of which is built by the incentive program builder. First, a series of pages, such as HTML pages, permit the consumer to view the graphics of the incentive program. The HTML pages permit dynamic actions to appear to the consumer. Thus, by flashing a series of HTML pages to the consumer, the appearance of motion can be created. For example, a series of pages depicting a pinball machine can be displayed, with the moving parts of the pinball machine and the pinball itself being positioned slightly differently in each page, creating a sense of dynamic motion as pages are sequentially displayed. This approach is the same as in any conventional Internet computer game that includes moving graphical images. The images are created through a series of GIF or JPG files that are displayed when called by the application program for the incentive program. In addition to including dynamic graphical images, the HTML pages of the incentive program that are viewed by the consumer can include static graphical images, text, and fields for completion of tables, or surveys. That is, the graphical interface for the end consumer can contain any combination of text and images typical of any computer game or incentive program.

An incentive program also includes records in the consumer database **200** and the sponsor database **202**. Thus, for each incentive program, information identifying the incentive program, the beginning date of the incentive program, the ending date of the incentive program, and any other information regarding the incentive program may be stored in the appropriate database. The information regarding the incentive program is automatically sent to the appropriate databases upon initial building of an incentive program. In addition, the incentive programs are designed to send a message to update the appropriate databases when an incentive program is played; that is, when the consumer interacts with the front end pieces that appear on the HTML page of the incentive program.

The graphics or text representations of the incentive program may include front end pieces, or objects, that are graphical representations of the objects that are part of the incentive program. Front end objects could include graphics for a scratch-and-win game, a table for completion of a survey, a submit button for entry into a sweepstakes, or the like. By clicking on the appropriate front end pieces, the user can play the game, complete the survey, or otherwise participate in the incentive program that appears on the HTML pages. The sponsor, in using these incentive program builders, can create the graphical objects by clicking and dragging from menus and placing objects in the empty space of the screen.

The front end graphical objects of the incentive program are connected to code. Code, which may be JAVA, CGI

34

script, or other code suitable for running on a web page defines the function of a given object. For example, the suitable code makes the clicking of a pointer on a particular scratch-and-win game look like the consumer is actually scratching a surface. In addition to programming the appropriate display of HTML pages to reflect dynamic interaction with the incentive program, the code permits instructions to the databases for updating. In a sweepstakes game, for example, clicking the submit button may result in a graphical movement of the submit button that is created by presenting a new HTML page with a slightly different location for the submit button; menu or like, underlying code sends a message to the databases that a consumer has entered the sweepstakes. The code also determines algorithms for determining the winner of an incentive program; that is, the code sends a "win" statement to the databases which leads to the association of the prize or prizes for that incentive program with the consumer's identification in the consumer database **200**.

To define an incentive program, the sponsor interacts with the user interface of the incentive program builder. In an embodiment of the invention, the user interface includes a substantially blank screen with a series of buttons or pull down menus that permit the user to build the incentive program. By clicking on the appropriate button or selecting the appropriate item from the menus, the user can define the characteristics of a particular incentive program and click and drag objects to desired places on the screen. When the sponsor has elected to build an incentive program, the incentive program is assigned a unique numeric identification code, which permits retrieval of all information relevant to the incentive program from the databases. Next, the sponsor is permitted to select appropriate objects for participation in the incentive program. The selection of the objects can be made by pull down menus, buttons, or the like. Upon selection of a particular object, a graphical representation of the object is displayed on the formerly substantially blank portion of the screen. Thus, if the sponsor selects a scratch-and-win implementation of an incentive program, the program will display a graphical scratch-and-win game on the screen. The promoter is then able to select by buttons or menus various aspects of the incentive program; for example, the user can select the appropriate icons for the scratch-and-win game, including corporate logos of the user or other companies that provide an advertising function. Similarly, if the sponsor wishes to provide a survey, then selection of a survey type of incentive program from the menu results in a survey table appearing in the substantially blank portion of the screen, and the sponsor is prompted to enter questions to be completed in the survey in the appropriate fields. Once the questions are submitted through the sponsor's input/output device, the questions appear on the screen as they will appear to the consumer.

The objects that the sponsor can select can be of any type, including objects coded by the host, or objects obtained from third parties, such as proprietary computer games. Thus, the user may select a proprietary game, such as TETRIS, or pinball, which would result in the graphical representations of that game appearing in the substantially blank portion of that screen. The graphical representations that appear on the screen are automatically associated with the appropriate code in the case of any objects with which the consumer is expected to interact in playing the incentive program. Thus, in the scratch-and-win example, not only does the graphical representation of a scratch-and-win game appear on the formerly blank portion of the screen, a file is created in which the code for implementing the scratch-and-win game

6,061,660

35

36

is associated with the graphical representation and the incentive program's unique ID number.

A sponsor can build any combination of incentive programs by including various graphical representations, or objects, on the screen. The sponsor is also permitted to design combinations of incentive programs, so that, for example, successful completion of a given incentive program results in eligibility to participate in another incentive program. The sponsor is also asked to define the beginning and ending dates of the incentive program, so that a single incentive program can be offered in different series of time periods, such as once per month. Many different variations of incentive programs can be envisioned, such as programs in which completion of a questionnaire in each of a series of months results in eligibility for a prize drawing for each month, as well as a grand prize for those who enter an incentive program in all three different months. Other examples would include completion of surveys, successful answering of questionnaires, successful completion of computer games, and any other type of activity that results in a "win" for the consumer.

Any incentive program may be provided, as long as some algorithm for determining a winner is available. Thus, a sweepstakes-style incentive program accumulate entries over a defined period of time and award prizes according to a probability algorithm that relies on a random number generator. Alternatively, incentive programs may be customer loyalty programs in which consumers accumulate points for performing certain actions, and the accumulation of a defined number of points permits eligibility for a prize. Obviously, incentive programs may be combinations of types; thus, successful completion of a customer loyalty program might render a consumer eligible for a sweepstakes prize, or victory in a sweepstakes might provide customer loyalty points for a prize. Incentive programs may also be parallel, in that victory in a sweepstakes might provide an immediate prize, as well as points in a customer loyalty incentive program.

The algorithms for determining successful participation in a program are conventional algorithms such as those in any computer game. These predetermined algorithms are associated with the graphical objects with which the user interacts in playing the incentive program. Thus, by clicking a menu or filling out a table identifying the parameters of the incentive program, and submitting those parameters, the sponsor instructs the incentive program builder to display the type of incentive program that has been selected on the screen and to associate the appropriate code with those programs.

The programs for a given incentive program are also associated with incentive program rules, which define eligibility for participation in the program. For example, an algorithm would provide a requirement that the consumer enters the consumer's age, if the incentive program is offered by a sponsor who can only provide incentive programs to those over a certain age. Any other eligibility rules can be entered by the sponsor in defining the eligibility requirements. The incentive program builder also includes a verification algorithm that determines whether data entered for eligibility requirements by the consumer satisfy the incentive program rules. Thus, the incentive program would include code to display a table in which the user must complete the user's age, and the verification algorithm would automatically be initiated upon entry into the incentive program by the consumer to determine eligibility according to the incentive program rules that are embodied in the algorithms created upon building the incentive program.

The winning rules are also embodied in algorithms that are stored in connection with the incentive programs. Thus, upon completion of an incentive program, a file is created that includes the graphical images that the consumer will see upon playing the incentive program, rules for eligibility for the incentive program, a verification algorithm for determining that the eligibility requirements have been satisfied, algorithms for determining whether the consumer has successfully completed the incentive program, and algorithms for controlling the objects that appear to the user and for updating the various databases to reflect creation of a new incentive program and successful completion of an incentive program. The incentive program builder thus permits the sponsor either through stand alone software or through a series of web pages to select through menus from a library of available incentive program objects, and to build a graphical representation of a incentive program, which is then automatically associated with code that creates the dynamic incentive program.

Referring to FIG. 19, an example of a graphical display of an HTML page from an incentive program builder is depicted. Thus, in a menu 900, the sponsor may click and drag various objects 902. The object could include a background field 904 for a scratch-and-win game, as well as various game pieces 906 and win symbols 908 that can be placed in the game by clicking and dragging on the icons that represent the objects. When an object is clicked or dragged, the object may appear in a display field 910. Thus, a user may select the object 904 for a scratch and win game, select a game piece 906 from the menu, and add the game where desired on the background field 904. The user may similarly select a win symbol 908, which may be text stating "WIN," or may be any other symbol. The game pieces and win symbols, as well as the background, may be or may include graphical branded images, such as trademarks and logos. When the win symbol and the game pieces are in place, the game can be saved, in which case the system generates the necessary code to run a scratch and win game that has the appearance of the game on the display 910.

In an embodiment of the invention the files for an incentive program are stored as conventional graphics and computer code files. In an alternative embodiment of the invention the files that are created upon building an incentive program may be embodied in the form of two different sets of computer code. Thus, an interpreter, typically written in a language such as C, creates a series of numeric tables, with each numeric table representing a logical element of computer code. Thus, the number "77" in a table could represent a logical "if" statement, and a number associated with that number could represent an action to be taken if the "if" statement is true and a different number could be associated with the case in which the "if" statement is false. Thus, any of the logical operators, such as "plus", "minus", "greater-than", "less-than", "not-equal-to", "equal to" or other logical operaters can be represented by numbers. An interpreter program thus permits the logical elements of a computer program, such as if statements, sub-routines, "do while" statements, "while" statements, and the like, to be represented as a table of numbers, where entry of a particular number can connect to other rows or columns of the table with further logical statements. Thus, an entire logical computer program may be reflected in a table of appropriately interconnected numbers.

In addition to an interpreter program which builds tables that reflect logical statements, an executor program may be prepared that executes the underlying computer program by reference to the tables. The combination of the interpreter

6,061,660

37

program and the executor program permits entire incentive programs to be reflected in the numerical tables which can be run as computer programs through object code of the executor program. Thus, incentive programs that are provided as files to sponsor companies may remain proprietary to the host who developed the incentive program; that is, while the sponsor company may run the particular incentive program, the sponsor company does not have access to the code for the underlying incentive program, except in table format, which requires substantial knowledge about the interpreter program so that the incentive program is not easily be copied. The combination of the interpreter program and the executor program is essentially a new computer language for building incentive programs.

Referring again to FIGS. 2, 5 and 13, the apparatus and method that permits a retailer's participation in the host system is described in more detail. In order to participate in the system, the retailer logs on to the retailer computer 16, which may be any "client" computer in a client/server system. The retailer computer 16 may include the typical components of a client computer, as depicted in FIG. 5, including the CPU 92, ROM 94, I/O interface 100, I/O Device 98, RAM 102, modem 124, and storage device 109. The retailer computer 16 further includes the operating system 42, which controls the applications running on the retailer computer 16, such as the data management, storage and retrieval application 44, the web browser 50, the communications application 52 and the other applications. The retailer computer 16 is preferably equipped with a graphical user interface, permitting the user to click on icons, buttons, highlighted text, or the like in order to initiate functions. Thus, the operating system 42 is preferably an operating system capable of supporting such an interface, such as WINDOWS 95, or the MacIntosh. The retailer computer 16 is connected by the modem 124 to the telecommunications connection 38 of a network, which may be the Internet, an intranet, or any other computer network.

In order to participate, the retailer logs onto the retailer computer 16 and initiates the web browser 50, which may be any conventional browser, such as NetScape Navigator, Microsoft Explorer, or the like. Due to the graphical nature of many Incentive program games, the browser is preferably one that supports a graphical user interface.

The browser 50 permits the retailer computer 16 to connect to the host gateway 19 over the telecommunications connection 38. Thus, the retailer may locate the award site 198 by entering the URL for the award site 198 in the browser 50. The browser then transmits a message, in the form of a package of data according to a network protocol, such as the HTTP protocol or the FTP protocol, to the host computer 18. The host gateway 19 of the host computer 18 is capable of receiving messages according to the HTTP protocol. Thus the host gateway 19 may be an HTTP server. The host computer 18 may be an HTTP server, or may be another server linked to an HTTP server. The host computer 18 may thus be any conventional server, such as UNIX server. The host computer 18 and the browser 50 permit communication between the computers in the form of data transmitted according to the HTTP protocol (or other conventional protocol).

The award site 198 is preferably a site located on the World Wide Web. Thus, as are the consumer site 192 and the sponsor site 194, the award site is located as a series of files stored on the HTTP server 188 of the host computer 18. The retailer home page 197 is an HTML document stored on the server 188, which is linked to a network, preferably the Internet. The retailer home page 197 may be reached by

38

message packets from a browser of the retailer computer 16, a hypertext link from the consumer home page 193 or the sponsor home page 195 or other web site, or on-line connection from dedicated terminal, such as a kiosk or ATM. The message may be sent according to standard protocols, such as FTP or HTTP protocols.

The retailer home page 197 displays an HTML page that graphically displays a list or directory of hypertext links, graphical icons, or buttons that represent actions that can be taken or that consist of links to other web pages containing information of the type indicated by the links. The award site 198 may include a series of HTML pages linked by hypertext links in a menu format, so that clicking on a link associated with particular subject matter causes the HTTP server to display HTML pages that have further information or links regarding that subject matter.

Upon entering the award site 198, retailers are prompted to enter a name in an HTML page at the step 454. The HTML page then calls a gateway program, such as a CGI script, to call a database program, such as an Oracle database program, to search the award database 204 for the retailer's name at the step 456. If the name is found, then the HTTP server is instructed by the application program to display an HTML page prompting the retailer to enter the retailer's password at the step 460. Upon entry of the correct password, the user is transmitted to the step 464 at which the retailer may view a directory of options in the form of an HTML page. If the retailer's name is not found at the step 456 in the award database 204, then the HTTP server 188 is instructed by the application program to display an HTML page querying the retailer at a step 462 whether the retailer wishes to register and providing "yes" and "no" icons or buttons permitting the retailer to answer in the affirmative or negative. If the retailer indicates "no" by clicking on the appropriate icon, then the HTTP server 188 is instructed to display an HTML page containing a message to inform the retailer that registration is required and to transfer the retailer to the log-out step 472.

If, at the step 462, the retailer wishes to register and indicates so by clicking the "yes" icon, the HTTP server calls an application program via a CGI script or similar gateway program that displays an HTML page, Java applet, or the like containing a table for input of data necessary for entry as a retailer in the host system, such as retailer name, the contact person, the prizes desired to be listed, prices of prizes and other information relating to the merchandise to be offered as incentive program awards. Completion of the table initiates an application program, such as a Java applet or HTML document, that updates the retailer home page to include any listed prizes among those listed in the site and places a hypertext link to the prizes on the retailer home page 197. Completion of the table also initiates an application program, such as an Oracle program, to update the award database 204, which may be an Oracle database, to reflect the information provided by the retailer.

In an alternative embodiment, the retailer may also register by completing a table generated by an application program supplied on a disk or on-line, in which case the information is downloaded to a disk and sent by electronic mail to the host computer 18 for manual input of the information necessary to list the incentive program in the retailer home page 197.

Once a retailer has entered the retailer's password at the step 460, or a retailer has registered at the step 462 of FIG. 13, the retailer may select various options that are associated with icons or buttons, which may be hypertext links or Java applets, displayed as an HTML page at the step 464.

6,061,660

39

At a step **465**, the retailer may choose to build or update the record for the retailer in the award database **204**. If the retailer chooses to build or update the award database **204**, the HTTP server **188** causes an HTML page to be displayed that may prompt the retailer to enter data in a table format. Once the data in entered, a CGI script or gateway application calls a database program, such as an Oracle database program, to update the award database to reflect new prizes, prices, fulfillment options and the like that are entered into the table. A CGI script also calls an application to update the award site **198** to add links to the new prizes.

The award database **204** may also be built by a connection, through an electronic data interchange connection **126** custom interface, to the retailer's proprietary inventory system **212**. That is, the retailer may permit the HTTP server **188** to query the retailer's inventory system **212** to determine merchandise available for incentive programs, locations of merchandise, or other information. Thus, the award database **204** may be maintained to keep a current list of retailer inventory of prizes associated with the retailer, including the specific location of a product in inventory.

One important item of data entered by the retailer at the step **465** via completion of HTML pages or obtained directly by the HTTP server through the electronic data interchange connection **126** with the retailer inventory system **212** is the geographic location of prizes of specific types. This data assists in award fulfillment, as described below.

Referring to FIG. **18**, an example of a data structure for the award database **204** may be understood. The data included in the award database **204** for a particular retailer may include various records, such as the name **862**, address **864**, e-mail address **866**, phone number **868**, identification address **870** of the HTTP server of the retailer computer **16**, password **872**, and account number **874**. The data included in the award database **204** may further include sub-records associated with each award offered by the retailer. Thus, an award data sub-record **876** may exist for, which may include further sub-records **877** for each award that include the information necessary to identify an award, associate the award with a win-eligible activity of an incentive program, and associate a fulfillment option with the award. Thus, a price sub-record **878** may include the price for the award. A geographic sub-record **880** may identify the geographic locations, such as the ZIP code, at which the award is available. A fulfillment sub-record **882** may include information necessary to identify fulfillment options for the award. A billing sub-record **884** may include further sub-records that include historical billing information for each sponsor who has purchased an award for offering in connection with an incentive program.

In a typical retailer inventory system **212**, an in-store intranet connects the inventory system to the point of sale apparatus, such as a computer or cash register. Most retail systems are client/server systems with the point of sale terminals utilizing the same hardware as the cash terminals, the clients, or as stand-alone clients. For individual store inventory systems, the server has an inventory database application that is accessed by each of the clients for query for product availability and that is updated based on purchases for inventory replenishment. Most of the in-store systems also have customer database connectivity in order to monitor purchasing behavior as well as perform point of sale direct response campaigns.

Large retailers typically link stores via a frame-relay, leased line or satellite networks. Smaller firms may utilize a local area network infrastructure, whereas all of the termi-

40

nals are connected and transfer information to a central location, which has a mainframe, which has inventory as well as customer database information stored. In instances where inventory is centrally managed, the server is connected via a secure gateway to a central inventory application stored on mainframe or workstation.

An embodiment of the present invention would include a retail-based information management and inventory system that consists of data communications equipment and a central server based on open systems technology. The server would perform gateway switching to outside third parties (such as credit card issuers or fulfillment card issuers, check verification services, EDI services, and the like) as well as enterprise users (host, server or client-based users) for in-house applications, including those that access customer databases. The inventory system in question would be enterprise-wide and would allow for the basic inventory tracking (stock keeping unit, SKU, availability) and replenishment applications as well as newer consumer purchasing pattern databases. The central server could perform gateway switching to outside third parties including credit card or check authorization as well as electronic fulfillment companies.

The award site **198** may also include hypertext links permitting the retailer to view information in the form of HTML documents in the step **466**, to link to the consumer site **192** in the step **467**, and to link to the sponsor site **194** in the step **469**. The award site may also permit the retailer to query the award database **204** via a gateway program, such as a CGI script, that calls a database program, such as an Oracle database program. Thus, the retailer may determine what prizes are in the database, the prices or locations of such prizes, and other information.

Referring to FIG. **14**, the system for awarding prizes is more particularly described. When a consumer wins an incentive program, a "win" message is sent at the step **422** by the application program for the incentive program. A database program, such as an Oracle program, then updates the consumer database **200** in the step **426**, to reflect that the consumer has won the incentive program. The database program also updates the sponsor database **202** at the step **428** to reflect that the incentive program has been won. The database program also updates the award database **204** to reflect that the particular consumer has won the incentive program. The application program then queries the award database to determine the closest geographic location of the retailer to the consumer's address from the consumer database **200**. The consumer is then sent a message by the application program, in the form of an HTML page, indicating the prize won and the location of the retail store at which the consumer can pick up the prize by displaying the card **11**.

The retail redemption method of fulfillment is further described. The primary components of the fulfillment portion of the process may be the retailer data input into the award database, identification of winner at the point of sale terminal via the use of a fulfillment card and billing of the incentive card company via the card issuer.

It should be understood that the award database is a collection of rewards and prizes that are a part of the incentive program of the present invention. These prizes (for promotional programs) or rewards (for incentive programs) can be products, services, discounts, points or other prizes or rewards. FIG. **22** is a flow chart **650** depicting the basic steps of award fulfillment. At a step **652**, for each award or reward several important pieces of data may be stored in the award

6,061,660

41

42

database. At a step **654** an incentive program is established, as described above. At a step **656**, the consumer wins an award, and at a step **658**, the award is redeemed at a retailer using a card. The details of the award database and the retail fulfillment are more particularly described below.

The items stored in the award database may include the method of fulfillment (i.e. by a third party, by a sponsor or by a retailer), identification numbers of the item, which may be accomplished by utilizing the retailer's inventory identifying data, a description of the item and the number of items available. In the case of retailer redemption, additional items could include a number assigned to the merchant, the merchant's store number, and the geographic location of the award or reward items, which may be sorted by zip code or area code. The prize or reward and all of the corresponding identifying or classifying information can be characterized as an award unit. An understanding of the award unit is important, because consumers may win award units, not just awards. The award unit information can be input and stored in the award database via traditional methods such as manual input via a keyboard or mouse or other automated methods such as electronic data interchange or transfer/upload from a retailer network. In each case, a filtering and verification procedure could ensure that award or prize identification data is complete and accurate. All prizes or promotion awards could be paid for in advance by the sponsoring firm.

As described above, via an interface (and after selection or design of an incentive program) a sponsor could select an award unit to be associated with a particular sponsor incentive program, and the subsequent association will be stored in the sponsor database **202**. Also included in the sponsor database is a collection of the parameters and constraints that define winning conditions for a given incentive program participant. The sponsor could also input its own awards and associated information (description, fulfillment method, etc.) in order to define the award units to be associated with the sponsor's incentive program or programs.

An example of a data structure for the sponsor database **202** may be understood by reference to FIG. **16**. The data included in the sponsor database **202** for a particular sponsor may include various records, such as the name **822**, address **824**, e-mail address **826**, phone number **828**, identification address **830** of the HTTP server of the sponsor computer **14**, password **832**, and account number **834**. The data included in the sponsor database **202** may further include sub-records associated with each incentive program for the sponsor. Thus, an incentive program data sub-record **836** may include additional sub-records **838** that include the defining algorithms and parameters for each incentive program offered by the sponsor. A winning sub-record **840** may include further sub-records **842** that include information regarding win-eligible activities by consumers in each of the sponsor's incentive programs. An award sub-record **844** may include sub-records **846** that record awards or loyalty points won or earned through consumer participation in each of the sponsor's incentive programs. A demographic and psychographic sub-record **848** may include sub-records **850** that include information obtained from consumer's through the consumer's participation in each of the sponsor's incentive programs, such as survey-completion and question-and-answer incentive programs. A billing sub-record **852** may include further sub-records **854** that include historical billing information for the sponsor for each of the sponsor's incentive programs.

A key component of the retail based redemption process is the electronic card **11** for redemption of specific prepaid products and services. The electronic card **11** may use magnetic strip technology for encoding and reading of information, or similar functionality may be achieved with a bar code, chip, smart card or other electronic card-based technology. The primary function of the card is to provide an electronic identification procedure at the check-out counter or point of sale (POS) whereby the identification information can be compared with an award winner's award information in order to authorize payment by the incentive company (via an issuer) for a particular product or service. The winning consumer's award information may include the name, identification number of the consumer and the identification of the award, e.g., the stock keeping unit, or SKU.

The electronic card **11** may carry only one-half of the data desired to authorize fulfillment, namely, the information for verifying the winning consumer. Re-loadable card technology may include both the consumer identification, the particular item to be redeemed, the monetary credit for the item and other information. Where part of the information is stored on the electronic card **11**, the other part of the information desired for authorization, verifying that the particular items or items that have been retrieved are the same items to be awarded to the cardholder, may required interaction with the retailer inventory system. Matching or verification of both pieces of information may trigger authorization and subsequent payment by the incentive company via the card issuer.

A record of the fulfilled transaction in the form of a transaction record can be aggregated for transfer to the issuer for settlement. The card issuer may be traditional issuers such as financial institutions or dining and entertainment card companies such as Discover or American Express.

A number of benefits are derived in comparison to current fulfillment procedures, as follows. The system still does not require substantial sums of working capital tied up with inventory or capital expenditures for property to house the inventory. Sponsors are able to target awards for giveaway by demographic preferences or geography. Sponsors able to incent with multiple products of various price points efficiently. The systems provides a natural paper trail for auditing purposes. The system creates increased traffic to retail outlets, even though the promotion may begin in cyberspace. The card is not necessarily a credit card and thus misuse or fraud should be kept to a minimum. The card is not necessarily a debit card as there may be no value on the card. It is potentially more functional than an in-store card because it may be acceptable across several chains or merchants or restaurants, etc., but it is similar in that it tags a purchase in order to store information about consumer purchasing behavior. The system provides more flexibility than normal discount or membership cards because it is for specific use. The system provides added benefits for merchants by card institution. Also, for fulfillment of specific items (including discounts), the system can replace some forms of regular product fulfillment, lessening the need and often saving time over shipping, etc. Further, manufacturers could launch promotions across multiple store networks with a single fulfillment card. Also, the card could enable smaller merchants to offer in-store promotions, sharing the cost to support a customer card program. A benefit of the present system over other applications such as ATM networks is that the present system can build promotions that are more powerful than just an instant win opportunity for swiping a card; the system can actually promote particular actions, such as opening of a particular account type, for example. Also, for example, the host company can launch a promotion over a supermarket intranet launched from the internet.

6,061,660

43

Referring to FIG. **24**, a flow chart **500** is provided. At a step **502** a consumer joins the host system online. Upon registering online, by phone, by mail or by other means, a consumer file is generated and stored in the consumer database at a step **504**. The consumer is assigned a unique identification number at a step **508**. Consumer account information would include name, age, address, chosen password, zip code, area code, home phone number, work number and e-mail address. All of the database information would be stored in a file behind a secure firewall in a step **510**. Upon receipt and verification of the information the incentive firm assigns a consumer account number. The name address and account number of the consumer/member is forwarded to card issuer in a step **512** for encoding and embossing with an assigned card number. The card issuer generates card numbers and the incentive firm keeps a copy of the card numbers associated with particular members. While membership numbers are to be permanent, a particular card number is associated with membership numbers. The electronic card **11** is encoded and embossed at a step **514** and mailed to the consumer along with other information on the club, including rules and regulations at a step **518**.

A registered consumer participates in an incentive program online at a step **520**. The consumer may win at a step **522**, in which case the consumer is instructed at a step **524** to go to store **Y** located a given distance from the consumer's home to pick up the award unit. (The host system uses an application program to match geographic information of an award with the geographic information of a consumer winner. If a consumer wins and no prizes are located nearby, a substitute method or prize may occur for the approximate value of the original award.) The consumer may then visit the store at a step **528**. Once in the store, the participant locates the item that is described at a step **530** and proceeds with the item and several others to the check-out counter (point of sale). All of the items that have been purchased have been scanned in as well. The consumer may present the electronic card **11** to the cashier at a step **532**, after which the cashier may scan the card **11** at a step **534**.

Having presented the card **11**, a dual matching of authorization process commences at a step **538**. Card data is used to search a table of award units and winning consumer ID numbers. Having matched the consumer ID with a winning ID, the final part of the match search is checking the items scanned to see if it matches the award unit. If both the consumer ID and the award unit is a match, the product is authorized to be claimed according the prize rules in the table. If it is a winner's redemption, the award is deducted from the bill of the consumer, to be paid for by the incentive company; if a discount, the discount is taken on the amount of a particular item(s) or for the entire purchase as appropriate. Finally, all of the winning transactions and the name and ID's of the consumers that came to pick up the prizes are uploaded or presented (paper) in a batch for payment by the issuer. The funds may be paid by the issuer or directly from the incentive company via an electronic transfer or funds or other means. Once a consumer's award is authorized, the consumer may exit with the award at a step **540**.

In an embodiment of the invention, a retailer, restaurateur or other merchant with an electronic inventory tracking and consumer database keeping capabilities is assumed, as depicted in the flow chart **542** of FIG. **25**. In this case, after the consumer wins at a step **544** a data entry is made in the winner's file at a step **546** and the incentive firm uploads the winner's file to the retail system's customer database at a step **548**; thus, incentive firms give the retailer a customer.

44

The incentive firm confirms the award units versus the award units submitted previously inputted to the award database, particularly in case of a need for substitution on the retail level and to avoid consumer-merchant dispute.

Next, the consumer receives instructions at a step **552** to visit a retail store, and the consumer presents the card **11** at a point-of-sale terminal at a step **554**. When the card is scanned, the retail system software locates and confirms that the consumer is a pre-registered fulfillment card customer at a step **558**. Then it checks to match any item (product or service) that was scanned via the point of sale terminal with the pre-paid item in their consumer database record at a step **560**. If the consumer does not appear in the database, then a check is made of the input at a step **562**. If the input was correct, but the item was not found, the consumer is referred to the issuer at a step **564**. If the consumer is registered as a winner, then the consumer presents the card **11** for the given promotion at a step **568**. The system then identifies the prize in the retailer inventory system **212** at a step **570**. A query is made to the winner's file at a step **572** to match the prize to the winner. At a step **574** a check is made to determine if the award is at the point of sale. If at a step **576** the award is available, the consumer is notified at a step **578** and the consumer is given the prize. If the award is not available at the step **576**, the system checks for an equivalent substitute at a step **580**. If no equivalent is available, the consumer is referred to the issuer at a step **582**. Otherwise, the consumer is provided a substitute at a step **584**. If the award is available, or a substitute is available, then the retailer credits the consumer's bill for the amount of the award or applies a discount at a step **586**. The consumer receives an authorization code on a receipt at a step **588**. The consumer may then exit with the award at a step **590**. If the item has been presented by the time of the total, the system deducts full amount for prize won or applies a discount as appropriate. The winner's file has the specification. The winner's file is a consumer database record and indicates the availability of in-store credit for a particular item or items or a discount.

If the consumer is a winner, but failed to retrieve the winning item, the transaction printout will provide the note for the product to be retrieved. The fulfilled transactions data, including the incentive firm ID, number of the persons, the name of the persons, and products or services won will collected at a step **592** and uploaded at a step **594** periodically via a batch file to the incentive firm via the issuer for remittance of funds, less any transaction costs as contracted. The incentive firm may then confirm the award at a step **596** and fulfill funds to the retailer at a step **598**.

The same can be accomplished with varying degrees of merchant sophistication, including single store merchants with manual inventory tracking procedures. The system for a less sophisticated merchant may be seen in a flow chart **600** of FIG. **26**. When the consumer wins at a step **602**, a data entry is created in a winner's table at a step **604** in the consumer database and the winner's table is updated online at a step **606**. In the case of these less sophisticated merchants, upon presentation of an item at check-out they would be able to access the award database by dedicated line dial-up, or phone call, and after imputting the store's password, would have online access to a winner's file that have items to redeem in their store as well as the card numbers and individuals that have won the information.

At a step **608** the consumer is instructed to visit a retailer to obtain a prize. The consumer presents the card **11** or a promotional item at a step **610**. The retailer dials the winner's database at a step **612**, inputs the card ID number

6,061,660

45

at a step **614**, and determines a match at a step **616**. In the absence of a match at the step **616**, the retailer checks the input at a step **618** and, still failing a match, refers the consumer to the issuer at a step **620**. If a match occurs at the step **616**, the retailer inputs the stock keeping unit number, or SKU at a step **622** and queries the consumer database for a match at a step **624**. Absent a match after checking for correct input at a step **626**, the retailer refers the consumer to the issuer at a step **628**. If a match occurs, the retailer receives an authorization code online or by phone from the host system at a step **630**. The retailer then provides a receipt at a step **632** that is signed by the consumer, in which case the consumer may then exit the store with the award.

Next, at a step **634** award transactions are collected, and at a step **636** are sent to the incentive firm by the issuer. The issuer confirms the award units and ID numbers at a step **638** and pays the funds to the retailer at a step **640**.

If after inputting the particular product or service ID of the item presented and the card identification number for the consumer, there is a match with the winning consumer and award unit information, an authorization number will be given for the merchant. A picture ID of the cardholder may also be required by the less sophisticated inventory system in the case of a lack of electronic verification procedures. The merchant will then present all of the transaction records with the authorization codes to the issuer for payment.

A further depiction of the databases of the current invention may be accomplished by reference to FIG. **15**. The consumer database **200** may be a conventional database, such as an Oracle database. An application program, such as an Oracle Program controls the input of data into the database, the structure of data records in the database, and the modification of or addition to data in the database. The consumer database **200** consists of records for each registered consumer. Thus, a record is initially added to the database upon registration by a consumer. The database is then updated as new consumers are added, and the record for each customer is updated upon the occurrence of specific events, including participation in an incentive program, winning an incentive program, completion of a survey, and the like. Each event that requires an update of the consumer database **200** calls the application program necessary to modify the relevant records in the consumer database **200**. The data structures of the consumer database **200** are dynamic; that is, the structures permit different incentive programs to access different data. Thus, the sponsor may customize an incentive program by requiring the consumer to complete a survey of information desired by the sponsor and the consumer database **200** will store and permit manipulation and retrieval of such information.

The sponsor database **202** may also be a conventional database, such as an Oracle database. An application program, such as an Oracle Program, controls the input of data into the database, the structure of data records in the database, and the modification of or addition to data in the database. The sponsor database **202** consists of records for each registered sponsor, as well as associated records for each incentive program of the sponsor, and each prize purchased by the sponsor and associated with each incentive program. Thus, a record is initially added to the database upon registration by a sponsor. The database is then updated as new sponsors are added, and the record for each sponsor is updated upon the occurrence of specific events, including consumer participation in an incentive program, consumer's winning an incentive program, purchase of an incentive program, building of an incentive program, selection of a prize, selection of a fulfillment option, and the like. Each

46

event that requires an update of the sponsor database calls the application program necessary to modify the relevant records in the sponsor database.

The award database **204** is also a conventional database, such as an Oracle database. An application program, such as an Oracle Program controls the input of data into the database, the structure of data records in the database, and the modification of or addition to data in the database. The award database consists of records for each registered retailer, as well as associated records for the retailer, including the prizes offered by the retailer, the prices of such prizes, the geographic location of the prizes, and any other information entered by the retailer, including information directly provided to the award database **204** through an electronic data interchange **126** connected by a custom interface with the inventory system **212** of the retailer. An application program connects the award database to the retailer's inventory system, so that each prize recorded in the award database can be tied, by an inventory number or SKU, to the exact item, or type of items, in the inventory of the retailer. In particular, the award database **204** can identify the geographic location of the prize, so that an application program can determine the closest geographic location of the retailer to the location of the consumer who has won a particular prize. The database is then updated as new retailers are added, and the record for each retailer is updated upon the occurrence of specific events, including a retailer's adding a new prize, purchase of a prize, a consumer winning a prize, selection of a fulfillment option, and the like. Each event that requires an update of the award database calls the application program, such as an Oracle program, necessary to modify the relevant records in the award database.

Referring to FIG. **21**, a flow chart **660** depicts the flow of information among the components of the present invention. The consumer database **200** permits a query at a step **662** to determine whether a consumer has won a prize. The consumer database accesses the winner's file at a step **664** and identifies the fulfillment method associated with the winner at a step **668**. Next, at steps **670**, **672** and **674**, the host system creates a file of the information obtained in the query for a retailer, a sponsor, or a third party. If the fulfillment is to be by a third party, the information is mailed at a step **676** to the third party for fulfillment. If the sponsoring firm is to fulfill the prize, the file is mailed at a step **678** to the sponsor. Otherwise, the retail database **204** is parsed by retailer at a step **680** and the file is transferred to the appropriate retailer at a step **682**. The retailer verifies that the cardholder is the winner of the prize at a step **684**, and the consumer collects the prize at a step **686**. At a step **688**, the retailer completes a report. At a step **690**, the retailer creates a file of information regarding prizes fulfilled. At a step **692**, the retailer uploads the file and supplies it to the incentive firm. At a step **694** the incentive firm verifies the information and pays the retailer.

From the consumer perspective, at a step **696**, the consumer is issued a card. The consumer wins a promotion at a step **698** and is instructed, at a step **700** to retrieve the prize. At a step **702**, the consumer collects the prize and, at a step **704**, presents the prize to the retailer for fulfillment, at which point the retailer verifies and awards the prize at the steps **684** and **686**.

While the invention has been disclosed in connection with the preferred embodiments shown and described in detail, various modifications and improvements thereon will become readily apparent to those skilled in the art. Accordingly, the spirit and scope of the present invention is to be limited only by the claims.

6,061,660

47

What is claimed is:

1. A system for incentive program generation, comprising:

a network;

a sponsor computer connected to the network;

a host computer connected to the network, the host computer having a server;

an incentive application builder program, running on the server;

a database of objects associated with parameters of an incentive application program; and

an interface of the incentive program builder application for sponsor entry of parameters for an incentive program; wherein the sponsor builds an incentive program by interacting with the application program.

2. The system of claim 1, wherein the incentive application program comprises:

an editor for generating an electronic file containing code for the incentive program;

a classifying application program for classifying the code in numbers that represent the elements of the code; and

a generator application program for generating tables of the numbers that represent the code for the incentive program.

3. The system of claim 1, further comprising:

an award association application program for associating an award with an incentive program.

4. The system of claim 1, further comprising:

a game piece, associated with the incentive application program, wherein the game piece comprises a branded image of a provider of an incentive program.

5. The system of claim 1, further comprising:

a fulfillment automation application program for associating a fulfillment method with the award.

6. The system of claim 2, further comprising:

an executor application that is capable of interpreting the tables and executing the code.

7. A method for generating an incentive program, comprising:

providing a computer;

providing an incentive program builder application of such computer;

providing a database of objects associated with parameters of an incentive program;

providing an interface of the incentive program builder application for user entry of parameters for an incentive program;

associating an object with each parameter entered by the user; and

generating an incentive program comprising the objects associated with all of the parameters entered by the user.

8. The method of claim 7, further comprising:

generating an electronic file containing code for the incentive program;

classifying the code in numbers that represent the elements of the code; and

generating tables of the numbers that represent the code for the incentive program.

9. The method of claim 8, further comprising:

providing an executor that is capable of interpreting the tables and executing the code.

10. A system for incentive program generation and award fulfillment, comprising:

48

a host computer connected to a network;

a client computer of a consumer connected to the network;

a sponsor computer of a sponsor connected to the network;

an incentive participation application program for participation by the consumer in an incentive program, wherein the participation may be in incentive programs of a plurality of sponsors;

a server of the host computer;

a web site, located on the server of the host computer, wherein the consumer may participate in an incentive program via the web site;

a database of the host computer of awards associated with the incentive participation application programs;

an award association application program for associating an award with an incentive program;

a fulfillment automation application program for associating a fulfillment method with an award;

an electronic card for fulfillment of an award, having memory for storing information associated with the consumer, wherein the information may be a personal identification number or information associated with the consumer's participation in an incentive program; and

an incentive builder application program, running on the server of the host computer, wherein the sponsor may build an incentive program by interacting with the incentive builder application program, wherein the incentive builder application program comprises a database of objects associated with incentive programs, wherein each object is associated with an action that is associated with the incentive program, an interface for permitting a sponsor to enter parameters associated with an incentive program, an object association application for associating objects with the parameters entered by a sponsor and building a file comprising the objects associated with all of the parameters entered by a sponsor, an editor for generating an electronic file containing code for the incentive program, a classifying application program for classifying the code in numbers that represent the elements of the code, a generator application program for generating tables of the numbers that represent the code for the incentive program, and an executor application that is capable of interpreting the tables and executing the code.

11. The system of claim 10, further comprising:

a graphical image file that is displayed in connection with an object, wherein the graphical image file is a branded image, wherein the object is a game piece in an incentive program, wherein the object is displayed upon winning an incentive program, wherein the graphical image file may change, and wherein the graphical image file that is displayed depends on characteristics of the user.

12. A method of providing incentive program generation and award fullfillment, comprising:

providing a host computer connected to a network;

providing a client computer of a consumer connected to the network;

providing a sponsor computer of a sponsor connected to the network;

providing an incentive participation application program for participation by the consumer in an incentive

6,061,660

<table>
<tr><td>49</td><td>50</td></tr>
</table>

program, wherein the participation may be in incentive programs of a plurality of sponsors;

providing a server of the host computer;

providing a web site, located on the server of the host computer, wherein the consumer may participate in an incentive program via the web site;

providing a database of the host computer of awards associated with the incentive participation application programs;

associating an award with an incentive program;

associating a fulfillment method with an award;

providing an electronic card for fulfillment of an award, having memory for storing information associated with the consumer, wherein the information may be a personal identification number or information associated with the consumer's participation in an incentive program; and

providing an incentive builder application program, running on the host computer, wherein the sponsor may build an incentive program by interacting with the incentive builder application program, wherein the incentive builder application program comprises a database of objects associated with incentive programs, wherein each object is associated with an action that is associated with the incentive program, an interface for permitting a sponsor to enter parameters associated with an incentive program, an object association application for associating objects with the parameters entered by a sponsor and building a file comprising the objects associated with all of the parameters entered by a sponsor, an editor for generating an electronic file containing code for the incentive program, a classifying application program for classifying the code in numbers that represent the elements of the code, a generator application program for generating tables of the numbers that represent the code for the incentive program, and an executor application that is capable of interpreting the tables and executing the code.

**13**. The method of claim **12**, further comprising:

displaying a graphical image file in connection with an object, wherein the graphical image file is a branded image, wherein the object is a game piece in an incentive program, wherein the object is displayed upon winning an incentive program, wherein the graphical image file may change, and wherein the graphical image file that is displayed depends on characteristics of the user.

**14**. A method of incentive program generation, comprising:

providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;

providing an incentive application builder program, running on the host computer;

providing a database of objects associated with parameters of said incentive application builder program; and

providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program; wherein the sponsor builds an incentive program by interacting with the application program.

**15**. A method of claim **14**, further comprising:

providing a database of awards associated with the incentive program; and

automating fulfillment of awards for the incentive program, wherein automating fulfillment permits the sponsor to select and enter a mode of fulfillment selected from a plurality of possible modes for a specific award won in an incentive program, determines a fulfillment location for the specific award pursuant to the selected fulfillment mode and updates the database of awards to reflect the selection of the award and the determination of the fulfillment location.

\*    \*    \*    \*    \*

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10496th)

# United States Patent

## Eggleston et al.

(10) **Number:** **US 6,061,660 C1**

(45) **Certificate Issued:** **Feb. 6, 2015**

(54) **SYSTEM AND METHOD FOR INCENTIVE PROGRAMS AND AWARD FULFILLMENT**

(75) Inventors: **York Eggleston**, Baltimore, MD (US); **Andrey Ukhov**, Washington, DC (US)

(73) Assignee: **Kroy IP Holdings LLC**, Baltimore, MD (US)

**Reexamination Request:**
No. 90/013,245, May 19, 2014

**Reexamination Certificate for:**
Patent No.: **6,061,660**
Issued: **May 9, 2000**
Appl. No.: **09/040,490**
Filed: **Mar. 18, 1998**

### Related U.S. Application Data

(60) Provisional application No. 60/063,180, filed on Oct. 20, 1997, provisional application No. 60/067,776, filed on Dec. 10, 1997.

(51) **Int. Cl.**
*G06Q 30/00* (2012.01)

(52) **U.S. Cl.**
USPC .................. **705/14.12**; 705/14.36; 705/14.39

(58) **Field of Classification Search**
USPC ................................ 705/14.12, 14.36, 14.39
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,245, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Jason Proctor

(57) **ABSTRACT**

A method and system for providing incentive programs over a computer network is provided in which a host may provide sponsoring companies with the capability to buy prepackaged or self-built incentive programs, offer such incentive programs to consumers, provide sponsoring companies and retailers with the capability to associate prizes with incentive programs, provide sponsoring companies, retailers and consumers with convenient fulfillment of prizes, and store and manipulate databases regarding all of the foregoing.



US 6,061,660 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.**

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims **1**, **2**, **4**, **7** and **14** are determined to be patentable as amended.

New claims **16-115** are added and determined to be patentable.

Claims **3**, **5**, **6**, **8-13** and **15** were not reexamined.

**1**. A system for incentive program generation, comprising:
a network;
a sponsor computer connected to the network;
a host computer connected to the network, the host computer having a server;
an incentive *program builder* application [builder program], running on the server;
a database of objects associated with parameters of [an] *the* incentive [application] program *builder application*; and
an interface of the incentive program builder application for sponsor entry of parameters for an incentive program[;]*.*
wherein the sponsor builds an incentive program by interacting with the [application] *incentive* program *builder application,*
*wherein the host computer is configured to receive first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors, receive second input from a consumer selecting an incentive program from among the plurality of incentive programs, issue an award to the consumer corresponding to the selected incentive program, receive a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program, and validate the award,*
*wherein the host, the sponsor, and the consumer are different entities, and*
*wherein the host and the sponsor are different individuals or corporate entities.*
**2**. The system of claim **1**, wherein the incentive *program builder* application [program] comprises:
an editor for generating an electronic file containing code for the incentive program;
a classifying application program for classifying the code in numbers that represent the elements of the code; and
a generator application program for generating tables of the numbers that represent the code for the incentive program.
**4**. The system of claim **1**, further comprising:
a game piece, associated with the incentive [application] program, wherein the game piece comprises a branded image of a provider of an incentive program.

**2**

**7**. A method for generating an incentive program, comprising:
providing a computer;
providing an incentive program builder application of such computer;
providing a database of objects associated with parameters of an incentive program;
providing an interface of the incentive program builder application for [user] *sponsor* entry of parameters for an incentive program;
*receiving first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors;*
associating an object *in the database* with each parameter entered by the [user] *plurality of sponsors*; [and]
generating [an incentive program] *the plurality of incentive programs* comprising the objects associated with all of the parameters entered by the [user] *plurality of sponsors;*
*receiving second input from a consumer selecting an incentive program from among the plurality of incentive programs;*
*issuing an award to the consumer corresponding to the selected incentive program;*
*receiving a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program; and*
*validating the award.*
**14**. A method of incentive program generation, comprising:
providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;
providing an incentive *program builder* application [builder program], running on the host computer;
providing a database of objects associated with parameters of said incentive *program builder* application [builder program]; [and]
providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program[;]*,* wherein the sponsor builds an incentive program by interacting with the [application] *incentive* program *builder application;*
*receiving first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors;*
*receiving second input from a consumer selecting an incentive program from among the plurality of incentive programs;*
*issuing an award to the consumer corresponding to the selected incentive program;*
*receiving a request to validate the award from a sponsor among the plurality of sponsors associated with the selected incentive program; and*
*validating the award.*
*16. The system of claim 1, wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host.*
*17. The system of claim 16, wherein the host computer is configured to host a website of the host through which the sponsor builds the incentive program.*

US 6,061,660 C1

3

18. The system of claim 17, wherein the interface is configured to allow the sponsor to build the incentive program by interacting with the interface through the website of the host.

19. The system of claim 18, wherein the sponsor interacting with the interface to build the incentive program comprises the interface receiving the sponsor entry of the parameters.

20. The system of claim 19, wherein the parameters comprise a duration of the incentive program.

21. The system of claim 19, wherein the parameters comprise a start date of the incentive program.

22. The system of claim 19, wherein the parameters comprise a number of consumers eligible to participate in the incentive program offered by the sponsor.

23. The system of claim 19, wherein the parameters comprise eligibility rules for permitting consumer participation in the incentive program.

24. The system of claim 19, wherein the parameters comprise an age of the consumer.

25. The system of claim 19, wherein the parameters comprise a location for fulfillment of the promotion.

26. The system of claim 19, wherein the parameters comprise merchandise offered by the sponsor to the consumer.

27. The system of claim 19, wherein the parameters comprise a discount offered by the sponsor to the consumer.

28. The system of claim 19, wherein the parameters comprise a service offered by the sponsor to the consumer.

29. The system of claim 16, wherein an interface of a website of the host receives consumer interaction to participate in the incentive program.

30. The system of claim 29, wherein the consumer interaction comprises the consumer registering at the website of the host.

31. The system of claim 29, wherein the website of the host is configured to provide a fulfillment location of the promotion based upon geographic location of the consumer.

32. The system of claim 29, wherein the website of the host is configured to provide a fulfillment location of the promotion based upon a geographic location selected by the consumer.

33. The method of claim 7, wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host.

34. The method of claim 33, wherein the host computer is configured to host a website of the host through which the sponsor builds the incentive program.

35. The method of claim 34, wherein the interface is configured to allow the sponsor to build the incentive program by interacting with the interface through the website of the host.

36. The method of claim 35, wherein the sponsor interacting with the interface to build the incentive program comprises the interface receiving the sponsor entry of the parameters.

37. The method of claim 36, wherein the parameters comprise a duration of the incentive program.

38. The method of claim 36, wherein the parameters comprise a start date of the incentive program.

39. The method of claim 36, wherein the parameters comprise a number of consumers eligible to participate in the incentive program offered by the sponsor.

40. The method of claim 36, wherein the parameters comprise eligibility rules for permitting consumer participation in the incentive program.

41. The method of claim 36, wherein the parameters comprise an age of the consumer.

42. The method of claim 36, wherein the parameters comprise a location for fulfillment of the promotion.

43. The method of claim 36, wherein the parameters comprise merchandise offered by the sponsor to the consumer.

4

44. The method of claim 36, wherein the parameters comprise a discount offered by the sponsor to the consumer.

45. The method of claim 36, wherein the parameters comprise a service offered by the sponsor to the consumer.

46. The method of claim 33, further comprising:
receiving consumer interaction through a website of the host to participate in the incentive program.

47. The method of claim 46, wherein the receiving comprises:
receiving consumer registration information through the website of the host.

48. The method of claim 33, further comprising:
providing a fulfillment location of the promotion based upon geographic location of the consumer.

49. The method of claim 33, further comprising:
providing a fulfillment location of the promotion based upon a geographic location selected by the consumer.

50. The method of claim 14, wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host.

51. The method of claim 50, wherein the host computer is configured to host a website of the host through which the sponsor builds the incentive program.

52. The method of claim 51, wherein the interface is configured to allow the sponsor to build the incentive program by interacting with the interface through the website of the host.

53. The method of claim 52, wherein the sponsor interacting with the interface to build the incentive program comprises the interface receiving the sponsor entry of the parameters.

54. The method of claim 53, wherein the parameters comprise a duration of the incentive program.

55. The method of claim 53, wherein the parameters comprise a start date of the incentive program.

56. The method of claim 53, wherein the parameters comprise a number of consumers eligible to participate in the incentive program offered by the sponsor.

57. The method of claim 53, wherein the parameters comprise eligibility rules for permitting consumer participation in the incentive program.

58. The method of claim 53, wherein the parameters comprise an age of the consumer.

59. The method of claim 53, wherein the parameters comprise a location for fulfillment of the promotion.

60. The method of claim 53, wherein the parameters comprise merchandise offered by the sponsor to the consumer.

61. The method of claim 53, wherein the parameters comprise a discount offered by the sponsor to the consumer.

62. The method of claim 53, wherein the parameters comprise a service offered by the sponsor to the consumer.

63. The method of claim 50, further comprising:
receiving consumer interaction through a website of the host to participate in the incentive program.

64. The method of claim 63, wherein the receiving comprises:
receiving consumer registration information through the website of the host.

65. The method of claim 50, further comprising:
providing a fulfillment location of the promotion based upon geographic location of the consumer.

66. The method of claim 50, further comprising:
providing a fulfillment location of the promotion based upon a geographic location selected by the consumer.

67. The method of claim 14, wherein the host computer is provided by a host through which the sponsor offers the incentive program to a consumer.

US 6,061,660 C1

| 5 | 6 |
|---|---|

**5**

68. The method of claim 67, wherein the award is a coupon.

69. The method of claim 67, wherein the award is a coupon for redemption of merchandise or services at the sponsor.

70. The method of claim 67, further comprising:

providing the incentive program to a consumer based on the demographic information of a consumer.

71. The method of claim 67, further comprising:

providing the incentive program to a consumer based on the psychographic information of a consumer.

72. The method of claim 67, further comprising:

providing the incentive program to a consumer based on the demographic and psychographic information of a consumer.

73. The method of claim 67, further comprising:

providing a sponsor selected geographic location for fulfillment of the incentive program.

74. The method of claim 67, further comprising:

compensating the sponsor according to a value of the award, in response to validating the award.

75. The method of claim 14, wherein the sponsor builds the incentive program by interacting with the incentive program builder application to select a prepackaged incentive program comprising a set of preset parameters.

76. The method of claim 14, wherein the award comprises a coupon offered to the consumer by the sponsor.

77. The method of claim 14, wherein the award comprises a bearer instrument offered to the consumer by the sponsor.

78. The method of claim 14, wherein the award is redeemed in response to the validating.

79. The method of claim 14, wherein the award is redeemed by the sponsor.

80. The method of claim 14, wherein the award is redeemed by a retailer.

81. The method of claim 80, wherein the retailer and the host are a same individual or corporate entity.

82. The method of claim 81, wherein the issuing comprises issuing the award to the consumer in accordance with the incentive program based on inventory of the retailer in an inventory management system of the retailer.

83. The method of claim 80, wherein the sponsor and the retailer are a same individual or corporate entity.

84. The method of claim 83, wherein the issuing comprises issuing the award to the consumer in accordance with the incentive program based on inventory of the retailer in an inventory management system of the retailer.

85. The method of claim 14, wherein the issuing comprises issuing the award to the consumer in accordance with the incentive program based on inventory of the sponsor in an inventory management system of the sponsor.

86. The method of claim 14, wherein the award comprises a game piece, associated with the incentive program, wherein the game piece comprises a branded image of a provider of an incentive program.

87. A system for incentive program generation, comprising:

a network;

a sponsor computer connected to the network;

a host computer connected to the network, the host computer having a server;

an incentive program builder application, running on the server;

a database of objects associated with parameters of the incentive program builder application; and

an interface of the incentive program builder application for sponsor entry of parameters for an incentive pro-

**6**

gram, wherein the sponsor builds an incentive program by interacting with the incentive program builder application,

wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer,

wherein the host, the sponsor, and the consumer are different entities,

wherein the host and the sponsor are different individuals or corporate entities,

wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host,

wherein an interface of a website of the host receives consumer interaction to participate in the incentive program,

wherein the consumer interaction comprises a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors.

88. The system of claim 87, wherein the consumer request comprises a request to search for the promotions using a name of the sponsor from among the plurality of sponsors.

89. The system of claim 87, wherein the consumer request comprises a request to search for the promotions using a type of promotion from among the plurality of promotions.

90. The system of claim 87, wherein the consumer request comprises a request to search a directory of promotions.

91. A method for generating an incentive program, comprising:

providing a computer;

providing an incentive program builder application of such computer;

providing a database of objects associated with parameters of an incentive program;

providing an interface of the incentive program builder application for user entry of parameters for an incentive program;

associating an object with each parameter entered by the user;

generating an incentive program comprising the objects associated with all of the parameters entered by the user;

wherein the computer is a host computer provided by a host through which a sponsor offers the incentive program to a consumer,

wherein the host, the sponsor, and the consumer are different entities, and

wherein the host and the sponsor are different individuals or corporate entities,

wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host;

receiving consumer interaction through a website of the host to participate in the incentive program

wherein the receiving comprises:

receiving a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors.

92. The method of claim 91, wherein the receiving a consumer request comprises:

receiving a request to search for the promotions using a name of the sponsor from among the plurality of sponsors.

93. The method of claim 91, wherein the receiving a consumer request comprises:

receiving a request to search for the promotions using a type of promotion from among the plurality of promotions.

US 6,061,660 C1

7

94. The method of claim 91, wherein the receiving a consumer request comprises:

receiving a request to search a directory of promotions.

95. A method of incentive program generation, comprising:

providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;

providing an incentive program builder application, running on the host computer; builder application;

providing a database of objects associated with parameters of said incentive program builder application;

providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program,

wherein the sponsor builds an incentive program by interacting with the incentive program builder application,

wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer,

wherein the host, the sponsor, and the consumer are different entities, and

wherein the host and the sponsor are different individuals or corporate entities,

wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host; and

receiving consumer interaction through a website of the host to participate in the incentive program,

wherein the receiving comprises:

receiving a consumer request to search for promotions from among a plurality of promotions offered to the consumer by a plurality of sponsors.

96. The method of claim 95, wherein the receiving a consumer request comprises:

receiving a request to search for the promotions using a name of the sponsor from among the plurality of sponsors.

97. The method of claim 95, wherein the receiving a consumer request comprises:

receiving a request to search for the promotions using a type of promotion from among the plurality of promotions.

98. The method of claim 95, wherein the receiving a consumer request comprises:

receiving a request to search a directory of promotions.

99. The method of claim 95, further comprising:

issuing an award to the consumer corresponding to the incentive program;

receiving a request to validate the award; and

validating the award.

100. A method of incentive program generation and redemption, comprising:

providing a host computer, said host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;

providing an incentive program builder application, running on the host computer;

providing a database of objects associated with parameters of said incentive program builder application;

providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program offered to a customer, wherein the sponsor builds an incentive program by interacting with the interface of the incentive program builder application;

8

issuing an award to the consumer in accordance with the incentive program, wherein the incentive program is a promotion of the sponsor to the consumer facilitated by the host;

receiving, from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer;

validating the award using the database,

wherein the host, the sponsor, and the consumer are different individuals or corporate entities,

wherein the host computer is provided by a host through which the sponsor offers the incentive program to a consumer,

wherein the host computer hosts a website of the host through which the sponsor builds the incentive program; and

providing an interface of a website of the host, wherein the consumer interacts with the interface to participate in the incentive program,

wherein the website of the host provides to the consumer incentive programs of a plurality of sponsors.

101. A method of incentive program generation and redemption, comprising:

providing a host computer, said host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;

providing an incentive program builder application, running on the host computer;

providing a database of objects associated with parameters of said incentive program builder application;

providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program offered to a customer, wherein the sponsor builds an incentive program by interacting with the interface of the incentive program builder application;

issuing an award to the consumer in accordance with the incentive program, wherein the incentive program is a promotion of the sponsor to the consumer facilitated by the host;

receiving, from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer;

validating the award using the database,

wherein the host, the sponsor, and the consumer are different individuals or corporate entities,

wherein the host computer is provided by a host through which the sponsor offers the incentive program to a consumer; and

providing the number of awards that remain to be issued before issuing the award to the consumer.

102. The method of claim 101, further comprising:

providing the number of awards that remain to be issued after issuing the award to the consumer.

103. A method of incentive program generation, comprising:

providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;

providing an incentive program builder application, running on the host computer;

providing a database of objects associated with parameters of said incentive program builder application; and

providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program,

US 6,061,660 C1

9

*wherein the sponsor builds an incentive program by interacting with the incentive program builder application,*

*wherein the host computer is provided by a host, the host computer configured to allow the sponsor to offer the incentive program to a consumer,*

*wherein the host, the sponsor, and the consumer are different entities,*

*wherein the host and the sponsor are different individuals or corporate entities,*

*wherein the incentive program is a promotion of the sponsor offered to the consumer and facilitated by the host; and*

*issuing an electronic card to the consumer, the electronic card storing information of the consumer for accessing the promotion of the sponsor offered to the consumer.*

*104. The method of claim 103, further comprising validating participation of the consumer in the promotion using the electronic card.*

*105. The method of claim 103, further comprising validating the award using the database and the electronic card.*

*106. The method of claim 103, wherein the electronic card indicates participation of the consumer in the promotion.*

*107. A method of incentive program generation and redemption, comprising:*

*providing a host computer, said host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;*

*providing an incentive program builder application, running on the host computer;*

*providing a database of objects associated with parameters of said incentive program builder application;*

*providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program offered to a customer, wherein the sponsor builds an incentive program by interacting with the interface of the incentive program builder application;*

*issuing an award to the consumer in accordance with the incentive program, wherein the incentive program is a promotion of the sponsor to the consumer facilitated by the host;*

*receiving, from the sponsor, a request to validate the award, wherein the award is received by the sponsor from the consumer;*

*validating the award using the database,*

*wherein the host, the sponsor, and the consumer are different individuals or corporate entities; and*

10

*issuing an electronic card to the consumer, the electronic card storing information of the consumer for accessing the promotion of the sponsor offered to the consumer.*

*108. The method of claim 107, further comprising validating participation of the consumer in the promotion using the electronic card.*

*109. The method of claim 107, wherein the validating comprises validating the award using the database and the electronic card.*

*110. The method of claim 107, wherein the electronic card indicates participation of the consumer in the promotion.*

*111. A method of incentive program generation, comprising:*

*providing a host computer connected to a network for hosting a sponsor having a sponsor computer connected to the network;*

*providing an incentive program builder application, running on the host computer;*

*providing a database of objects associated with parameters of said incentive program builder application;*

*providing an interface of the incentive program builder application for sponsor entry of parameters for an incentive program, wherein the sponsor builds an incentive program by interacting with the incentive program builder application;*

*receiving first input from a plurality of sponsors corresponding to the parameters for creating a plurality of incentive programs associated with the plurality of sponsors via the interface of the incentive program builder application from a plurality of sponsors;*

*receiving second input from a consumer selecting an incentive program from among the plurality of incentive programs;*

*issuing an award to the consumer corresponding to the selected incentive program;*

*receiving a request to validate the award; and*

*validating the award.*

*112. The method of claim 111, wherein the validating comprises validation with a database of goods or services from an inventory system.*

*113. The method of claim 111, wherein the validating comprises validation done against an award database.*

*114. The method of claim 111, wherein the validating comprises validation done with database of consumers.*

*115. The method of claim 111, wherein the validating comprises validation done against an award database, good or service from an inventory system and a database of consumers.*

\*    \*    \*    \*    \*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing motion complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared in a proportionally spaced typeface in 14-point font and includes 9,556 words, excluding the parts exempted under those Rules.

*/s/ Timothy Devlin*
Timothy Devlin

*Attorney for Plaintiff-Appellant*
*Kroy IP Holdings, LLC*